Docket No. 11-56986

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

SGT. JEFFREY S. SARVER,

**Plaintiff-Appellant**

**vs.**

**NICHOLAS CHARTIER; et. al.,**

Defendants-Appellees.

On Appeal from the United States District Court, Central District of California
No. 2:10-CV-09034 JHN-JC
**JUDGE JACQUELINE H. NGUYEN**

## EXCERPTS OF RECORD – VOL. II
(pgs. 71-228)

Submitted by:

Michael R. Dezsi
Law Office of Michael R. Dezsi, PLLC
615 Griswold, Suite 700
Detroit, MI 48226
(313)281-8090
www.dezsilaw.com
*Counsel for Plaintiff-Appellant*

## INDEX TO EXCERPTS OF RECORD

### VOLUME I

| Description of Entry | Record Entry No. | Excerpts Page No. |
|---|---|---|
| Judgment | R.160 | 1 |
| Judgment | R.159 | 3 |
| Order Denying Plaintiff's Motion Stay Execution and Waiver of Bond Pending Appeal | R.156 | 5 |
| Judgment | R.154 | 11 |
| Tentative Ruling | R.149-2 | 13 |
| Order Granting Def Motions to Strike | R.129 | 37 |
| In Chambers Order (minute entry) | R.123 | 59 |
| Order Denying Motion to Dismiss | R.55 | 60 |
| Opinion | R.54 | 62 |

### VOLUME II

| Description of Entry | Record Entry No. | Excerpts Page No. |
|---|---|---|
| Notice of Appeal | R.161 | 71 |
| Notice of Appeal | R.135 | 73 |
| Transcript of proceedings held on 8/8/2011 | R.130 | 75 |
| Declaration of First Sgt. Paul Wilcock | R.110-1 | 107 |
| Declaration of Sgt. Sarver with Exhibits A-D | R.105 | 112 |
| Declaration of Mark Boal | R.98-1 | 153 |
| Complaint | R.1 | 174 |
| Civil Docket Entries for District Court | n/a | 200 |

1  Erik L. Jackson (SBN 166010)
   ejackson@cozen.com
2  Nathan M. Dooley (SBN 224331)
   ndooley@cozen.com
3  COZEN O'CONNOR
   601 S. Figueroa Street, Suite 3700
4  Los Angeles, CA 90017
   Telephone: 213.892.7900
5  Toll Free Phone: 1.800.563.1027
   Facsimile: 213.892.7999
6
   Todd J. Weglarz (*pro hac vice*)
7  tweglarz@weglarzlaw.com
   Law Offices of Todd J. Weglarz
8  30903 Northwest Highway, Suite 250
   Farmington Hills, Michigan 48334
9  Telephone: 248.539.9081
   Facsimile: 248.413.2647
10

11 Attorneys for Plaintiff
   SGT. JEFFREY S. SARVER
12

13              UNITED STATES DISTRICT COURT

14         FOR THE CENTRAL DISTRICT OF CALIFORNIA

15

16 SGT. JEFFREY S. SARVER,              Case No.: 2:10-cv-09034-JHN (JCx)

17              Plaintiff,              **PLAINTIFF'S NOTICE OF
                                        APPEAL TO THE UNITED
18     vs.                             STATES COURT OF APPEALS
                                        FOR THE NINTH CIRCUIT**
19 THE HURT LOCKER, LLC, MARK
   BOAL, KATHRYN BIGELOW, GREG
20 SHAPIRO, NICOLAS CHARTIER,
   TONY MARK, DONALL McCUSKER,
21 SUMMIT ENTERTAINMENT, LLC,
   VOLTAGE PICTURES, LLC,
22 GROSVENOR PARK MEDIA, LP,
   FIRST LIGHT PRODUCTIONS, INC.,
23 KINGSGATE FILMS, INC., and
   PLAYBOY ENTERPRISES, INC.,
24 Jointly and Severally,

25              Defendants.

26

27        Notice is hereby given that Sgt. Jeffrey S. Sarver, the plaintiff herein, hereby

28 appeals to the United States Court of Appeals for the Ninth Circuit from the final

                                    1

1    judgment of the District Court, entered in this case on October 13, 2011, and all

2    interlocutory orders that gave rise to that judgment, including but not limited to:

3       1. Order denying Plaintiff's Motion for stay of Execution and Waiver of Bond

4    Pending Appeal. [Doc. No. 156.]

5

6    Dated: March 5, 2012            COZEN O'CONNOR

7

8                      By: /s/ Erik L. Jackson

9                         Erik L. Jackson
                           Attorneys for Plaintiff

10                      SGT. JEFFREY S. SARVER

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

1    ERIK L. JACKSON (State Bar No. 166010)
     COZEN & O'CONNOR
2    601 S. Figueroa Street, Suite 3700
     Cozen O'Connor
3    Los Angeles, California 90017
4    Telephone: (213) 892-7961
     Fax: (866) 484-0947
5    ejackson@cozen.com
6

7    TODD J. WEGLARZ (*pro hac vice*)
8    Law Offices of Todd J. Weglarz
     30903 Northwestern Highway, Suite 250
9    Farmington Hills, Michigan 48334
10   Telephone: (248) 539-9081
     Fax: (248) 413-2647
11   tweglarz@weglarzlaw.com
12   Attorneys for Plaintiff

13

              UNITED STATES DISTRICT COURT
14             CENTRAL DISTRICT OF CALIFORNIA

15   SGT. JEFFREY S. SARVER,        )   Case No.: 2:10-cv-09034-JHN
16                         )   (JCx)
       Plaintiff,             )
17                         )   **PLAINTIFF'S NOTICE OF**
      v                         )   **APPEAL TO THE UNITED**
18                         )   **STATES COURT OF APPEALS**
      THE HURT LOCKER, LLC, MARK   )   **FOR THE NINTH CIRCUIT**
19    BOAL, KATHRYN BIGELOW, GREG   )
      SHAPIRO, NICOLAS CHARTIER,    )
20    TONY MARK, DONALL McCUSKER,   )
      SUMMIT ENTERTAINMENT, LLC,    )
21    VOLTAGE PICTURES, LLC,        )
      GROSVENOR PARK MEDIA, LP,     )
22    FIRST LIGHT PRODUCTIONS, INC.,   )
      KINGSGATE FILMS, INC., and      )
23    PLAYBOY ENTERPRISES, INC., Jointly )
      and Severally,                 )
24                         )
       Defendants.           )
25

26

27

28
                     **NOTICE OF APPEAL**
                            1

Notice is hereby given that Sgt. Jeffrey S. Sarver, the plaintiff herein, hereby appeals to the United States Court of Appeals for the Ninth Circuit from the final judgment of the District Court, entered in this case on October 13, 2011, and all interlocutory orders that gave rise to that judgment, including but not limited to:

1. Order granting Defendants Motions to Strike (Doc. No. 129, granted and issued on October 13, 2011, attached hereto as Exhibit A.)
2. Order granting Motion to Change Venue to the Central District of California, (Doc. No. 55, entered November 19, 2010, attached hereto as Exhibit B.)

Dated: November 10, 2011          COZEN & O'CONNOR


                                  _____-/S/-_____
                                  Erik L. Jackson
                                  Attorneys for Plaintiff, Sgt. Sarver.

**NOTICE OF APPEAL**
2

0074

1

1    UNITED STATES DISTRICT COURT

2    CENTRAL DISTRICT OF CALIFORNIA

3    WESTERN DIVISION

4    THE HONORABLE JACQUELINE H. NGUYEN, JUDGE PRESIDING

5

6    JEFFREY S. SARVER,                    )
                                           )
7                        Plaintiff,        )
                                           )
8          vs.                             )   No. CV 10-9034-JHN-JC
                                           )
9    THE HURT LOCKER, LLC, et al.,         )
                                           )
10                                         )
                         Defendants.       )
11    ─────────────────────────────────────)

12

13

14

15              REPORTER'S TRANSCRIPT OF PROCEEDINGS

16

17                  Los Angeles, California

18            Monday, August 8, 2011, 2:53 P.M.

19          Defendants' Motion to Strike Complaint

20

21                            PAT CUNEO CSR 1600, CRR-CM
                              Official Reporter
22                            Roybal Federal Building
                              Room 181-E
23                            255 East Temple Street
                              Los Angeles, California 90012
24                            (213) 617-1817
                              grammacuneo@aol.com
25

```
 1   APPEARANCES OF COUNSEL:

 2   FOR THE PLAINTIFF:     COZEN O'CONNOR
                            BY:  NATHAN M. DOOLEY, ATTORNEY AT LAW
 3                          601 South Figueroa Street
                            Suite 3700
 4                          Los Angeles, California 90017
                            (213) 892-7961
 5                          ndooley@cozen.com
                                    -and-
 6                          LAW OFFICES OF TODD J. WEGLARZ
                            BY:  TODD J. WEGLARZ, ATTORNEY AT LAW
 7                          30903 Northwestern Highway
                            Suite 250
 8                          Farmington Hills, MI  48334
                            (248) 539-9081
 9                          tweglarz@weglarzlaw.com

10

11   FOR THE DEFENDANT:     EISNER, KAHAN & GORRY
                            BY:  TIMOTHY J. GORRY, ATTORNEY AT LAW
                            and  JACKIE M. JOSEPH, ATTORNEY AT LAW
12                          9601 Wilshire Boulevard
                            Suite 700
13                          Beverly Hills, California  90210
                            (310) 855-3200
14                          tgorry@eisnerlaw.com
                            jjoseph@eisnerlaw.com
15
     FOR THE DEFENDANT:     KATTEN MUCHIN ZAVIS ROSENMAN
16                          BY:  DAVID HALBERSTADTER, ATTORNEY AT LAW
                            2029 Century Park East
17                          Suite 2600
                            Los Angeles, California 90067-3012
18                          (310)788-4570
                            david.halberstadter@kattenlaw.com
19
     FOR THE DEFENDANT:     KINSELLA, WEITZMAN, ISER, KUMP &
20                               ALDISERT, LLP
                            BY:  JEREMIAH T. REYNOLDS, ATTORNEY AT LAW
21                          808 Wilshire Boulevard
                            Third Floor
22                          Santa Monica, California  90401
                            (310) 566-9800
23                          jreynolds@kwikalaw.com

24

25
```

```
 1    LOS ANGELES, CALIFORNIA; MONDAY, AUGUST 8, 2011; 2:53 P.M.
 2                            -oOo-
 3              THE CLERK:  All rise.  This United States District
 4    Court for the Central District of California is now in
 5    session.  The Honorable Jacqueline H. Nguyen, Judge
 6    Presiding.
 7              Calling Civil Case 10-9034-JHN-JC, Jeffrey S.
 8    Sarver vs. The Hurt Locker LLC, et al.
 9              Please state your appearances for record.
10              MR. WEGLARZ:  Your Honor, Todd Weglarz for the
11    plaintiff.
12              MR. DOOLEY:  Nathan Dooley for the plaintiff.
13              MR. GORRY:  Good afternoon, Your Honor.
14    Timothy J. Gorry, Eisner, Kahan & Gorry, on behalf of -- and
15    I'll have to read them all off here -- defendants Hurt
16    Locker LLC, Greg Shapiro, Nicolas Chartier, Voltage Pictures
17    LLC, Grosvenor Park Media LP, and Kingsgate Films, Inc.
18              MR. HALBERSTADTER:  Good afternoon, Your Honor.
19    David Halberstadter for defendants Summit Entertainment LLC.
20              THE COURT:  Good afternoon.
21              MR. REYNOLDS:  Good afternoon, Your Honor.
22    Jeremiah Reynolds on behalf of defendants Mark Boal and
23    Kathryn Bigelow.
24              MS. JOSEPH:  And good afternoon, Your Honor.
25    Jackie Joseph from Eisner, Kahan & Gorry on behalf of the
```

1   Hurt Locker LLC, Nicolas Chartier, Gregory Shapiro, Voltage
2   Pictures LLC, Grosvenor Park Media, and Kingsgate Films.
3           THE COURT:  All right.  Good afternoon to
4   everyone.
5           I did issue a full written tentative in this
6   matter.  I take it that all parties or counsel have had an
7   opportunity to review the court's written tentative.
8           Is that fair to say?
9           MR. WEGLARZ:  Yes, Your Honor.
10          THE COURT:  All right.  Then let me have --
11  actually, let me have the moving party take the lectern
12  first to address the court's tentative unless you wish to
13  submit.
14          If you submit, you don't have to take the lectern;
15  but if you don't, I will give you an opportunity to be
16  heard.
17          MR. GORRY:  Well, Your Honor, on the -- what we've
18  agreed to do is that to the extent that the court wishes to
19  address the anti-SLAPP motion, the jurisdictional issues, I
20  would address those arguments to the extent that the court
21  wants to hear regarding -- discussion regarding the
22  substantive causes of action.
23          Both Mr. Halberstadter and Mr. Reynolds are
24  prepared to address that.
25          So I guess, to a certain extent, based on your

```
 1   tentative, you know, I would seek some guidance as to what
 2   you would like us to address as opposed to arguing the whole
 3   motion since you've obviously covered it well in your
 4   tentative.
 5           THE COURT:  Well, given the complexity and the
 6   number of issues in this case, that's why I really did want
 7   to have a written tentative before counsel came in for
 8   argument because I wanted you to argue off the tentative.
 9           So if there's something that is contained in the
10   written tentative that you think the court erred on, that's
11   what I want to hear from you about.
12           MS. JOSEPH:  Okay.
13           THE COURT:  So if you think the court is correct,
14   by all means, there's need to address it any further.
15           MR. GORRY:  Well, as you can probably guess, Your
16   Honor, we do want to actually address a couple of issues,
17   the first of which is the court's tentative ruling as it
18   relates to the misappropriation of name and likeness; and I
19   believe Mr. Halberstadter will start with that argument.
20           THE COURT:  All right.
21           MR. HALBERSTADTER:  Good afternoon, Your Honor.
22   So I guess I get to tell the court where it erred; is
23   that --
24           THE COURT:  Please do.  I welcome comments.
25   That's why you're here.
```

 1          MR. HALBERSTADTER:  Thank you, Your Honor.

 2          With respect to the right of publicity claim, the

 3   court's tentative makes two main findings.

 4          First, that the plaintiff has made a *prima facie*

 5   showing in support of its claim -- his claim; and, secondly,

 6   that the defendant's First Amendment transformative use

 7   defense is belied by certain factors that the court listed.

 8          The majority of my argument will focus on that

 9   latter finding; but before turning to it, I'd like to make a

10   couple of brief points about the court's tentative

11   conclusions about plaintiff's *prima facie* showing.

12          The tentative ruling that plaintiff has made a

13   *prima facie* showing in support of his right of publicity

14   claim appears to be based on two main findings that

15   plaintiff presented evidence that he's identifiable in the

16   film because details of his actual life story are included

17   in the *Playboy* and *Reader's Digest* articles and, secondly,

18   that plaintiff presented evidence that Sergeant Will James,

19   that character in the motion picture, was based on him given

20   that Mr. Boal, the writer, followed him closely while he was

21   embedded in Iraq; that Mr. Boal wrote the *Playboy* article

22   and the script; that there are some similarities between the

23   plaintiff and the Sergeant James character and some

24   statements made by Jeremy Renner in a *YouTube* interview

25   suggesting that the character he played was like this one

1   guy, in rough quotes.

2          Well, first, Your Honor, basing a fictional

3   character upon an actual person is not the legal equivalent

4   of using a person's name, voice, photograph, likeness, or

5   even his or her identity.

6          Many fictional characters are based to one degree

7   or another on real people.  That is the acorn from which

8   most writers create their characters.

9          Mr. Boal's familiarity with the plaintiff may well

10  have helped him create the Sergeant James character; but the

11  fact that Mr. Boal knew plaintiff and was able to observe

12  him in action in Iraq does not, in our view, constitute

13  *prima facie* evidence that the film misappropriated

14  plaintiff's likeness or his identity.

15          To the extent --

16          THE COURT:  Would you concede though, counsel,

17  that there are striking similarities between the *Playboy*

18  article, which admittedly is about the plaintiff, and the

19  movie itself?

20          MR. HALBERSTADTER:  No, Your Honor.  I think that

21  there are certainly a number of similarities between the

22  Sergeant James character and plaintiff as his background,

23  et cetera, are described in the *Playboy* article.

24          However, a great number of those similarities, I

25  believe, are common to members of the military in general

1   and EOD -- I tend to search around the letters a little too

2   much -- the EOD technicians in particular.

3           There are certain characteristics that they share;

4   but there are many, many differences between those two

5   characters as well.

6           For example, the article describes the plaintiff

7   as having grown up in a trailer park in West Virginia, not

8   the same for the Sergeant James character.  His age is

9   different.

10          He makes certain statements that are quoted in the

11  article, which I will not repeat in court, that are not used

12  by the Sergeant James character.  The age of his son is

13  different.  He has a different girlfriend pregnant with

14  another child.  Not the same as Sergeant James character.

15          His marital status is different.  Apparently, the

16  plaintiff -- at least his team members would comment on how

17  the plaintiff would frequently give the rest of his team

18  members marital advice when he wasn't married; and they

19  found that ironic; and it's not something that's depicted in

20  the motion picture at all.

21          His father was a carpenter.  They used to go

22  hunting together.

23          THE COURT:  But is that the right way to approach

24  it for the court?  Would you have the court get down to the

25  level of details and sort of act as the trier of fact and

1   doing a scene-by-scene, characteristic-by-characteristic
2   comparison? *Prima facie* case. That's not a very high
3   threshold.

4        Or should the court say: Look. There are some
5   striking similarities here albeit some differences as well;
6   and that's sufficient to find that the plaintiff has met his
7   burden of establishing a *prima facie* case and that a
8   reasonable trier of fact looking at all of that and weighing
9   his testimony at trial would say: I think there's been
10  misappropriation here.

11       Shouldn't they be allowed to get passed at least
12  this stage with those similarities already identified by the
13  court?

14       MR. HALBERSTADTER: Well, I don't think that the
15  anti-SLAPP statute, or the cases deciding it, really address
16  Your Honor's point; and I certainly understand the point.

17       However, I think that if the -- in my view, the
18  differences and similarities that we're talking about right
19  here would not be sufficient to get the plaintiff past
20  summary judgment; and I think it's the same standard.

21       So if he has to establish a *prima facie* case on
22  all the elements of his claim, which is what he would have
23  to do for surviving summary judgment, I don't think these
24  similarities, given all of the multiple differences not only
25  in the character but in the experiences described as that

1    character is described as having in the film, suffice to

2    satisfy the *prima facie* case.

3            That said, there's a little more and I want to

4    mention that as well as long as we're talking about the

5    characteristics.

6            Because not only are the characteristics of the

7    plaintiff and the characteristic of the Sergeant James

8    character overlapping in some generic ways but very

9    different in others.  So, too, are the stories and the

10   missions that he has undertaken.

11           And since the court is talking about the

12   misappropriation in the context of an identity, not just a

13   likeness, I thought it would be worth mentioning those, too.

14           There are a number of missions that are described

15   in the *Playboy* article that don't appear anywhere in the

16   film.  I can identify them for the court if the court wants.

17           There are a number of missions in the film that

18   are nowhere in the *Playboy* article including, among others,

19   disarming a bomb inside the hood -- under the hood of a

20   vehicle; disarming a bomb placed in a body cavity of a dead

21   boy, leaving the base to look for a child who he had

22   befriended; being under sniper fire; a man trapped -- trying

23   to disarm a man trapped in a bomb vest who was put in that

24   bomb vest against his will.

25           So I think given all of these substantial

1    dissimilarities that can be gleaned from comparing the film

2    to the article, we would urge the court to assess this under

3    a summary judgment standard and find that the plaintiff has

4    not met his initial burden of proof.

5            That having been said, I would like to focus

6    primarily on the court's tentative finding that -- at least

7    as I read the tentative -- that the same factors:  Boal's

8    having been embedded, having written both the article and

9    the screenplay, the actor's statement which incidentally is

10   hearsay and objected to, and the similarities and

11   differences between the two works, that the First Amendment

12   transformative use defense has been belied by those factors.

13           In that regard, the tentative appears to have

14   rejected the First Amendment defense without having applied

15   the California Supreme Court's required balancing test for

16   resolving conflicts between the First Amendment and the

17   right of publicity without assessing, at least in the

18   tentative, the extent to which the film incorporates

19   significant creative elements aside from plaintiff's -- the

20   arguable use of plaintiff's identity in order to determine

21   whether the film as a whole is transformative without

22   considering the broader First Amendment protections that are

23   afforded to works of the public interest -- in the public

24   interest which this court has found the film to be.

25           Focusing first on the balancing test, I think it's

1 important to underscore a few of the holdings of the *Comedy*

2 *III* and *Winters* cases decided by the California Supreme

3 Court.

4    First is that transformative does not mean or

5 require, although it can include, that there is some

6 physical or visual or auditory alteration of the

7 individual's name, voice, photograph, or likeness.

8    Rather, the transformative test focuses on the

9 work as a whole and asks whether an individual's name,

10 voice, photograph, likeness, or even identity has been

11 combined with other creative elements such that the work as

12 a whole is transformed into something that is more than a

13 mere likeness or imitation of the individual and such that

14 the individual's likeness is simply one of the raw materials

15 from which an original work has been synthesized.

16    California Supreme Court's ruling make clear that

17 a broad range of works satisfy this test, not just

18 cartoon-like distortions as in *Winter*, but also factual

19 reporting and fictionalized portrayals.

20    Under those two cases the court is not supposed to

21 just consider the similarities and differences between the

22 plaintiff and the character that is claimed to be an

23 appropriation of his likeness, rather, the court is supposed

24 to conduct an analysis of the work as a whole to determine

25 whether it combines the plaintiff's likeness with other

1    creative elements to create a work that is more than not
2    merely a duplication of the plaintiff's likeness.
3              I think that when the film is viewed as a whole
4    and the transformative test is applied to it, the motion
5    picture *The Hurt Locker* is a prototypically transformative
6    work that is entitled to First Amendment protection as a
7    matter of law even if its main character is based entirely
8    on plaintiff and his real-life experiences.
9              Even if we assume for purposes of this portion of
10   the argument that the Sergeant James character was a close
11   or virtual replica of plaintiff, plaintiff's likeness or
12   identity have been combined with many, many original
13   elements of creative expression by the writer, the director,
14   the actors, and the cinematographer, among others.
15             The film includes many plot lines and subplots
16   that are wholly invented and not based on anything in
17   plaintiff's real life, at least as described in the *Playboy*
18   article.
19             It includes many other characters who have been
20   invented for the film who the plaintiff does not even allege
21   to be similar to people in his life including the members of
22   his EOD squad.
23             All of the film's dialogue has been invented and
24   is not claimed other than with respect to the phrase "the
25   hurt locker" and perhaps "war is a drug" to be words that

14

1  plaintiff or those around him have ever said.

2         The overarching storyline and themes, though

3  authentic in feel, are fictional.  The cinematography and

4  the soundtrack were created for the film.

5         The skilled direction and editing are creative

6  elements that have been combined with everything else to

7  synthesize this film.

8         So based on these factors, all evidence from the

9  film itself, I don't believe that the court can reach a

10  conclusion other than that plaintiff's likeness or his

11  identity, even if it was the basis for the main character

12  and even if it was incorporated wholesale, is anything other

13  than one of the raw materials, not the sum and substance of

14  the film.

15         But there's more.  In fact, to the extent that the

16  plaintiff's likeness or identity could be considered the

17  basis for the Sergeant James character, it, too, has been

18  somewhat modified and transformed by creative elements.

19         The character doesn't bear his name, doesn't use

20  his actual likeness, although plaintiff claims that the

21  actor used to depict that character resembles him in certain

22  respects.

23         The character's military background is different,

24  how he was deployed to Iraq was invented.  His personal

25  background and relationship history are different.

0088

1    Many of the things that he does and the

2    experiences he has have been invented.  His dialogue has

3    been invented and so on.

4    So under the relevant case law, I believe that

5    this film easily satisfies the transformative use test.

6    A finding that this film is entitled to First

7    Amendment protection as a matter of law because it is a

8    transformative work would be in line with other California

9    cases involving fictionalized portrayals of real people and

10   events, including docudramas where they are intended to be

11   portrayals, though fictionalized, of real identifiable

12   people.

13   *Guglielmi* is the most obvious example, was a

14   docudrama about Rudolph Valentino, decided before *Comedy III*

15   and *Winter* and so it did not apply the transformative test

16   *per se*.

17   But the California Supreme Court found that there

18   was substantial -- that the substantial creative expression

19   included in the film outweighed any right of publicity that

20   otherwise would have existed.

21   *Polydoros*, which I know Your Honor has

22   distinguished on the basis that it's purely fictional so I

23   won't spend too much time with that.

24   The *Kirby* lawsuit, which involved a video game and

25   a character, I think that's a specifically notable case

1    because in that instance the court, although it found that

2    the video game, animated character-protagonist of the video

3    game bore a number of similarities to the plaintiff, the

4    court also found that the plot and the setting of the video

5    game were different.

6           The dance moves and the music were all creative

7    elements that were new and added and supported a

8    transformative use.

9           The finding that I'm urging the court to make

10   today is also in line with many cases from other

11   jurisdictions involving fictionalized portrayals that are

12   admittedly about real people and their experiences.

13          In *Hicks*, it involved a book and a docudrama about

14   Agatha Christie.  *Matthews* case -- and I can provide the

15   full citations for all these if Your Honor wants them.

16          THE COURT:  I don't.

17          MR. HALBERSTADTER:  Okay.

18          THE COURT:  I understand where you're going with

19   the argument.

20          MR. HALBERSTADTER:  Okay.

21          THE COURT:  You're basically saying that the court

22   didn't weigh it carefully enough; and upon further

23   reflection, you're going to win on the transformative use.

24          MR. HALBERSTADTER:  I'm actually saying that I

25   don't see from the tentative that the court engaged in an

1    evaluation of the work as a whole at all as opposed to a

2    comparison of the plaintiff to the fictional character; and

3    I'm urging the court that under the *Winter's* and *Comedy III*

4    test that's what it is supposed to do.

5              THE COURT:  All right.

6              Anyone else from the defense wish to be heard?

7                   *(No response.)*

8              THE COURT:  Thank you, counsel.

9              MR. HALBERSTADTER:  Thank you, Your Honor.  I

10   appreciate it.

11             MR. REYNOLDS:  Good afternoon, Your Honor.

12             I promise to be very brief.  I know Mr. Weglarz is

13   itching to get up here.

14             I would submit to the court respectfully that it

15   is clear that the First Amendment bars completely the

16   plaintiff's right of publicity claim; and I would point to

17   two findings made by the court that are critical to this

18   analysis.

19             First of all, the court has found that the film

20   involves an issue of public interest.  The court quotes --

21   or quote from the court is:  The article and the movie

22   directly address a problem of improvised explosive devices

23   and the men who diffuse them, an issue of paramount

24   importance at that point in the war.

25             The other finding made by the court is that on

1    page 17 the court notes that:   Private individuals must

2    establish actual malice if a defamation involves an issue of

3    public issue.

4            That same finding must be applied to the court --

5    to the plaintiff's right of publicity claim under numerous

6    precedents; and I want to talk about four cases

7    specifically.

8            The first time is *Time v. Hill* from 1967.  That's

9    a U.S. Supreme Court case, 385 U.S. 374.

10           That case holds that the actual malice standard

11   must be applied to actions that seek to hold defendants

12   liable for reporting on matters of public interest; and the

13   court could look at page 388 and 389 of that opinion for

14   that holding.

15           The Ninth Circuit has also found very specifically

16   in connection with the California Civil Code, Section 3344,

17   right of publicity claim and the common-law claim that,

18   again, claims that involve the public interest, the

19   plaintiff must establish actual malice to get by the First

20   Amendment.

21           Again, that's *Hoffman v. Capital Cities*, 255 F.3d

22   1180, Ninth Circuit, 2001, page 1186 to 1187 of the court's

23   opinion, the court makes that specific holding.

24           The California courts have also held that, again,

25   matters that involve the public interest, even if you're

1    bringing a claim for invasion of privacy or for a violation

2    of right of publicity, must apply the actual malice

3    standard.

4            *Dora v. Frontline Video*, 15 Cal.App.4th 536.  It's

5    a 1993 case.  The court holds at page 543 and 544 that the

6    actual malice standard applies to right of publicity claims

7    where, again, there's an issue of public interest involved.

8            The last case is a case cited by the court in your

9    tentative opinion.  That's *Stewart v. Rolling Stone LLC*, 181

10   Cal.App.4th, 664.  That's a 2010 case.  Again, another case

11   involving a right of publicity claim by several indie

12   musicians.

13           Again, the court holds on page 682:  A defendant

14   publisher may assert actual malice standard applies to

15   claims for commercial misrepresentations whether claims are

16   under the common law or Civil Code Section 3344.

17           If the court applies those cases to the facts of

18   this case, it's very clear that the plaintiff's claim is

19   barred.

20           I have copies of those cases for the court.  I'd

21   like to, with the court's permission, I have already

22   provided copies to counsel for plaintiff.

23           If it pleases the court, I'd like to provide

24   copies of those cases to the court.

25           THE COURT:  All right.  You may do so after the

```
 1    hearing.
 2             MR. REYNOLDS:  Thank you very much, Your Honor.
 3             I would just say in closing that I would
 4    respectfully ask court to think about the impact of its
 5    holding.
 6             Again, we have a situation involving a film, a
 7    highly popular film that involved an issue of public
 8    interest.  Your holding that even though it involves issues
 9    of public interest, the plaintiff can come and sue based
10    upon a right of publicity.
11             That's going to directly impact artists,
12    directors, screenwriters going forward; and, again, the
13    Supreme Court has set up protections for this very situation
14    so I urge the court to look at those cases.
15             Thank you very much.
16             THE COURT:  All right.  Thank you very much.
17             MR. GORRY:  Your Honor, just one final point.
18             THE COURT:  Sure.
19             MR. GORRY:  I didn't want to be left out here.
20             The point that I'd like to address quickly, Your
21    Honor, is in the tentative itself you state that, after
22    discussing the ComputerXpress, that the defendants are not
23    entitled to their attorney's fees because the most
24    significant claim in your estimation still remains.
25             Under California law, as the court is well aware,
```

0094

1    Section 42 --

2            THE COURT:  Well, significant, perhaps that's

3    maybe a poor choice of words.  The heart of the plaintiff's

4    Complaint -- let's put it that way.  The core of his

5    allegation is:  Look.  You took my identity and you made

6    this movie out of it.

7            MR. GORRY:  Okay.  And I understand that, Your

8    Honor.  In connection with that, under *ComputerXpress*, which

9    the court cites, and under several cases that follow it --

10   *Morrow v. United States* or -- excuse me -- *Los Angeles*

11   *United School District*, 149 Cal.App.4th 1424, and *Mann v.*

12   *Quality Old Time Service, Inc.*, 139 Cal.App.4th 328, the

13   courts analyze 42516 and the requirement regarding

14   attorney's fees for partially prevailing parties.

15           And what those cases hold is that a partially

16   prevailing defendant, or moving party -- generally, it's the

17   defendant obviously -- who brings an anti-SLAPP motion need

18   not succeed in striking every challenge claimed to be

19   considered a prevailing party within the meaning of 42516.

20           In the *Mann* case, the court discusses and

21   ultimately holds that a party who partially prevails on an

22   anti-SLAPP motion must generally be considered a prevailing

23   party unless the results of the motion were so insignificant

24   that the party did not achieve any practical benefit from

25   bringing the motion.

```
 1            And in the *Mann* case, it discusses that the court

 2     shall apportion the attorney's fees award based on the

 3     result.

 4            What we would submit here, Your Honor, is that in

 5     this case, if you take a look at the causes of action that

 6     the court in its tentative -- assuming the court adheres to

 7     its tentative -- has dismissed, clearly provides a practical

 8     benefit to the moving parties here.

 9            Eliminating the false light, defamation, breach of

10     contract, intentional infliction of emotional distress,

11     fraud, and constructive fraud/negligent misrepresentation

12     claim clearly changes the defense and the overall penumbra

13     of the case.

14            As the court has indicated, you know, you feel

15     that the case comes down to:  You stole my name and

16     likeness.

17            Well, this case has now completely changed.  All

18     of the claims, if they are, you know, kept out per your

19     tentative, this case is greatly simplified down to the one

20     cause of action that we've been discussing so --

21            THE COURT:  That's a fair point.  I'll go back and

22     look at the attorney's fees issue again.

23            MR. GORRY:  Great.  Thank you.

24            And I also have copies of the cases.  I wasn't

25     able to give the other two cases to counsel; but I can give
```

```
 1   them to him now if he wants or after the hearing if the

 2   court so desires.

 3            THE COURT:  After the hearing, please.

 4            MR. GORRY:  Okay; thank you.

 5            THE COURT:  All right.  Anyone on this side before

 6   I give the plaintiffs an opportunity to -- I'm sure he wants

 7   to respond on many fronts.

 8                         (No response.)

 9            THE COURT:  All right.  If would you take the

10   lectern, please.

11            MR. WEGLARZ:  Thank you, Your Honor.

12            Your Honor, first of all, I would like to make a

13   record that to the extent that the court does issue a final

14   ruling on these motions relying upon any of the new

15   authorities that the defendants are now discussing and

16   giving to us, that we have an opportunity to review those

17   authorities and to brief those authorities if need be.

18            Your Honor, a couple of things I would like to

19   address for the court and, actually, not that many.  I do

20   respect the court's ruling.  Though I do not agree with each

21   and everything in it, I do respect it.

22            However, I did anticipate that the defendants

23   would be attacking somewhat aggressively the court's ruling

24   on the finding of a prima facie case of misappropriation.

25            And if you just think about this case, if you
```

1  stand back and look at it as a whole, when you realize you

2  have this army soldier serving his country who is being

3  followed by this journalist for 30 days and this journalist

4  is videotaping him, photographing him, recording all of his

5  statements and interviews while being told at the same time:

6  Look, you know, I'm just doing this to do a story on EOD

7  operations in general.

8           And then when we step back and we learn that after

9  Sergeant Sarver confided in this reporter about all of his

10  personal details in his life, Mr. Boal observed the way he

11  dressed, his mannerisms, his height, the way his nose looked

12  in the shield, the way he specifically addressed a certain

13  mission, his personal habits of dress around the base, how

14  he treated his kid, how he didn't treat his kid, how he was

15  sometimes not the best father or husband or boyfriend.

16           THE COURT:  Well, what about transformative use,

17  counsel?  Because I've got to tell you even on the

18  *prima facie* standard, I found this to be quite a close call.

19           MR. WEGLARZ:  And I appreciate that and --

20           THE COURT:  For the reasons that I think some of

21  the reasons were highlighted by the defense in their

22  arguments.

23           MR. WEGLARZ:  Sure.

24           Your Honor, the court found that, look, this is

25  different from all the other cases that I've looked at

```
 1    addressing this issue:  The Polydoros case, the other cases,
 2    transformative use cases.
 3            Here we have Sergeant Sarver who is portrayed in a
 4    biography not just once, but twice.  I mean, Mr. Boal sells
 5    his article to Playboy; and there's a biography now out for
 6    the whole world to see about Sergeant Sarver down to the
 7    smallest detail of what he did in Iraq plus his personal
 8    being as well as his life.
 9            A few years later, Mr. Boal sells the rights to
10    that article to Reader's Digest.  Again, there's another
11    biography displayed to the world talking about
12    Sergeant Sarver, his exploits while overseas and in the
13    military, his personal life, and his family life.
14            And I really thought when I looked at the
15    tentative ruling that really this court, rather than
16    ignoring the transformative use defense or even kind of
17    side-stepping it or even glossing over it, I thought the
18    court addressed and analyzed that defense right at its very
19    heart.
20            The court pointed out, unlike these other cases,
21    now you have publication to the whole world as to what this
22    guy's story is about.
23            The court also pointed out:  Lookit.  Here you
24    have this reporter who tagged him for 30 days, learned
25    everything about him, recorded everything about him; and we
```

```
 1    even have the main character who is playing Sergeant Sarver,

 2    Jeremy Renner, who says:  Yeah, you know what?  They kept

 3    showing me this one guy who is like this Will James

 4    character.  This one guy.  This was the character they

 5    wanted me to be.

 6              And the court didn't find that there's a lot of

 7    similarities just because of that video.  Of course not.

 8              When you read that Playboy article and if you

 9    watch that movie, how anyone can say that that movie is not

10    about Sergeant Sarver, I don't know.  Because it clearly is.

11              And the transformative use defense, after the

12    court says:  I look at all the elements for common-law

13    misappropriation and for the statutory cause of action for

14    misappropriation.  I believe the plaintiff has presented

15    sufficient evidence for a prima facie case.  But if you look

16    at the transformative use defense, it is analyzed and here's

17    what the defense says.

18              Transformative use provides that:  Lookit.  If an

19    artist wants to use someone's likeness and they want to

20    start it out as the kernel, you better use -- you better

21    transform it into some artistic impression; and trivial

22    transformations do not count.

23              It has to be significant.  So significant that

24    once you now went from the plaintiff's likeness to the

25    artist's transformation of that likeness, you have to be
```

1   able to say:  That's really not the plaintiff.  That's

2   really the artist and what he did.

3         You have to look at:  Is it predominantly the

4   artist creative expression or really what we see in the

5   movie of Will James?  Are we really seeing predominantly

6   Sergeant Sarver?

7         If you read that article and if you watch that

8   movie, Will James is predominantly and is basically the main

9   character in that movie and that movie is nothing more --

10  and there are some trivial changes in it -- but that movie

11  is really nothing more than a movie about the life of

12  Sergeant Sarver and he does have a right to his name and his

13  likeness and he should be compensated for it.

14        Your Honor, having addressed that, I did want to

15  address one other thing in the tentative ruling if the court

16  will allow me to address that now.

17        Actually, I'm just responding to the argument set

18  forth by defense counsel; but if you wish for me to go ahead

19  and address --

20        THE COURT:  Go ahead.

21        MR. WEGLARZ:  Okay.

22        The one thing I wanted to touch upon, the court's

23  finding that the plaintiffs did not respond to a separate

24  motion that was based upon not the misappropriation claim of

25  the First Amendment, it was really just based upon the other

1   collateral claims:  Defamation, negligent misrepresentation,

2   those types of claims.

3           I do apologize to the court to the extent that

4   when we filed our response and it was filed in two separate

5   briefs, that perhaps we did not make it clear that the

6   response brief was really a global response to all of the

7   motions.

8           And though we don't list Summit separately in the

9   response when we say we're responding to so and so's

10  motions, that's only because Summit just filed a joinder,

11  never labeled it as a motion, though I do understand they

12  did file a separate Memorandum of Points and Authorities.

13          So, in essence, we did respond to that motion

14  globally; and we also addressed some specifics representing

15  to the court and we understood this.

16          Look.  With respect to Summit, we know they came

17  on towards the end.  They weren't there for the filming of

18  the movie at least as far as we know right now.  We

19  understand that.

20          And I represent to the court I would appreciate

21  having some discovery trying to figure out the role of

22  Summit's involvement.

23          I want to see all of the contracts, not just the

24  redacted contract that they gave to the court to base its

25  arguments upon, but maybe all of the contracts.

```
1              I would like to know what discussions did they
2    have with Boal and defendant Bigelow and Voltage Pictures.
3    Maybe they did really know.  Maybe they did engage in these
4    things that was supported by a declaration and that was
5    addressed.
6              And, you know, the court -- I just want the court
7    to appreciate and I'm sure the court does that
8    Sergeant Sarver is a military member.
9              He survives on a mere pittance and we initially
10   filed this case in New Jersey thinking that was the place to
11   file because if you look at all the laws and you look at the
12   articles about what do you do in a multi-state publication?
13   Where do you file?  What law applies?  It's kind of murky.
14   It's not exactly clear.
15             A lot of the restatements state --
16             THE COURT:  Well, but now that it's in California,
17   the court has to apply the anti-SLAPP -- do I have any
18   discretion since they're the prevailing party?
19             MR. WEGLARZ:  I was looking at that.
20             I mean, really, the claims against Summit were
21   filed in New Jersey based upon New Jersey law.  In fact,
22   Summit filed a motion, a 12(b)(6), based upon New Jersey
23   law.
24             So realizing that the court is granting the motion
25   with respect to the other claims just as it is with respect
```

0103

1 to the other defendants, it's the same situation with

2 Summit.

3    I am respectfully requesting the court to make a

4 similar ruling with respect to the assessment of costs on

5 the anti-SLAPP.

6    Thank you very much, Your Honor.

7    THE COURT:  Why don't you address counsel's fees

8 that even though they didn't -- or counsel's argument

9 regarding attorney's fees; that even though they did not

10 prevail in striking every claim, that the court's analysis

11 of that is not that one claim goes forward and so,

12 therefore, no attorney's fees.

13    It should be in looking at whether they've been

14 able to achieve some substantial benefit to their client's

15 case; and some apportionment would be appropriate even as to

16 the rest of the parties.

17    MR. WEGLARZ:  It's a good question; but I think

18 the court's reasoning and analysis on that issue, I think,

19 is the appropriate one; that lookit.  Let's face it.  The

20 misappropriation claim is really the essence of this case.

21 I mean, this is about a movie about this person's life which

22 defendants are denying.

23    That is the claim that's the essence of everything

24 here.  If that claim survives, which in the court's

25 tentative ruling it claims it does, we still have to go

31

```
 1    through the same set of discovery.
 2            Basically the same damages.  It's just not
 3    financial injury.  It's any injury that the plaintiff
 4    suffered whether it be emotional, problems at work, problems
 5    with relationships, so the court is correct.
 6            We're basically -- they really didn't gain a
 7    significant benefit other than some extra claims are gone;
 8    but we're all still going to go through the same work on
 9    this case.
10            Thank you, Judge.
11            THE COURT:  All right.  Thank you.
12            I'll take the matter under submission and will
13    issue a written decision as soon as I can.  Thank you.
14            ALL COUNSEL:  Thank you, Your Honor.
15            THE CLERK:  Court stands adjourned.
16            (At 3:30 p.m. proceedings were concluded.)
17
18                          -oOo-
19
20
21
22
23
24
25
```

```
 1                        CERTIFICATE

 2

 3          I hereby certify that pursuant to Section 753,

 4   Title 28, United States Code, the foregoing is a true and

 5   correct transcript of the stenographically reported

 6   proceedings held in the above-entitled matter and that the

 7   transcript page format is in conformance with the

 8   regulations of the Judicial Conference of the United States.

 9
     Date:   October 19, 2011
10

11

12

13

14                              /s/   PAT CUNEO

15                              OFFICIAL COURT REPORTER
                                CSR NO. 1600
16

17

18

19

20

21

22

23

24

25
```

Case: 11-56986   02/13/2013   ID: 8512444   DktEntry: 34-3   Page: 39 of 44

EXHIBIT 1

0107

ERIK L. JACKSON (State Bar No. 166010)
COZEN & O'CONNOR
601 S. Figueroa Street, Suite 3700
Cozen O'Connor
Los Angeles, California 90017
Telephone: (213) 892-7961
Fax: (866) 484-0947
ejackson@cozen.com

GEOFFREY N. FIEGER (*pro hac vice* admission pending)
TODD J. WEGLARZ     (*pro hac vice*)
Fieger, Fieger, Kenney, Johnson & Giroux, P.C
19390 West Ten Mile Road
Southfield, Michigan 48075
Telephone: (248) 355-5555
Fax: (248) 355-1445
t.weglarz@fiegerlaw.com
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SGT. JEFFREY S. SARVER,<br><br>        Plaintiff,<br><br>v<br><br>THE HURT LOCKER, LLC, MARK BOAL, KATHRYN BIGELOW, GREG SHAPIRO, NICOLAS CHARTIER, TONY MARK, DONALL McCUSKER, SUMMIT ENTERTAINMENT, LLC, VOLTAGE PICTURES, LLC, GROSVENOR PARK MEDIA, LP, FIRST LIGHT PRODUCTIONS, INC., KINGSGATE FILMS, INC., and PLAYBOY ENTERPRISES, INC., Jointly and Severally,<br><br>        Defendants. | Case No.: 2:10-cv-09034-JHN (JCx)<br><br>**SUPPLEMENTAL DECLARATION OF FIRST SGT. PAUL WILCOCK IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO STRIKE PLAINTIFF'S COMPLAINT PURSUANT TO CAL. CIV. PROC. CODE §425.16 [ANTI-SLAPP]**<br><br>**Date:    04-04-2011**<br>**Time:    02:00 pm**<br>**Courtroom: 790** |

## DECLARATION OF FIRST SGT. PAUL WILCOCK

I, First Sgt. Paul Wilcock, declare as follows:

1

**0108**

1.    I am a First Sergeant for the United States Army, and was stationed at the Picatinny Arsenal located in Dover, New Jersey, during the year 2009. The facts set forth in this declaration are personally known to me and I have firsthand knowledge thereof. If called as a witness I could and would testify competently to the facts set forth herein under oath.

2.    During the summer of 2009, several service members, including myself, heard that the Hurt Locker movie would be premiering / showing in New York.

3.    Several service members, including Sgt. Sarver and myself, decided to attend the Hurt Locker movie premiere. We were not invited to this premiere by Mr. Mark Boal. Rather, we decided to attend on our own accord.

4.    After traveling to the New York movie theater, Sgt. Sarver, myself, and other service members waited in line, to pay for our tickets, after which we were admitted to the theater where we watched the premiere showing of the Hurt Locker.

5.    Though I was not deployed with Sgt. Sarver during the time Mr. Boal was embedded with Sgt. Sarver's unit in Iraq in December of 2004, I got to know Sgt. Sarver during the time we were both stationed at the Fort Picatinny Arsenal during the year 2009. I became familiar with Sgt. Sarver's personality, mannerisms, expressions, habits, and persona.

6.    While watching the movie the Hurt Locker, I immediately recognized that the main character in the movie, Will James played by Jeremy Renner, was not a fictional character, but rather a complete and literal portrayal of Sgt. Sarver.

2

Throughout the movie, Jeremy Renner/Will James displayed the same personality, expressions, habits, behaviors, demeanor, attitude and even physical characteristic of my fellow soldier Sgt. Sarver.

7.  During the movie, I commented that whoever was able to transform Jeremy Renner into Sgt. Sarver deserved a gold medal.

8.  After the movie, Mr. Boal and Ms. Bigelow sat themselves right in front of our group, and started to answer questions from the audience.

9.  During this question and answer session, Mr. Boal explained that the movie was based upon his experiences with a <u>single</u> EOD team he spent time with while embedded in Iraq in December of 2004.

10.  Mr. Boal and Ms. Bigelow were very relaxed while openly talking about the movie with the audience.

11.  During the question and answer session, our Garrison Commander asked Mr. Bigelow if he recognized the soldier seated (who was Sgt. Sarver) next to the Commander.

12.  In response, Mr. Boal answered that he recognized the soldier as Sgt. Sarver.

13.  Once Mr. Boal and Ms. Bigelow realized that Sgt. Sarver was in the audience, their carefree demeanor quickly changed as their answers became short and guarded, and they were in a hurry to leave the theater.

3

14.   I was shocked to discover that Mr. Boal and Ms. Bigelow made a Hollywood movie which was based upon, and about my co-worker Sgt. Jeffrey Sarver, without ever having obtained Sgt. Sarver's consent.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed at _Buffalo_____, New York on March _18ᵗʰ_____, 2011.


_Paul Wilcock, 1SG_
1SG Paul Wilcock

ERIK L. JACKSON (State Bar No. 166010)
COZEN & O'CONNOR
601 S. Figueroa Street, Suite 3700
Cozen O'Connor
Los Angeles, California 90017
Telephone: (213) 892-7961
Fax: (866) 484-0947
ejackson@cozen.com

GEOFFREY N. FIEGER    (*pro hac vice* admission pending)
TODD J. WEGLARZ    (*pro hac vice*)Fieger, Fieger, Kenney, Johnson & Giroux, P.C
19390 West Ten Mile Road
Southfield, Michigan 48075
Telephone: (248) 355-5555
Fax: (248) 355-1445
t.weglarz@fiegerlaw.com
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SGT. JEFFREY S. SARVER,<br><br>    Plaintiff,<br><br>v<br><br>THE HURT LOCKER, LLC, MARK BOAL, KATHRYN BIGELOW, GREG SHAPIRO, NICOLAS CHARTIER, TONY MARK, DONALL McCUSKER, SUMMIT ENTERTAINMENT, LLC, VOLTAGE PICTURES, LLC, GROSVENOR PARK MEDIA, LP, FIRST LIGHT PRODUCTIONS, INC., KINGSGATE FILMS, INC., and PLAYBOY ENTERPRISES, INC., Jointly and Severally,<br><br>    Defendants. | Case No.: 2:10-cv-09034-JHN (JCx)<br><br>**DECLARATION OF SGT. JEFFREY S. SARVER**<br><br>**Current Hearing Date:**  04-04-2011<br>**Time:**  02:00 pm<br>**Courtroom:**  790 |

1

DECLARATION OF SGT. JEFFREY S. SARVER

0112