## DECLARATION OF SGT. JEFFREY S. SARVER

I, Sgt. Jeffrey S. Sarver, declare as follows:

1.     I am the Plaintiff in this action and have personal knowledge of the facts set forth herein.  If called as a witness, I could and would testify competently to the facts set forth herein under oath.

2.     I have been a member of the United States Army since October 7, 1991, and I continue to serve as a First Sergeant.

3.     I am currently in Afghanistan, where I am serving an active deployment for the United States Army.

4.     In July of 2004, I was a Staff Sergeant of the US Army's 788th Ordnance Company, and was a trained and experienced EOD (explosive ordnance disposal) technician.

5.     In July of 2004, orders were received for the 788th Ordnance Company, including myself, to deploy overseas for a six months of service in Operation Iraqi Freedom II.

6.     These orders commanded me to assemble and lead one of three EOD teams (a/k/a "Bomb Squad" teams) for the 788th while deployed in Iraq.  I selected Specialist Jonathan Williams and Jeremiah Gorsuch to serve on my EOD team.  Two weeks into the deployment I had replaced SGT Gorsuch with SGT Christopher Millwood.

7.     While deployed in Iraq, the central mission of the 788th EOD teams was to identify, render safe, and dispose of hazardous unexploded conventional munitions, chemical munitions, and improvised explosive devices (hereinafter "IEDs").

8.     During this time, there were only about 150 trained Army EOD techs in Iraq.

2

**DECLARATION OF SGT. JEFFREY S. SARVER**

9.     Because the war zones were inundated with IEDs, my job as an Army EOD tech in Iraq was very dangerous, such that bomb techs were five times more likely to die in Iraq than all other soldiers in theater.

10.     During this deployment, my EOD team was sent out on a significant number of missions, during which I successfully disarmed a significant number of IEDs.

11.     In December of 2004, Mark Boal, a writer for Playboy Magazine, was embedded with my unit (788th Ordnance Company), which was set up at Camp Victory (formerly Camp Liberty) in Baghdad, Iraq.

12.     Shortly before Mr. Boal's embedment, our Command consisting of Command Sergeant Major James Clifford advised us of Mr. Boal's upcoming 30 day embedment, and we were told to accommodate Mr. Boal since he was embedded for the purpose of reporting on / writing about, EOD operations in Iraq, *in general.*  Because Mr. Boal was an embedded journalist/reporter it was my understanding Mr. Boal and our unit were subject to the government issued embedded media "ground rules", a copy of which is attached as **Exhibit A**.

13.     Shortly after he was embedded in our unit, Mr. Boal represented and assured us that he was working on a report / story about EOD operations in Iraq, *in general.*

14.     During his embedment to the 788th EOD, Mr. Boal basically followed and accompanied *my EOD team only,* during his 30 day embedment period, which included Mr. Boal accompanying and following me on my various different EOD missions and assignments, as well as following me after operations when I retired for my shift back at the camp.  The only time Boal left our company was when he was picked up by a civilian contractor and taken to the Sheraton Hotel in the Green Zone for a few days.

15.     Mr. Boal's embedded exposure to EOD operations was essentially limited to following and observing my three member team.  Mr. Boal commented to me that he did not feel

3

**DECLARATION OF SGT. JEFFREY S. SARVER**

1   safe around the other EOD teams / members, and that he did not feel safe going out on EOD

2   missions and assignments unless I was there. Though Mr. Boal did go out a couple of times with

3   Sgt. Siam's and Sgt. Hendrickson's teams, he stopped doing so because the one team didn't do

4   unexploded ordance calls, and he didn't feel safe with the other team.

5       16.     Throughout his embedment, Mr. Boal took multiple photographs, videos, and audios

6   of me, as well as some of the other service members. On several occasions, Mr. Boal emphasized

7   and assured us these were necessary for Mr. Boal's report / article on EOD operations *in general*.

8

9       17.     Throughout Mr. Boal's embedment, my team and I fed, sheltered, personally

10  protected, and ensured the personal safety of Mr. Boal.

11      18.     During his embedment, Mr. Boal became acquainted with not only the *general*

12  military operations of the 788th EOD, but also with me, personally. Mr. Boal became familiar with

13  my physical characteristics, my personal likeness, my individual personality, my mannerisms, and

14  my personal life story by virtue of the questions Mr. Boal directed to me, by virtue of Mr. Boal

15  being around me all the time (even when I was not on an active mission), and by Mr. Boal's

16  incessant observing, documenting, and recording of my image and likeness, including the

17  documentation of my personal environment and effects, including my closed off personal bedroom /

18  sleeping area.

19

20      19.     Mr. Boal never explained to me that he intended to use his government issued

21  embedment for the purpose of gathering my personal information, photographing my likeness,

22  videotaping my likeness, mannerisms, and habits, and recording my discussions, which would later

23  be published in the form of a sensational, personal, private, and embarrassing story or movie about

24  me.

25

26

27

28

4

**DECLARATION OF SGT. JEFFREY S. SARVER**

20.     Had Mr. Boal or my command advised me that Mr. Boal was gathering information for the purpose of publishing a story and / or even a movie, based upon me personally, I would have refused to answer or respond to Defendant's questions and other requests for information.

21.     My deployment ended in January of 2005. I was awarded the bronze star for my service during this deployment, and I was told that I disarmed more IEDs than any single team since the operations began in Iraq.

22.     I returned home to Wisconsin in January of 2005, after which Mr. Boal started to hound the Command of the 788th Company, asking for a "visit" with the service members in Wisconsin so he could finish reporting on his "article" by documenting they were now "safely home".

23.     Mr. Boal visited with me in Wisconsin in early 2005, during which he recorded one interview. Even at this time I was not aware that Mr. Boal intended to write an article which was a personal portrayal of me. Instead, Mr. Boal told me the article would be about EOD operations in general.

24.     Mr. Boal sent me an advance copy of his article which he intended to publish in Playboy magazine [Doc 1-1]. Attached hereto as **Exhibit D** is a true and correct copy of the Playboy magazine article.

25.     Before receiving the advance copy, I requested Mr. Boal to also send a copy to my girlfriend. I thought nothing of this, since I was told the article was about EOD operations in general, not about me personally.

26.     Immediately after receiving a copy of Mr. Boal's article, I advised Mr. Boal, CSM James Clifford and my superiors that I did *not* approve of the article because it was about me personally, contained several untruths, and portrayed me in a false light in various different sections. A true and correct copy of Mr. Boal's August 3, 2005 e-mail, sent to my unit commander

5

**DECLARATION OF SGT. JEFFREY S. SARVER**

0116

Christopher "Todd" Wilson, acknowledging my reaction to the article as "less than favorable", is attached as **Exhibit B**.

27.    I requested and insisted that the article not be published. I even requested counsel with the Fort McCoy Staff Judge Advocate, as well as the 20th Support Command Staff Judge Advocate, and was told that nothing could be done to stop the article.

28.    I was told the article was already published in Playboy magazine, and had already been distributed to retail stores, and therefore nothing further that could be done.

29.    Also during this time, Mr. Boal told me that he intended to make the Playboy article into a movie. At no point in time did I ever consent to having my name, likeness, or any facet of my personal life depicted in a movie.

30.    Over my objections, Mr. Boal released and published his article through Playboy magazine in September of 2005. [Doc 1-1]. The published article was identical to the advance copy version, and the eleven (11) page article was not about EOD operations in general, but rather, about me personally[1].

31.    Mr. Boal's Playboy article sets forth a plethora of information personal to me, including, but not limited to, the following:

    a.  My name and *personal* life are the actual title of Defendants' article;

    b.  The title identifies "me" as "THE MAN IN THE BOMB SUIT";

    c.  The two photos depicting a man in a bomb suit are me, and are identified as me;

    d.  My age & height (33 years old and 5'8") are provided and I am described as a "little guy", having a wide nose, with large blue/green eyes;

    e.  I grew up in a "trailer park" in West Virginia;

---

[1] Even the article's title and introduction were about me - "For Staff Sergeant Jeffrey Sarver ... the war in Iraq couldn't get any more personal. What's it like to be THE MAN IN THE BOMB SUIT".

6

**DECLARATION OF SGT. JEFFREY S. SARVER**

f.  My specific pronunciation of words through my "accent" ("West Virginia twang"; "ah-ee-dee" [IED]);

g.  The identification of my minor son by name - Jared, who lives back home with my ex-girlfriend;

h.  I refer to my son as: "... a hard headed bastard";

i.  Turning off the headset in my bombsuit during missons, and therefore having no communication with my team members;

j.  My history of bar fights;

k.  My personal relationship problems with my ex-girlfriend and my son, as well as my alleged reputation for fathering children out of wedlock;

l.  My bedroom / sleeping area being decorated with a map of Iraq;

m.  My collection of bomb remnants which was kept in a box under my bed;

n.  Stowing away photos of my son, and unwilling to share or show them to others unless I'm pressed to do so (basically telling the world I don't care about my family or my son);

o.  My military history and background, including having been a former US Army Ranger, and having fought several combat missions while in the Seters of An Najaf;

p.  My fascination with bombs and deadly explosives;

q.  My described feelings while walking up to and dropping on a bomb - "the morbid thrill" where I feel a meth like "surge of adrenaline;"

r.  My being able to hear the sound of my heart beating and the sound of my rasp breath through the amplified speakers in my bombsuit;

s.  My consumption of alcohol after missions;

t.  My practice of tracking the number of IEDs I disarmed by painting bomb stencils on my humvee;

u.  Being obsessed with wanting to disarm more IEDs than any other soldier;

v.  Having successfully disarmed more IED's than any other team since the Iraqi war operations began;

7

DECLARATION OF SGT. JEFFREY S. SARVER

w. Being approached by a Colonel after I successfully disarmed a very dangerous IED in the Colonel's presence, during which the Colonel asked me if I was the crazy man in the bomb suit, then called me a hero and asked for a picture with me. That Colonel is now Major General Mark Milley which still serves in the active Army at the Pentagon Joint Staff.

x. Abandoning my family (including my son) because I chose to return to Iraq and continue serving my country;

y. Describing me as having fallen for an obsession with killing and suffering since I was a child/teenager;

z. Essentially stating I am a successful bomb tech but a horrible human being because I am reckless and flawed (ie, implying I am addicted to war and violence; implying I am willing to risk my life or anyone else's life simply for "the morbid thrill" or adrenaline rush of war; implying I am reckless by describing me as a "wild-man" or "cowboy"; implying I have a twisted fascination and obsession for death and deadly explosive devices; implying I love war and violence more than my family);

aa. After giving away my identity, residence, hometown, age, height, speech accent and speech dialect, after publishing photos of me both in and out of my bomb suit; after identifying me as *the* man in the bomb suit, and while knowing I was going back to Iraq in the very near future, Mr. Boal gratuitously published that there is a $25,000 bounty for the head of any EOD tech.

32. Mr. Boal sold his article to Reader's Digest where it was republished (an abridged version) in 2006. I did work with A Reader's Digest editor in an effort to remove some portions of the article, but I was told there was not much I could do, since Mr. Boal sold the same article to Reader's Digest and was permitting Reader's Digest to publish the article "as is".

33. On June 26, 2009, there was a limited release (premiere) showing of the motion picture film "The Hurt Locker" in the cities of New York and Los Angeles.

34. At that time, I was stationed and resided at the Picatinny Arsenal located in Dover, New Jersey.

35. While at Fort Picatinny, I heard about the New York premiere through several service members from our garrison. Several service members from the garrison, including

8

DECLARATION OF SGT. JEFFREY S. SARVER

1  Lieutenant colonel John Stack, First Sergeant Paul Wilcock, and myself, decided to attend the

2  premier showing of the Hurt Locker on June 26, 2009.

3          36.     Mr. Boal never invited me to any advance screening of the film, despite the claims in

4  his Declaration. Several soldiers and I decided to attend the premier showing in New York on our

5  own.

6          37.     A couple of weeks later, and while I was still stationed / residing at the Picatinny

7  Arsenal, The Hurt Locker was showing in New Jersey theaters, and was even playing at the theater

8  just outside the Picatinny Arsenal in New Jersey.

9

10          38.     The Hurt Locker was showing in New Jersey theaters for at least a month up until

11  the time I was transferred to Fort Campbell, located in Tennessee, in September of 2009.

12          39.     No one ever asked for, nor did I give, consent to use my personal story, name, and

13  likeness in a major motion picture.

14

15          40.     No one ever asked for, nor did I give, consent to make or publish a movie about

16  myself, my family, or my military activities while in Iraq.

17          41.     The movie and the movie's main character "Will James" - played by actor Jeremy

18  Renner - is not a fictional story about a fictional character. Instead, the character "Will James" is a

19  literal replication of my persona and likeness, and the story nothing more than a chronicle of my

20  personal life and events, all of which were heard/observed and /or recorded by Mr. Boal during his

21  embedment on my team and subsequent visit to my unit's garrison in Wisconsin.

22

23          42.     My colleagues, family members, and friends easily recognize that the movie's main

24  character Will James and the movie itself are about me personally, both with respect to my actions

25  while in Iraq, as well as my personal actions and circumstances at home and with my family.

26

27

28                                           9

                          **DECLARATION OF SGT. JEFFREY S. SARVER**

43.     Any casual reader of the Playboy Article can easily identify that the movie's main character Will James and the movie itself are about me personally, both with respect to my actions while in Iraq, as well as my personal actions and circumstances at home and with his family.

44.     *Some Examples*[2] of the Hurt Locker movie's portrayal of my likeness and personal information, some of which were documented in Mr. Boal's Playboy Article, others of which were observed, heard, and/or recorded by Mr. Boal during his deployment with my unit, include the following:

a.  The title "The Hurt Locker" – Though I did not "invent" this term, Mr. Boal heard me express the term "The Hurt Locker" on multiple occasions while in Iraq. He asked me what it meant and I responded with "a place you go when you f*ck up". Mr. Boal captured this on video outside our unit's Tactical Operations Center before we responded to an IED while waiting for security.

b.  The movie's quote of "War is a Drug" – I mentioned this to Boal during one of our conversations which he recorded. I explained to Mr. Boal that war was like drugs because you could never experience a "high" like it. The adrenaline rush you receive when working on an IED was like drugs. This was expressed to Mr. Boal at the time he was supplying our unit with alcoholic beverages.

c.  "Will James", played by Jeremy Renner" – Mr. Renner is basically the same age and height as me. He has my same hair and eye color. Mr. James is not married, and has a young son back home. I was also not married with a young son back home at the time. Renner / James identifying call signal is "Blaster One", which was my unique identifying call signal. Renner / James acts like, behaves like, and impersonates me down to the smallest detail, including the replication of my West Virginia accent and dialect, my expressions, my mannerisms, my personality, and even my dress habits (i.e. Renner wears his sleeves rolled up in the exact same manner as me; Renner wears the same black hoodie[3] that I wore around the unit area and living quarters; and Renner wears the same flack vest as I wore (I was the only EOD member who wore this)).

I saw a You Tube video entitled "NYC Comic Con 2009 – Hurt Locker – Jeremy Renner", in which Jeremy Renner described his character Will James and how he was taught to play this character. Mr. Renner said specifically said:

"this character James, which isn't very common at all in EOD – that's what

---

[2] There are many, many more likenesses of me depicted throughout the movie.

[3] Which was sent to me by a family member during the time of Mr. Boal's embedment. Mr. Boal watched and videotaped me unwrapping the gift wrapped black hoodie, which I wore regularly around base camp thereafter.

10

**DECLARATION OF SGT. JEFFREY S. SARVER**

made the character interesting. I had to learn the rules of EOD so I knew how to break them. But they **showed** me a guy, *there's one guy* that they knew [who] was like James, whose character I played, who would literally go up – that's why I started kicking that trunk – that guy would literally go up to an IED and kick it, and he uses a lot of velocity; he was like 'it didn't go off, I won'. That was the sort of mentality of that guy, so they told me stories very similar to that."

"That guy" is me. In Mr. Boal's presence, I kicked many objects with IEDs. A true and correct copy of the Jeremy Renner You Tube video is attached as **Exhibit C.**

Furthermore, Mr. Boal's Declaration falsely represents "Renner wore a distinctively different uniform from Plaintiff during the film and carried a gun in his uniform, unlike plaintiff". This is untrue. Renner wore the exact same body armor I wore which is the woodland camouflage pattern. In fact, Renner was the only one to wear that style of uniform during the movie. I also carried an Iraqi 9 mm pistol in the front of my body armor during my deployment.

d. <u>Same Military & Family Background</u> – Just like me, "Will James" is a former Army Ranger, not married, who has a young son who lives with his mother back home; Will James is also referenced as a "red neck" and "trailer trash"; As documented in Mr. Boal's article, I grew up in a trailer park in West Virginia.

e. <u>Same EOD Missions</u> – Most of the EOD missions depicted in the movie are identical to my missions, including the same camps where the EOD team was based (ie Camp Victory), same time frame, and the same manner in which they were handled - as documented in the Playboy Article;

f. Jeremy Renner sleeping in his bed at night wearing his bomb helmet and underwear;

g. Jeremy Renner taking a shower while in full army uniform, including the helmet; This was described to Mark Boal after my return to FOB Hotel after the ten day offensive to take back the City of An Najaf;

h. Photos of Renner's son discovered in his (Renner's) bedroom / sleeping area, which Renner kept hidden from his teammates;

i. Renner's bedroom / sleeping area decorated with a map of Iraq and having a box of collected miscellaneous bomb parts underneath his bed;

j. Renner referencing his son as a "bastard";

k. Renner struggling with personal, family relationships just like, and in the same manner as, myself; the other team leaders assigned to the 788th Siam and Hendrickson were both married and not going through a divorce at the time of the embedment;

11

**DECLARATION OF SGT. JEFFREY S. SARVER**

l. Renner drinking alcohol with his subordinates. In fact, Mr. Boal provided us with the alcohol and he had drinks with my team; he also furnished alcohol to me on several occasions when he wanted to ask me questions for his article;

m. Renner setting the record for the most IEDs disarmed by any single soldier;

n. Renner shown leaving his son / family again by enlisting in another deployment to Iraq.

o. Renner severing communications with his teammates during a mission. Contrary to Mr. Boal's Declaration, and as even documented in the Playboy article, I severed communications by turning off the radio receiver in my helmet.

p. Though not documented in Mr. Boal's Playboy article, Renner deploying a smoke grenade in Baghdad by tossing the grenade onto a city street to create a diversion to avoid being seen by potential snipers. Contrary to his Declaration, Mr. Boal observed me doing this very same thing in Iraq when I disarmed an IED in the middle of the city at the request of an Iraqi bomb squad;

q. Though not documented in Mr. Boal's Playboy article, Renner discharging his pistol at an Iraqi motor vehicle which refused to move after being ordered to do so (out of concern for a vehicle born IED). Contrary to his declaration, Mr. Boal watched me do this on multiple occasions.

r. Though not documented in Mr. Boal's Playboy article, Renner discharging his pistol through the windshield of an Iraqi motor vehicle. Contrary to his declaration, Mr. Boal observed footage of my first vehicle born IED (VBIED) where I had shot the windshield of a vehicle heading towards our Team;

s. Though not documented in Mr. Boal's Playboy article, Renner placing the barrel of his gun to the forehead of an Iraqi driver in the middle of Baghdad. Contrary to his declaration, Mr. Boal observed me do this in order to get the driver to move away, which was necessary because of VBIED's driving around looking for US convoy targets;

t. Though not documented in Mr. Boal's Playboy article, Renner taking off his bomb suit when confronting a VBIED in a car. On multiple occasions, and in the presence of Mr. Boal, I removed my bomb suit when engaging IED's stuck or stored in cars, because this was the only way I could effectively work in the close confines of a car.

u. Though not documented in Mr. Boal's Playboy article, Renner befriending an Iraqi child street vendor. Mr. Boal observed me befriending several Iraqi children, from whom I would often purchase whatever trinkets or wares they were trying to sell.

v. Renner shooting at and killing insurgents in a desert fight. Contrary to Mr. Boal's Declaration, I told him about my first month of deployment in Iraq (August 2004), when our team was sent to the desert in An Najaf, during which I told him about shooting three insurgents during combat operations / a desert fight in An Najaf. I

12

**DECLARATION OF SGT. JEFFREY S. SARVER**

explained to him I was providing security for mechanics fixing a vehicle, and had to shoot the insurgents during this time. I also told him of my firefights in An Najaf involving the Barrett sniper rifle. Mr. Boal recorded these conversations, and they are the source for the desert insurgency fighting scenes;

w. Though not documented in the Playboy article, Renner taking off his bombsuit to get into a car in which was an IED. On numerous occasions in front of Mr. Boal, I removed my bombsuit to work on vehicle borne IEDs, because this was the only way I could work effectively while inside the motor vehicle.

x. Renner finding a body bomb. Contrary to Mr. Boal's declaration, when describing to him my combat experiences in An Najaf, I told him about the times I had to remove booby-traps and grenades that were attached to and just inside the bodies of insurgents.

y. Renner witnessing the death by IED of a fellow soldier. I explained to Mr. Boal that I had witnessed the deaths of several soldiers and civilians, and explained my emotions and the scenarios to him on several occasions.

z. Renner responding to a tanker explosion, during which he uses a flashlight to figure out the end point of the fireball. Renner looks up into a tree, sees a healthy, pristine orange, and exclaims that's where it ended. This was also observed and documented by Boal in his Playboy article.

aa. Renner encountering a suicide bomber detonating himself. I witnessed such an event while in An Najef and described this for Mr. Boal.

bb. Renner returning home only to immediately redeploy back to Iraq. This is taken directly from Mr. Boal's Playboy article, in which he quoted me as saying – one month after my return home – that I needed to quickly re-deploy back to Iraq.

cc. Like the Playboy Article, I am depicted in the movie as one who is abnormally fascinated with death, deadly explosives, to the extent that the adrenaline rush I get from death, killing, and war, is more important to me than my personal relationships, including my children, my wife, and former wife;

45. Though the movie clings to my likeness and personal circumstances throughout, there are several scenes in which I am falsely portrayed, such as:

a. The scene where Will James responded to a burning car bomb (VBIED) by using a fire extinguisher to put out the fire. All EOD's run from a burning VBIED, and this depiction casts me in a false light and causes leadership and junior soldiers to doubt my judgment. I am routinely asked by soldiers I do not know if I really used a fire extinguisher on a burning VBIED;

13

**DECLARATION OF SGT. JEFFREY S. SARVER**

b. The scene where Will James explains to his young son that he essentially does not love him, and that the only thing James loves now is "war" (the movie ends by showing James back in Iraq, starting another deployment mission);

c. The portrayal of James as a reckless, gung-ho war addict who has a morbid fascination with death, which is more important to him than his personal relationships, which causes him to carelessly risk both his and his colleagues' lives in the theater of war, simply to feel the thrill of cheating death. At the end of the movie, James tells his young son that when you get older, you only love one or two things, and with James, it is only one thing. The next scene shows James leaving his family for another combat riddled overseas deployment.

46. The movie's portrayal of my personal life, actions, and circumstances, both the accurate and false portrayals, have caused me harm. For example:

a. I am an increased risk of harm and/or death caused by Defendants' misappropriating my likeness, and highly publicizing both my likeness and my "perceived" likeness (ie the defamatory / untrue portrayal of me as a mad, foolish, crazy, wild, mentally ill man, who will recklessly risk his and others' lives because of an addiction / fascination with death) – Defendants have essentially placed a bulls-eye on the back of my army uniform / bomb suit for my current and any future deployments;

b. Emotional distress and harm (i.e. young soldiers – privates - now laugh at me as they unabashedly walk up to me, a highly ranked, First Sergeant, to jokingly ask for my autograph because of my likeness, and my involuntary lead role in the film; the fear of whether my peers will now respect / protect me in the theater of war);

c. Because of the article and movie, I have been discredited by my imputed actions documented therein. I routinely have been made fun of and have been denied employment by soldiers and leadership in JSOC for "selling my movie rights", which labels me a Counter Intelligence Risk. My portrayed actions, and personality, and likeness in the movie directly correlate with the article to which people have read. I am constantly harassed about the movie and article by soldiers I have never met.

d. Distress and concern about how my son will react to the above scene where James explains he no longer loves his son.

e. Because the actor portrays me as a reckless soldier and idiot, this portrayal is being reflected upon me at work, at home, and amongst friends.

14

**DECLARATION OF SGT. JEFFREY S. SARVER**

47.    I have also never had any type of relationship with the state of California, never lived there, never worked there, never vacationed there.

I declare under penalty of perjury under the laws of the United States of America and the State of California that the foregoing is true and correct.

Executed at _____ 9:15 _____, Afghanistan, on March ___ 15 ___, 2011.

_____
Sgt. Jeffrey S. Sarver

15

**DECLARATION OF SGT. JEFFREY S. SARVER**

0126

101900Z FEB 03
FM SECDEF WASHINGTON DC//OASD-PA//
TO SECDEF WASHINGTON DC//CHAIRS//
AIG 8777
HQ USEUCOM VAIHINGEN GE//PA//
USCINCEUR VAIHINGEN GE//ECPA//
JOINT STAFF WASHINGTON DC//PA//
SECSTATE WASHINGTON DC//PA//
CJCS WASHINGTON DC//PA//
NSC WASHINGTON DC
WHITE HOUSE SITUATION ROOM
INFO SECDEF WASHINGTON DC//OASD-PA/DPO//

UNCLAS

SUBJECT:  PUBLIC AFFAIRS GUIDANCE (PAG) ON EMBEDDING MEDIA DURING
POSSIBLE FUTURE OPERATIONS/DEPLOYMENTS IN THE U.S. CENTRAL COMMANDS
(CENTCOM) AREA OF RESPONSIBILITY (AOR).

REFERENCES:  REF. A.  SECDEF MSG, DTG 172200Z JAN 03, SUBJ:  PUBLIC
AFFAIRS GUIDANCE (PAG) FOR MOVEMENT OF FORCES INTO THE CENTCOM AOR FOR
POSSIBLE FUTURE OPERATIONS.

1.  PURPOSE.  THIS MESSAGE PROVIDES GUIDANCE, POLICIES AND PROCEDURES
ON EMBEDDING NEWS MEDIA DURING POSSIBLE FUTURE OPERATIONS/DEPLOYMENTS
IN THE CENTCOM AOR.  IT CAN BE ADAPTED FOR USE IN OTHER UNIFIED COMMAND
AORS AS NECESSARY.

2.  POLICY.

2.A.  THE DEPARTMENT OF DEFENSE (DOD) POLICY ON MEDIA COVERAGE OF
FUTURE MILITARY OPERATIONS IS THAT MEDIA WILL HAVE LONG-TERM, MINIMALLY
RESTRICTIVE ACCESS TO U.S. AIR, GROUND AND NAVAL FORCES THROUGH
EMBEDDING.  MEDIA COVERAGE OF ANY FUTURE OPERATION WILL, TO A LARGE
EXTENT, SHAPE PUBLIC PERCEPTION OF THE NATIONAL SECURITY ENVIRONMENT
NOW AND IN THE YEARS AHEAD.  THIS HOLDS TRUE FOR THE U.S. PUBLIC; THE
PUBLIC IN ALLIED COUNTRIES WHOSE OPINION CAN AFFECT THE DURABILITY OF
OUR COALITION; AND PUBLICS IN COUNTRIES WHERE WE CONDUCT OPERATIONS,
WHOSE PERCEPTIONS OF US CAN AFFECT THE COST AND DURATION OF OUR
INVOLVEMENT.  OUR ULTIMATE STRATEGIC SUCCESS IN BRINGING PEACE AND
SECURITY TO THIS REGION WILL COME IN OUR LONG-TERM COMMITMENT TO
SUPPORTING OUR DEMOCRATIC IDEALS.  WE NEED TO TELL THE FACTUAL STORY -
GOOD OR BAD - BEFORE OTHERS SEED THE MEDIA WITH DISINFORMATION AND
DISTORTIONS, AS THEY MOST CERTAINLY WILL CONTINUE TO DO.  OUR PEOPLE IN
THE FIELD NEED TO TELL OUR STORY - ONLY COMMANDERS CAN ENSURE THE MEDIA
GET TO THE STORY ALONGSIDE THE TROOPS.  WE MUST ORGANIZE FOR AND
FACILITATE ACCESS OF NATIONAL AND INTERNATIONAL MEDIA TO OUR FORCES,
INCLUDING THOSE FORCES ENGAGED IN GROUND OPERATIONS, WITH THE GOAL OF
DOING SO RIGHT FROM THE START.  TO ACCOMPLISH THIS, WE WILL EMBED MEDIA
WITH OUR UNITS.  THESE EMBEDDED MEDIA WILL LIVE, WORK AND TRAVEL AS
PART OF THE UNITS WITH WHICH THEY ARE EMBEDDED TO FACILITATE MAXIMUM,
IN-DEPTH COVERAGE OF U.S. FORCES IN COMBAT AND RELATED OPERATIONS.
COMMANDERS AND PUBLIC AFFAIRS OFFICERS MUST WORK TOGETHER TO BALANCE
THE NEED FOR MEDIA ACCESS WITH THE NEED FOR OPERATIONAL SECURITY.

2.B.  MEDIA WILL BE EMBEDDED WITH UNIT PERSONNEL AT AIR AND GROUND
FORCES BASES AND AFLOAT TO ENSURE A FULL UNDERSTANDING OF ALL

0127

OPERATIONS. MEDIA WILL BE GIVEN ACCESS TO OPERATIONAL COMBAT MISSIONS, INCLUDING MISSION PREPARATION AND DEBRIEFING, WHENEVER POSSIBLE.

2.C. A MEDIA EMBED IS DEFINED AS A MEDIA REPRESENTATIVE REMAINING WITH A UNIT ON AN EXTENDED BASIS - PERHAPS A PERIOD OF WEEKS OR EVEN MONTHS. COMMANDERS WILL PROVIDE BILLETING, RATIONS AND MEDICAL ATTENTION, IF NEEDED, TO THE EMBEDDED MEDIA COMMENSURATE WITH THAT PROVIDED TO MEMBERS OF THE UNIT, AS WELL AS ACCESS TO MILITARY TRANSPORTATION AND ASSISTANCE WITH COMMUNICATIONS FILING/TRANSMITTING MEDIA PRODUCTS, IF REQUIRED.

2.C.1. EMBEDDED MEDIA ARE NOT AUTHORIZED USE OF THEIR OWN VEHICLES WHILE TRAVELING IN AN EMBEDDED STATUS.

2.C.2. TO THE EXTENT POSSIBLE, SPACE ON MILITARY TRANSPORTATION WILL BE MADE AVAILABLE FOR MEDIA EQUIPMENT NECESSARY TO COVER A PARTICULAR OPERATION. THE MEDIA IS RESPONSIBLE FOR LOADING AND CARRYING THEIR OWN EQUIPMENT AT ALL TIMES. USE OF PRIORITY INTER-THEATER AIRLIFT FOR EMBEDDED MEDIA TO COVER STORIES, AS WELL AS TO FILE STORIES, IS HIGHLY ENCOURAGED. SEATS ABOARD VEHICLES, AIRCRAFT AND NAVAL SHIPS WILL BE MADE AVAILABLE TO ALLOW MAXIMUM COVERAGE OF U.S. TROOPS IN THE FIELD.

2.C.3. UNITS SHOULD PLAN LIFT AND LOGISTICAL SUPPORT TO ASSIST IN MOVING MEDIA PRODUCTS TO AND FROM THE BATTLEFIELD SO AS TO TELL OUR STORY IN A TIMELY MANNER. IN THE EVENT OF COMMERCIAL COMMUNICATIONS DIFFICULTIES, MEDIA ARE AUTHORIZED TO FILE STORIES VIA EXPEDITIOUS MILITARY SIGNAL/COMMUNICATIONS CAPABILITIES.

2.C.4. NO COMMUNICATIONS EQUIPMENT FOR USE BY MEDIA IN THE CONDUCT OF THEIR DUTIES WILL BE SPECIFICALLY PROHIBITED. HOWEVER, UNIT COMMANDERS MAY IMPOSE TEMPORARY RESTRICTIONS ON ELECTRONIC TRANSMISSIONS FOR OPERATIONAL SECURITY REASONS. MEDIA WILL SEEK APPROVAL TO USE ELECTRONIC DEVICES IN A COMBAT/HOSTILE ENVIRONMENT, UNLESS OTHERWISE DIRECTED BY THE UNIT COMMANDER OR HIS/HER DESIGNATED REPRESENTATIVE. THE USE OF COMMUNICATIONS EQUIPMENT WILL BE DISCUSSED IN FULL WHEN THE MEDIA ARRIVE AT THEIR ASSIGNED UNIT.

3. PROCEDURES.

3.A. THE OFFICE OF THE ASSISTANT SECRETARY OF DEFENSE FOR PUBLIC AFFAIRS (OASD(PA) IS THE CENTRAL AGENCY FOR MANAGING AND VETTING MEDIA EMBEDS TO INCLUDE ALLOCATING EMBED SLOTS TO MEDIA ORGANIZATIONS. EMBED AUTHORITY MAY BE DELEGATED TO SUBORDINATE ELEMENTS AFTER THE COMMENCEMENT OF HOSTILITIES AND AT THE DISCRETION OF OASD(PA). EMBED OPPORTUNITIES WILL BE ASSIGNED TO MEDIA ORGANIZATIONS, NOT TO INDIVIDUAL REPORTERS. THE DECISION AS TO WHICH MEDIA REPRESENTATIVE WILL FILL ASSIGNED EMBED SLOTS WILL BE MADE BY THE DESIGNATED POC FOR EACH NEWS ORGANIZATION.

3.A.1. IAW REF. A, COMMANDERS OF UNITS IN RECEIPT OF A DEPLOYMENT ORDER MAY EMBED REGIONAL/LOCAL MEDIA DURING PREPARATIONS FOR DEPLOYMENT, DEPLOYMENT AND ARRIVAL IN THEATER UPON RECEIPT OF THEATER CLEARANCE FROM CENTCOM AND APPROVAL OF THE COMPONENT COMMAND. COMMANDERS WILL INFORM THESE MEDIA, PRIOR TO THE DEPLOYING EMBED, THAT OASD(PA) IS THE APPROVAL AUTHORITY FOR ALL COMBAT EMBEDS AND THAT THEIR PARTICULAR EMBED MAY END AFTER THE UNIT'S ARRIVAL IN THEATER. THE MEDIA ORGANIZATION MAY APPLY TO OASD(PA) FOR CONTINUED EMBEDDING, BUT

THERE IS NO GUARANTEE AND THE MEDIA ORGANIZATION WILL HAVE TO MAKE ARRANGEMENTS FOR AND PAY FOR THE JOURNALISTS' RETURN TRIP.

3.B.   WITHOUT MAKING COMMITMENTS TO MEDIA ORGANIZATIONS, DEPLOYING UNITS WILL IDENTIFY LOCAL MEDIA FOR POTENTIAL EMBEDS AND NOMINATE THEM THROUGH PA CHANNELS TO OASD(PA) (POC:  MAJ TIM BLAIR, DSN 227-1253; COMM. 703-697-1253; EMAIL TIMOTHY.BLAIR@OSD.MIL).  INFORMATION REQUIRED TO BE FORWARDED INCLUDES MEDIA ORGANIZATION, TYPE OF MEDIA AND CONTACT INFORMATION INCLUDING BUREAU CHIEF/MANAGING EDITOR/NEWS DIRECTOR'S NAME; OFFICE, HOME AND CELL PHONE NUMBERS; PAGER NUMBERS AND EMAIL ADDRESSES.  SUBMISSIONS FOR EMBEDS WITH SPECIFIC UNITS SHOULD INCLUDE AN UNIT'S RECOMMENDATION AS TO WHETHER THE REQUEST SHOULD BE HONORED.

3.C.   UNIT COMMANDERS SHOULD ALSO EXPRESS, THROUGH THEIR CHAIN OF COMMAND AND PA CHANNELS TO OASD(PA), THEIR DESIRE AND CAPABILITY TO SUPPORT ADDITIONAL MEDIA EMBEDS BEYOND THOSE ASSIGNED.

3.D.   FREELANCE MEDIA WILL BE AUTHORIZED TO EMBED IF THEY ARE SELECTED BY A NEWS ORGANIZATION AS THEIR EMBED REPRESENTATIVE.

3.E.   UNITS WILL BE AUTHORIZED DIRECT COORDINATION WITH MEDIA AFTER ASSIGNMENT AND APPROVAL BY OASD(PA).

3.E.1.UNITS ARE RESPONSIBLE FOR ENSURING THAT ALL EMBEDDED MEDIA AND THEIR NEWS ORGANIZATIONS HAVE SIGNED THE "RELEASE, INDEMNIFICATION, AND HOLD HARMLESS AGREEMENT AND AGREEMENT NOT TO SUE", FOUND AT HTTP://WWW.DEFENSELINK.MIL/NEWS/FEB2003/D20030210EMBED.PDF.  UNITS MUST MAINTAIN A COPY OF THIS AGREEMENT FOR ALL MEDIA EMBEDDED WITH THEIR UNIT.

3.F.   EMBEDDED MEDIA OPERATE AS PART OF THEIR ASSIGNED UNIT.  AN ESCORT MAY BE ASSIGNED AT THE DISCRETION OF THE UNIT COMMANDER.  THE ABSENCE OF A PA ESCORT IS NOT A REASON TO PRECLUDE MEDIA ACCESS TO OPERATIONS.

3.G.   COMMANDERS WILL ENSURE THE MEDIA ARE PROVIDED WITH EVERY OPPORTUNITY TO OBSERVE ACTUAL COMBAT OPERATIONS.  THE PERSONAL SAFETY OF CORRESPONDENTS IS NOT A REASON TO EXCLUDE THEM FROM COMBAT AREAS.

3.H.   IF, IN THE OPINION OF THE UNIT COMMANDER, A MEDIA REPRESENTATIVE IS UNABLE TO WITHSTAND THE RIGOROUS CONDITIONS REQUIRED TO OPERATE WITH THE FORWARD DEPLOYED FORCES, THE COMMANDER OR HIS/HER REPRESENTATIVE MAY LIMIT THE REPRESENTATIVES PARTICIPATION WITH OPERATIONAL FORCES TO ENSURE UNIT SAFETY AND INFORM OASD(PA) THROUGH PA CHANNELS AS SOON AS POSSIBLE.  GENDER WILL NOT BE AN EXCLUDING FACTOR UNDER ANY CIRCUMSTANCE.

3.I.   IF FOR ANY REASON A MEDIA REPRESENTATIVE CANNOT PARTICIPATE IN AN OPERATION, THEY WILL BE TRANSPORTED TO THE NEXT HIGHER HEADQUARTERS FOR THE DURATION OF THE OPERATION.

3.J.   COMMANDERS WILL OBTAIN THEATER CLEARANCE FROM CENTCOM/PA FOR MEDIA EMBARKING ON MILITARY CONVEYANCE FOR PURPOSES OF EMBEDDING.

3.K.   UNITS HOSTING EMBEDDED MEDIA WILL ISSUE INVITATIONAL TRAVEL ORDERS, AND NUCLEAR, BIOLOGICAL AND CHEMICAL (NBC) GEAR.  SEE PARA. 5. FOR DETAILS ON WHICH ITEMS ARE ISSUED AND WHICH ITEMS THE MEDIA ARE RESPONSIBLE TO PROVIDE FOR THEMSELVES.

3.L. MEDIA ARE RESPONSIBLE FOR OBTAINING THEIR OWN PASSPORTS AND VISAS.

3.M. MEDIA WILL AGREE TO ABIDE BY THE CENTCOM/OASD(PA) GROUND RULES STATED IN PARA. 4 OF THIS MESSAGE IN EXCHANGE FOR COMMAND/UNIT-PROVIDED SUPPORT AND ACCESS TO SERVICE MEMBERS, INFORMATION AND OTHER PREVIOUSLY-STATED PRIVILEGES. ANY VIOLATION OF THE GROUND RULES COULD RESULT IN TERMINATION OF THAT MEDIA'S EMBED OPPORTUNITY.

3.N. DISPUTES/DIFFICULTIES. ISSUES, QUESTIONS, DIFFICULTIES OR DISPUTES ASSOCIATED WITH GROUND RULES OR OTHER ASPECTS OF EMBEDDING MEDIA THAT CANNOT BE RESOLVED AT THE UNIT LEVEL, OR THROUGH THE CHAIN OF COMMAND, WILL BE FORWARDED THROUGH PA CHANNELS FOR RESOLUTION. COMMANDERS WHO WISH TO TERMINATE AN EMBED FOR CAUSE MUST NOTIFY CENTCOM/PA PRIOR TO TERMINATION. IF A DISPUTE CANNOT BE RESOLVED AT A LOWER LEVEL, OASD(PA) WILL BE THE FINAL RESOLUTION AUTHORITY. IN ALL CASES, THIS SHOULD BE DONE AS EXPEDITIOUSLY AS POSSIBLE TO PRESERVE THE NEWS VALUE OF THE SITUATION.

3.O. MEDIA WILL PAY THEIR OWN BILLETING EXPENSES IF BILLETED IN A COMMERCIAL FACILITY.

3.F. MEDIA WILL DEPLOY WITH THE NECESSARY EQUIPMENT TO COLLECT AND TRANSMIT THEIR STORIES.

3.Q. THE STANDARD FOR RELEASE OF INFORMATION SHOULD BE TO ASK "WHY NOT RELEASE" VICE "WHY RELEASE." DECISIONS SHOULD BE MADE ASAP, PREFERABLY IN MINUTES, NOT HOURS.

3.R. THERE IS NO GENERAL REVIEW PROCESS FOR MEDIA PRODUCTS. SEE PARA 6.A. FOR FURTHER DETAIL CONCERNING SECURITY AT THE SOURCE.

3.S. MEDIA WILL ONLY BE GRANTED ACCESS TO DETAINEES OR EPWS WITHIN THE PROVISIONS OF THE GENEVA CONVENTIONS OF 1949. SEE PARA. 4.G.17. FOR THE GROUND RULE.

3.T. HAVING EMBEDDED MEDIA DOES NOT PRECLUDE CONTACT WITH OTHER MEDIA. EMBEDDED MEDIA, AS A RESULT OF TIME INVESTED WITH THE UNIT AND GROUND RULES AGREEMENT, MAY HAVE A DIFFERENT LEVEL OF ACCESS.

3.U. CENTCOM/PA WILL ACCOUNT FOR EMBEDDED MEDIA DURING THE TIME THE MEDIA IS EMBEDDED IN THEATER. CENTCOM/PA WILL REPORT CHANGES IN EMBED STATUS TO OASD(PA) AS THEY OCCUR.

3.V. IF A MEDIA REPRESENTATIVE IS KILLED OR INJURED IN THE COURSE OF MILITARY OPERATIONS, THE UNIT WILL IMMEDIATELY NOTIFY OASD(PA), THROUGH PA CHANNELS. OASD(PA) WILL CONTACT THE RESPECTIVE MEDIA ORGANIZATION(S), WHICH WILL MAKE NEXT OF KIN NOTIFICATION IN ACCORDANCE WITH THE INDIVIDUAL'S WISHES.

3.W. MEDIA MAY TERMINATE THEIR EMBED OPPORTUNITY AT ANY TIME. UNIT COMMANDERS WILL PROVIDE, AS THE TACTICAL SITUATION PERMITS AND BASED ON THE AVAILABILITY OF TRANSPORTATION, MOVEMENT BACK TO THE NEAREST LOCATION WITH COMMERCIAL TRANSPORTATION.

3.W.1.  DEPARTING MEDIA WILL BE DEBRIEFED ON OPERATIONAL SECURITY CONSIDERATIONS AS APPLICABLE TO ONGOING AND FUTURE OPERATIONS WHICH THEY MAY NOW HAVE INFORMATION CONCERNING.

4.  GROUND RULES.  FOR THE SAFETY AND SECURITY OF U.S. FORCES AND EMBEDDED MEDIA, MEDIA WILL ADHERE TO ESTABLISHED GROUND RULES.  GROUND RULES WILL BE AGREED TO IN ADVANCE AND SIGNED BY MEDIA PRIOR TO EMBEDDING.  VIOLATION OF THE GROUND RULES MAY RESULT IN THE IMMEDIATE TERMINATION OF THE EMEED AND REMOVAL FROM THE AOR.  THESE GROUND RULES RECOGNIZE THE RIGHT OF THE MEDIA TO COVER MILITARY OPERATIONS AND ARE IN NO WAY INTENDED TO PREVENT RELEASE OF DEROGATORY, EMBARRASSING, NEGATIVE OR UNCOMPLIMENTARY INFORMATION.  ANY MODIFICATION TO THE STANDARD GROUND RULES WILL BE FORWARDED THROUGH THE PA CHANNELS TO CENTCOM/PA FOR APPROVAL.  STANDARD GROUND RULES ARE:

4.A.  ALL INTERVIEWS WITH SERVICE MEMBERS WILL BE ON THE RECORD. SECURITY AT THE SOURCE IS THE POLICY.  INTERVIEWS WITH PILOTS AND AIRCREW MEMBERS ARE AUTHORIZED UPON COMPLETION OF MISSIONS; HOWEVER, RELEASE OF INFORMATION MUST CONFORM TO THESE MEDIA GROUND RULES.

4.B.  PRINT OR BROADCAST STORIES WILL BE DATELINED ACCORDING TO LOCAL GROUND RULES.  LOCAL GROUND RULES WILL BE COORDINATED THROUGH COMMAND CHANNELS WITH CENTCOM.

4.C.  MEDIA EMBEDDED WITH U.S. FORCES ARE NOT PERMITTED TO CARRY PERSONAL FIREARMS.

4.D.  LIGHT DISCIPLINE RESTRICTIONS WILL BE FOLLOWED.  VISIBLE LIGHT SOURCES, INCLUDING FLASH OR TELEVISION LIGHTS, FLASH CAMERAS WILL NOT BE USED WHEN OPERATING WITH FORCES AT NIGHT UNLESS SPECIFICALLY APPROVED IN ADVANCE BY THE ON-SCENE COMMANDER.

4.E.  EMBARGOES MAY BE IMPOSED TO PROTECT OPERATIONAL SECURITY. EMBARGOES WILL ONLY BE USED FOR OPERATIONAL SECURITY AND WILL BE LIFTED AS SOON AS THE OPERATIONAL SECURITY ISSUE HAS PASSED.

4.F.  THE FOLLOWING CATEGORIES OF INFORMATION ARE RELEASABLE.

4.F.1.  APPROXIMATE FRIENDLY FORCE STRENGTH FIGURES.

4.F.2.  APPROXIMATE FRIENDLY CASUALTY FIGURES BY SERVICE.  EMBEDDED MEDIA MAY, WITHIN OPSEC LIMITS, CONFIRM UNIT CASUALTIES THEY HAVE WITNESSED.

4.F.3.  CONFIRMED FIGURES OF ENEMY PERSONNEL DETAINED OR CAPTURED.

4.F.4.  SIZE OF FRIENDLY FORCE PARTICIPATING IN AN ACTION OR OPERATION CAN BE DISCLOSED USING APPROXIMATE TERMS.  SPECIFIC FORCE OR UNIT IDENTIFICATION MAY BE RELEASED WHEN IT NO LONGER WARRANTS SECURITY PROTECTION.

4.F.5.  INFORMATION AND LOCATION OF MILITARY TARGETS AND OBJECTIVES PREVIOUSLY UNDER ATTACK.

4.F.6.  GENERIC DESCRIPTION OF ORIGIN OF AIR OPERATIONS, SUCH AS "LAND-BASED."

4.F.7.   DATE, TIME OR LOCATION OF PREVIOUS CONVENTIONAL MILITARY MISSIONS AND ACTIONS, AS WELL AS MISSION RESULTS ARE RELEASABLE ONLY IF DESCRIBED IN GENERAL TERMS.

4.F.8.   TYPES OF ORDNANCE EXPENDED IN GENERAL TERMS.

4.F.9.   NUMBER OF AERIAL COMBAT OR RECONNAISSANCE MISSIONS OR SORTIES FLOWN IN CENTCOM'S AREA OF OPERATION.

4.F.10.   TYPE OF FORCES INVOLVED (E.G., AIR DEFENSE, INFANTRY, ARMOR, MARINES).

4.F.11.   ALLIED PARTICIPATION BY TYPE OF OPERATION (SHIPS, AIRCRAFT, GROUND UNITS, ETC.) AFTER APPROVAL OF THE ALLIED UNIT COMMANDER.

4.F.12.   OPERATION CODE NAMES.

4.F.13.   NAMES AND HOMETOWNS OF U.S. MILITARY UNITS.

4.F.14.   SERVICE MEMBERS' NAMES AND HOME TOWNS WITH THE INDIVIDUALS' CONSENT.

4.G.   THE FOLLOWING CATEGORIES OF INFORMATION ARE NOT RELEASABLE SINCE THEIR PUBLICATION OR BROADCAST COULD JEOPARDIZE OPERATIONS AND ENDANGER LIVES.

4.G.1.   SPECIFIC NUMBER OF TROOPS IN UNITS BELOW CORPS/MEF LEVEL.

4.G.2.   SPECIFIC NUMBER OF AIRCRAFT IN UNITS AT OR BELOW THE AIR EXPEDITIONARY WING LEVEL.

4.G.3.   SPECIFIC NUMBERS REGARDING OTHER EQUIPMENT OR CRITICAL SUPPLIES (E.G. ARTILLERY, TANKS, LANDING CRAFT, RADARS, TRUCKS, WATER, ETC.).

4.G.4.   SPECIFIC NUMBERS OF SHIPS IN UNITS BELOW THE CARRIER BATTLE GROUP LEVEL.

4.G.5.   NAMES OF MILITARY INSTALLATIONS OR SPECIFIC GEOGRAPHIC LOCATIONS OF MILITARY UNITS IN THE CENTCOM AREA OF RESPONSIBILITY, UNLESS SPECIFICALLY RELEASED BY THE DEPARTMENT OF DEFENSE OR AUTHORIZED BY THE CENTCOM COMMANDER.   NEWS AND IMAGERY PRODUCTS THAT IDENTIFY OR INCLUDE IDENTIFIABLE FEATURES OF THESE LOCATIONS ARE NOT AUTHORIZED FOR RELEASE.

4.G.6.   INFORMATION REGARDING FUTURE OPERATIONS.

4.G.7.   INFORMATION REGARDING FORCE PROTECTION MEASURES AT MILITARY INSTALLATIONS OR ENCAMPMENTS (EXCEPT THOSE WHICH ARE VISIBLE OR READILY APPARENT).

4.G.8.   PHOTOGRAPHY SHOWING LEVEL OF SECURITY AT MILITARY INSTALLATIONS OR ENCAMPMENTS.

4.G.9.   RULES OF ENGAGEMENT.

4.G.10.   INFORMATION ON INTELLIGENCE COLLECTION ACTIVITIES COMPROMISING TACTICS, TECHNIQUES OR PROCEDURES.

4.G.11.  EXTRA PRECAUTIONS IN REPORTING WILL BE REQUIRED AT THE COMMENCEMENT OF HOSTILITIES TO MAXIMIZE OPERATIONAL SURPRISE. LIVE BROADCASTS FROM AIRFIELDS, ON THE GROUND OR AFLOAT, BY EMBEDDED MEDIA ARE PROHIBITED UNTIL THE SAFE RETURN OF THE INITIAL STRIKE PACKAGE OR UNTIL AUTHORIZED BY THE UNIT COMMANDER.

4.G.12.  DURING AN OPERATION, SPECIFIC INFORMATION ON FRIENDLY FORCE TROOP MOVEMENTS, TACTICAL DEPLOYMENTS, AND DISPOSITIONS THAT WOULD JEOPARDIZE OPERATIONAL SECURITY OR LIVES.  INFORMATION ON ON-GOING ENGAGEMENTS WILL NOT BE RELEASED UNLESS AUTHORIZED FOR RELEASE BY ON-SCENE COMMANDER.

4.G.13.  INFORMATION ON SPECIAL OPERATIONS UNITS, UNIQUE OPERATIONS METHODOLOGY OR TACTICS, FOR EXAMPLE, AIR OPERATIONS, ANGLES OF ATTACK, AND SPEEDS; NAVAL TACTICAL OR EVASIVE MANEUVERS, ETC. GENERAL TERMS SUCH AS "LOW" OR "FAST" MAY BE USED.

4.G.14.  INFORMATION ON EFFECTIVENESS OF ENEMY ELECTRONIC WARFARE.

4.G.15.  INFORMATION IDENTIFYING POSTPONED OR CANCELED OPERATIONS.

4.G.16.  INFORMATION ON MISSING OR DOWNED AIRCRAFT OR MISSING VESSELS WHILE SEARCH AND RESCUE AND RECOVERY OPERATIONS ARE BEING PLANNED OR UNDERWAY.

4.G.17.  INFORMATION ON EFFECTIVENESS OF ENEMY CAMOUFLAGE, COVER, DECEPTION, TARGETING, DIRECT AND INDIRECT FIRE, INTELLIGENCE COLLECTION, OR SECURITY MEASURES.

4.G.18.  NO PHOTOGRAPHS OR OTHER VISUAL MEDIA SHOWING AN ENEMY PRISONER OF WAR OR DETAINEE'S RECOGNIZABLE FACE, NAMETAG OR OTHER IDENTIFYING FEATURE OR ITEM MAY BE TAKEN.

4.G.19.  STILL OR VIDEO IMAGERY OF CUSTODY OPERATIONS OR INTERVIEWS WITH PERSONS UNDER CUSTODY.

4.H.  THE FOLLOWING PROCEDURES AND POLICIES APPLY TO COVERAGE OF WOUNDED, INJURED, AND ILL PERSONNEL:

4.H.1.  MEDIA REPRESENTATIVES WILL BE REMINDED OF THE SENSITIVITY OF USING NAMES OF INDIVIDUAL CASUALTIES OR PHOTOGRAPHS THEY MAY HAVE TAKEN WHICH CLEARLY IDENTIFY CASUALTIES UNTIL AFTER NOTIFICATION OF THE NOK AND RELEASE BY OASD(PA).

4.H.2.  BATTLEFIELD CASUALTIES MAY BE COVERED BY EMBEDDED MEDIA AS LONG AS THE SERVICE MEMBER'S IDENTITY IS PROTECTED FROM DISCLOSURE FOR 72 HOURS OR UPON VERIFICATION OF NOK NOTIFICATION, WHICHEVER IS FIRST.

4.H.3.  MEDIA VISITS TO MEDICAL FACILITIES WILL BE IN ACCORDANCE WITH APPLICABLE REGULATIONS, STANDARD OPERATING PROCEDURES, OPERATIONS ORDERS AND INSTRUCTIONS BY ATTENDING PHYSICIANS.  IF APPROVED, SERVICE OR MEDICAL FACILITY PERSONNEL MUST ESCORT MEDIA AT ALL TIMES.

4.H.4.  PATIENT WELFARE, PATIENT PRIVACY, AND NEXT OF KIN/FAMILY CONSIDERATIONS ARE THE GOVERNING CONCERNS ABOUT NEWS MEDIA COVERAGE OF

WOUNDED, INJURED, AND ILL PERSONNEL IN MEDICAL TREATMENT FACILITIES OR
OTHER CASUALTY COLLECTION AND TREATMENT LOCATIONS.

4.H.5. MEDIA VISITS ARE AUTHORIZED TO MEDICAL CARE FACILITIES, BUT
MUST BE APPROVED BY THE MEDICAL FACILITY COMMANDER AND ATTENDING
PHYSICIAN AND MUST NOT INTERFERE WITH MEDICAL TREATMENT. REQUESTS TO
VISIT MEDICAL CARE FACILITIES OUTSIDE THE CONTINENTAL UNITED STATES
WILL BE COORDINATED BY THE UNIFIED COMMAND PA.

4.H.6. REPORTERS MAY VISIT THOSE AREAS DESIGNATED BY THE FACILITY
COMMANDER, BUT WILL NOT BE ALLOWED IN OPERATING ROOMS DURING OPERATING
PROCEDURES.

4.H.7. PERMISSION TO INTERVIEW OR PHOTOGRAPH A PATIENT WILL BE GRANTED
ONLY WITH THE CONSENT OF THE ATTENDING PHYSICIAN OR FACILITY COMMANDER
AND WITH THE PATIENT'S INFORMED CONSENT, WITNESSED BY THE ESCORT.

4.H.8. "INFORMED CONSENT" MEANS THE PATIENT UNDERSTANDS HIS OR HER
PICTURE AND COMMENTS ARE BEING COLLECTED FOR NEWS MEDIA PURPOSES AND
THEY MAY APPEAR NATIONWIDE IN NEWS MEDIA REPORTS.

4.H.9. THE ATTENDING PHYSICIAN OR ESCORT SHOULD ADVISE THE SERVICE
MEMEER IF NOK HAVE BEEN NOTIFIED.

5. IMMUNIZATIONS AND PERSONAL PROTECTIVE GEAR.

5.A. MEDIA ORGANIZATIONS SHOULD ENSURE THAT MEDIA ARE PROPERLY
IMMUNIZED BEFORE EMEEDDING WITH UNITS. THE CENTERS FOR DISEASE CONTROL
(CDC)-RECOMMENDED IMMUNIZATIONS FOR DEPLOYMENT TO THE MIDDLE EAST
INCLUDE HEPATITIS A; HEPATITIS B; RAEIES; TETANUS-DIPHTHERIA; AND
TYPHOID. THE CDC RECOMMENDS MENINGOCOCCAL IMMUNIZATIONS FOR VISITORS
TO MECCA. IF TRAVELING TO CERTAIN AREAS IN THE CENTCOM AOR, THE CDC
RECOMMENDS TAKING PRESCRIPTION ANTIMALARIAL DRUGS. ANTHRAX AND
SMALLPOX VACCINES WILL BE PROVIDED TO THE MEDIA AT NO EXPENSE TO THE
GOVERNMENT (THE MEDIA OUTLET WILL BEAR THE EXPENSE). FOR MORE HEALTH
INFORMATION FOR TRAVELERS TO THE MIDDLE EAST, GO TO THE CDC WEB SITE AT
HTTP://WWW.CDC.GOV/TRAVEL/MIDEAST.HTM.

5.E. BECAUSE THE USE OF PERSONAL PROTECTIVE GEAR, SUCH AS HELMETS OR
FLAK VESTS, IS BOTH A PERSONAL AND PROFESSIONAL CHOICE, MEDIA WILL BE
RESPONSIELE FOR PROCURING/USING SUCH EQUIPMENT. PERSONAL PROTECTIVE
GEAR, AS WELL AS CLOTHING, WILL BE SUBDUED IN COLOR AND APPEARANCE.

5.C. EMEEDDED MEDIA ARE AUTHORIZED AND REQUIRED TO BE PROVIDED WITH,
ON A TEMPORARY LOAN EASIS, NUCLEAR, BIOLOGICAL, CHEMICAL (NBC)
PROTECTIVE EQUIPMENT BY THE UNIT WITH WHICH THEY ARE EMBEDDED. UNIT
PERSONNEL WILL PROVIDE BASIC INSTRUCTION IN THE PROPER WEAR, USE, AND
MAINTENANCE OF THE EQUIPMENT. UPON TERMINATION OF THE EMBED, INITIATED
BY EITHER PARTY, THE NBC EQUIPMENT SHALL BE RETURNED TO THE EMBEDDING
UNIT. IF SUFFICIENT NBC PROTECTIVE EQUIPMENT IS NOT AVAILABLE FOR
EMEEDDED MEDIA, COMMANDERS MAY PURCHASE ADDITIONAL EQUIPMENT, WITH
FUNDS NORMALLY AVAILAELE FOR THAT PURPOSE, AND LOAN IT TO EMBEDDED
MEDIA IN ACCORDANCE WITH THIS PARAGRAPH.

6. SECURITY

6.A.  MEDIA PRODUCTS WILL NOT BE SUBJECT TO SECURITY REVIEW OR
CENSORSHIP EXCEPT AS INDICATED IN PARA. 6.A.1.  SECURITY AT THE SOURCE
WILL BE THE RULE.  U.S. MILITARY PERSONNEL SHALL PROTECT CLASSIFIED
INFORMATION FROM UNAUTHORIZED OR INADVERTENT DISCLOSURE.  MEDIA
PROVIDED ACCESS TO SENSITIVE INFORMATION, INFORMATION WHICH IS NOT
CLASSIFIED BUT WHICH MAY BE OF OPERATIONAL VALUE TO AN ADVERSARY OR
WHEN COMBINED WITH OTHER UNCLASSIFIED INFORMATION MAY REVEAL CLASSIFIED
INFORMATION, WILL BE INFORMED IN ADVANCE BY THE UNIT COMMANDER OR
HIS/HER DESIGNATED REPRESENTATIVE OF THE RESTRICTIONS ON THE USE OR
DISCLOSURE OF SUCH INFORMATION.  WHEN IN DOUBT, MEDIA WILL CONSULT WITH
THE UNIT COMMANDER OR HIS/HER DESIGNATED REPRESENTATIVE.

6.A.1.  THE NATURE OF THE EMBEDDING PROCESS MAY INVOLVE OBSERVATION OF
SENSITIVE INFORMATION, INCLUDING TROOP MOVEMENTS, BATTLE PREPARATIONS,
MATERIEL CAPABILITIES AND VULNERABILITIES AND OTHER INFORMATION AS
LISTED IN PARA. 4.G.  WHEN A COMMANDER OR HIS/HER DESIGNATED
REPRESENTATIVE HAS REASON TO BELIEVE THAT A MEDIA MEMBER WILL HAVE
ACCESS TO THIS TYPE OF SENSITIVE INFORMATION, PRIOR TO ALLOWING SUCH
ACCESS, HE/SHE WILL TAKE PRUDENT PRECAUTIONS TO ENSURE THE SECURITY OF
THAT INFORMATION.  THE PRIMARY SAFEGUARD WILL BE TO BRIEF MEDIA IN
ADVANCE ABOUT WHAT INFORMATION IS SENSITIVE AND WHAT THE PARAMETERS ARE
FOR COVERING THIS TYPE OF INFORMATION.  IF MEDIA ARE INADVERTENTLY
EXPOSED TO SENSITIVE INFORMATION THEY SHOULD BE BRIEFED AFTER EXPOSURE
ON WHAT INFORMATION THEY SHOULD AVOID COVERING.  IN INSTANCES WHERE A
UNIT COMMANDER OR THE DESIGNATED REPRESENTATIVE DETERMINES THAT
COVERAGE OF A STORY WILL INVOLVE EXPOSURE TO SENSITIVE INFORMATION
BEYOND THE SCOPE OF WHAT MAY BE PROTECTED BY PREBRIEFING OR DEBRIEFING,
BUT COVERAGE OF WHICH IS IN THE BEST INTERESTS OF THE DOD, THE
COMMANDER MAY OFFER ACCESS IF THE REPORTER AGREES TO A SECURITY REVIEW
OF THEIR COVERAGE.  AGREEMENT TO SECURITY REVIEW IN EXCHANGE FOR THIS
TYPE OF ACCESS MUST BE STRICTLY VOLUNTARY AND IF THE REPORTER DOES NOT
AGREE, THEN ACCESS MAY NOT BE GRANTED.  IF A SECURITY REVIEW IS AGREED
TO, IT WILL NOT INVOLVE ANY EDITORIAL CHANGES; IT WILL BE CONDUCTED
SOLELY TO ENSURE THAT NO SENSITIVE OR CLASSIFIED INFORMATION IS
INCLUDED IN THE PRODUCT.  IF SUCH INFORMATION IS FOUND, THE MEDIA WILL
BE ASKED TO REMOVE THAT INFORMATION FROM THE PRODUCT AND/OR EMBARGO THE
PRODUCT UNTIL SUCH INFORMATION IS NO LONGER CLASSIFIED OR SENSITIVE.
REVIEWS ARE TO BE DONE AS SOON AS PRACTICAL SO AS NOT TO INTERRUPT
COMBAT OPERATIONS NOR DELAY REPORTING.  IF THERE ARE DISPUTES RESULTING
FROM THE SECURITY REVIEW PROCESS THEY MAY BE APPEALED THROUGH THE CHAIN
OF COMMAND, OR THROUGH PA CHANNELS TO OASD/PA.  THIS PARAGRAPH DOES NOT
AUTHORIZE COMMANDERS TO ALLOW MEDIA ACCESS TO CLASSIFIED INFORMATION.

6.A.2.  MEDIA PRODUCTS WILL NOT BE CONFISCATED OR OTHERWISE IMPOUNDED.
IF IT IS BELIEVED THAT CLASSIFIED INFORMATION HAS BEEN COMPROMISED AND
THE MEDIA REPRESENTATIVE REFUSES TO REMOVE THAT INFORMATION NOTIFY THE
CPIC AND/OR OASD/PA AS SOON AS POSSIBLE SO THE ISSUE MAY BE ADDRESSED
WITH THE MEDIA ORGANIZATION'S MANAGEMENT.

7.  MISCELLANEOUS/COORDINATING INSTRUCTIONS:

7.A.  OASD(PA) IS THE INITIAL EMBED AUTHORITY.  EMBEDDING PROCEDURES
AND ASSIGNMENT AUTHORITY MAY BE TRANSFERRED TO CENTCOM PA AT A LATER
DATE.  THIS AUTHORITY MAY BE FURTHER DELEGATED AT CENTCOM'S DISCRETION.

7.B.  THIS GUIDANCE AUTHORIZES BLANKET APPROVAL FOR NON-LOCAL AND LOCAL
MEDIA TRAVEL ABOARD DOD AIRLIFT FOR ALL EMBEDDED MEDIA ON A NO-COST,

SPACE AVAILABLE BASIS.  NO ADDITIONAL COSTS SHALL BE INCURRED BY THE
GOVERNMENT TO PROVIDE ASSISTANCE IAW DODI 5410.15, PARA 3.4.

7.C.  USE OF LIPSTICK AND HELMET-MOUNTED CAMERAS ON COMBAT SORTIES IS
APPROVED AND ENCOURAGED TO THE GREATEST EXTENT POSSIBLE.

8. OASD(PA) POC FOR EMBEDDING MEDIA IS MAJ TIM BLAIR, DSN 227-1253,
CMCL 703-697-1253, EMAIL TIMOTHY.BLAIR@OSD.MIL.

## Todd Weglarz

**From:** Mark Boal [mboal@nyc.rr.com]
**Sent:** Wednesday, August 03, 2005 6:07 PM
**To:** christopher.t.wilson@us.army.mil
**Subject:** Re: hello from Playboy
**Attachments:** SEP FEAT Bomb Squad;31.pdf

Todd,
Here's an advance copy of the article as a PDF. Please do not circulate it as Playboy does
not want electronic copies floating around. I've shown it already to CSM Clifford and
received a positive response. Clifford will be arranging media interviews with various news
organizations as follow ups to the article which he said reflected well on EOD. I also showed
it to Sarver and his initial reaction was less favorable. I guess that makes me 1-1 so far.
Ready to be the tie-breaker?
Mark


On 8/2/05 2:15 PM, "christopher.t.wilson@us.army.mil"
<christopher.t.wilson@us.army.mil> wrote:

> Mark,
>
>
> Good to hear from you!!!
>
> Commander
> 788th Ord Co (EOD0
> 1401 S. 10th AVE
> Fort McCoy, WI 54656
>
>
> I'm looking forward to reading the article.  (I hope...)   My CPT bars are
> riding on it!!!!  ha ha Just kidding.  I'm sure the 52nd Ord Group has
> already seen the article.
>
>
> By the way,  SGT Gorsuch never received one of the original packages
> from Playboy with the goodies.  Is there any way that you could put something
> together for him?   I'm pretty sure that he gave you an incorrect address.  If
> you can put something together,  you can send it to the address above
> with his name on it.  I'd like to make sure that he atleast has
> something for his scap book to show his grand kids when he's a dirty
> old .... telling his war stories.
>
>
>
> Talk to you later,
> Todd
>
>
> v/r,
> CPT Wilson
> 788th EOD
> DSN 280-4121
>

0137

```
> AKO: christopher.t.wilson@us.army.mil
> McCoy: christopher.t.wilson@emh2.mccoy.army.mil
>
> ----- Original Message -----
> From: Mark Boal <mboal@nyc.rr.com>
> Date: Tuesday, August 2, 2005 12:12 pm
> Subject: Re: hello from Playboy
>
>> Todd,
>> I have an early copy of the Playboy article that I wish to send you
>> so you can read it before the magazine hits the streets.
>>
>> Can you give me an address that will receive Fed Ex or Express Mail?
>>
>> Mark
>>
>>
>> On 2/25/05 2:59 PM, "christopher.t.wilson@us.army.mil"
>> <christopher.t.wilson@us.army.mil> wrote:
>>
>>> Mark,
>>>
>>>
>>> The 24hr number is (608) 388-3315.   The best time to call is
>> the 1st of the
>>> week.  That way I can have the training calendar in front of me
>> to find the
>>> best dates.
>>>
>>>
>>> Todd
>>>
>>> ----- Original Message -----
>>> From: Mark Boal <mboal@nyc.rr.com>
>>> Date: Friday, February 25, 2005 1:18 pm
>>> Subject: RE: RE: hello from Playboy
>>>
>>>> Todd,
>>>>
>>>> You are most welcome, and it was the least I could do after all
>> your>> hospitality. I'm only sorry it's not mansion tickets but
>> I'm still
>>>> trying to finagle that.
>>>>
>>>> I would like to come and visit you guys in WI soon, to finish the
>>>> reporting on the article with the troops safely back home, and
>> I hope
>>>> you agree that's a good idea.
>>>>
>>>> How do I reach you by phone to coordinate this?
>>>>
>>>> Mark
>>>>
>>>> -----Original Message-----
>>>> From: christopher.t.wilson@us.army.mil
>>>> [mailto:christopher.t.wilson@us.army.mil]
>>>> Sent: Friday, February 25, 2005 12:59 PM
```

0138

>>>> To: Mark Boal
>>>> Subject: Re: RE: hello from Playboy
>>>>
>>>> Mark,
>>>>
>>>>
>>>>
>>>> Attached is the FINAL copy of the 788th EOD's historical for our
>>>> time in Iraq.  I hope it is not too late for you to use.
>>>>
>>>>
>>>> Thanks for the packages that everyone received the last couple of
>>>> days.We definitely didn't expect to receive such.  I'll be sure to
>>>> the lay the hard cover books out on my coffee table before my girl
>>>> friend comesin this weekend!!!!
>>>>
>>>>
>>>> Todd
>>>>
>>>> ----- Original Message -----
>>>> From: Mark Boal <mboal@nyc.rr.com>
>>>> Date: Monday, January 24, 2005 11:49 am
>>>> Subject: RE: hello from Playboy
>>>>
>>>>> Todd,
>>>>>
>>>>> Glad you are home safe. (Funny coincidence that your birthday is
>>>>> Jan 21, mine is Jan 23.)
>>>>>
>>>>>
>>>>> Sorry to hear about your grandmother.
>>>>> My thoughts and prayers are with you.
>>>>>
>>>>> Mark
>>>>>
>>>>> -----Original Message-----
>>>>> From: christopher.t.wilson@us.army.mil
>>>>> [mailto:christopher.t.wilson@us.army.mil]
>>>>> Sent: Monday, January 24, 2005 10:03 AM
>>>>> To: Mark Boal
>>>>> Subject: Re: hello from Playboy
>>>>>
>>>>> Mark,
>>>>>
>>>>>
>>>>> We arrived back to WI late afternoon on 21 Jan 05.  (My 30th
>>>> Birthday)>
>>>>> Everyone made it home fine.  We did have a CLOSE call before we
>>>> left,> Hendrickson wasn't hurt.  A secondary IED should have killed
>>>> him
>>>>> and the
>>>>> other Team Leader.  Both walked away w/o injuries.
>>>>>
>>>>> I'm about to go on Emergency LEAVE to AL.  My Grandmother isn't
>>>>> expectedto last much longer.  If you need any info,  you can
>>>> email
>>>>> 1SG Stone or

3

```
>>>>> SFC Mutka.  I'll shoot you the final 788th EOD HISTORY in a few
>>>> days.>
>>>>>
>>>>> Later
>>>>> Todd
>>>>>
>>>>> ----- Original Message -----
>>>>> From: Mark Boal <mboal@nyc.rr.com>
>>>>> Date: Monday, January 24, 2005 1:48 am
>>>>> Subject: hello from Playboy
>>>>>
>>>>>>
>>>>>>
>>>>>>
>>>>>> Hey Chris,
>>>>>>
>>>>>> Are you back home yet?
>>>>>>
>>>>>> Mark
>>>>>>
>>>>>>
>>>>>>
>>>>>> Mark Boal
>>>>>> Writer At Large
>>>>>> Playboy Magazine
>>>>>>
>>>>>
>>>>>
>>>>
>>>>
>>
>>
```

0140