# EXHIBIT "C"

# INTENTIONALLY LEFT BLANK

# --VIDEO TO BE LODGED WITH COURT--

Case: 11-56986  02/13/2013  ID: 8512444  DktEntry: 34-5  Page 2 of 54



For Staff Sergeant Jeffrey Sarver of the U.S. Army's 788th Ordnance Company, the war in Iraq couldn't get any more personal. What it's like to be **THE MAN IN THE...**

by mark boal

0142



# BO MB SUIT

t's 4:30 P.M., early December 2004, and a caravan of Humvees rumbles out of Camp Victory carrying Staff Sergeant Jeffrey S. Sarver and his team of bomb-squad technicians from the U.S. Army's 788th Ordnance Company. As Sarver's team bounces down Victory's rutted roads, the convoy passes a helipad where Chinooks, Black Hawks and Apaches thump in and out, some of them armed with laser-guided missiles and 30-millimeter cannons that fire fist-size shells. Sarver sees the Bradley and Abrams tanks sitting in neat rows, like cars at a dealership, their depleted-uranium bumpers aligned with precision. All that lethal hardware is parked, more or less useless

0143



Sarver (above) takes the long, lonely walk downrange to defuse an improvised explosive device, known in this war as an IED, while an Army Ranger watches his back. Right, from top: Sarver, Williams and Millward, part of the Badass Baghdad Bomb Squad (their words). During their six-month tour, which ended in January 2005, these three soldiers are believed to have "rendered safe" more IEDs than any other explosive-ordnance-disposal team since combat operations in Iraq began. They may have saved hundreds of lives.

against the Iraqi insurgency's main weapon in this phase of the war: improvised explosive devices made from artillery shells, nine-volt batteries and electrical tape—what the troops call IEDs.

As they leave the front gate, Sarver is in high spirits. He grabs the radio and sings out in his West Virginia twang, "Hey, ah, do you want to be the dirty old man or the cute young boy?"

"I'll be the boy," comes the response with a laugh. It's Sarver's junior team member, Specialist Jonathan Williams.

"Okay, cute boy. This is dirty old man, over."

"Roger, ol' man. We're en route to the ah-ee-dee."

Turning onto a main road, the busiest bomb squad in Iraq enters Baghdad—a massive city, filthy and foul-smelling, teeming with life despite two decades of war—and the caravan blasts down its highways, jumping curbs on the side streets, pushing through traffic like VIPs. The lead Humvee driver leans on the horn, and his gunner in the .50-caliber machine gun turret shouts, "Imshee, imshee, imshee! Go away, go away, go away!" his finger ready on the trigger if any car violates the cushion of space between them and anything Iraqi.

At last they arrive at an intersection where everything is still. Here the city has stopped dead, pressing itself against road-blocks set up by a Ranger team, and traffic is backing up on both sides of the busy crossroads. This is what the war in Iraq looks like on most days: a traffic jam and a roadside bomb. The war has stopped to wait for Sarver and his fellow techs,

## It is a job so dangerous that bomb techs are five times more likely to die in Iraq than all other soldiers in the theater.

the 100- to 150-man counterforce in this theater, who are specifically trained to handle the homemade bombs that now account for more than half of American hostile deaths.

Sarver is out of his seat and moving fast, darting up to a cluster of Ranger officers. A little guy, just five-foot-eight in combat boots, Sarver is a head shorter than the Rangers. His helmet bobs at the level of their shoulders as he steps up and slaps one of them on the back, saying, "What's goin' on boys? What have we got here? Where's the ah-ee-dee at?"

The Rangers point to a white plastic bag fluttering in the breeze on the side of a dusty median, 300 meters downrange.

Sarver, 33, in wraparound shooting shades that make his baby face look even younger, takes a second to consider the possibilities: Is it real or a decoy to lure him into the kill zone of a second bomb? Is it a hoax designed only to pull him into the shooting range of a sniper? Is it wired to a mine or daisy-chained to a series of IEDs? Is it wired at all or remote-controlled? Is it on a mechanical timer ticking down? Wired in a collapsible circuit that will trigger the explosion when he cuts it? He runs back to his truck, a few inches of belly fat moving under his uniform. He keeps his time on the ground to a minimum because it is impossible to tell whether that Iraqi in the dark suit with the cell phone is calling his wife or transmitting Sarver's position to a sniper team. This is a job so dangerous that bomb techs in Iraq are five times more likely to die than all other soldiers in the theater.

He tells Specialist Williams and Sergeant Chris Millward to break out the $150,000 Talon robot, which has articulating plier grips and tanklike treads. The bot moves out under the remote control of a military-grade laptop that Sergeant Millward operates on the hood of the Humvee. It zips down to the bag

ALL PHOTOGRAPHY BY MARK BOAL

and pulls it apart. Then it separates the shell from the electronics, or at least it appears to. Army protocol insists the area is not safe until a human explosive-ordnance-disposal tech goes downrange and sees the device with his own eyes. Sarver's team kneels in the dirt, working on his armor like squires attending a knight. Soon he is strapped into an 80-pound bomb-protection envelope that will save his life if the blast is caused by five pounds or less of explosives. As the men secure the straps, Sarver looks down, impatient.

"Come on, man, let's go," Sarver says. "Let's go."

Williams seals Sarver in by inserting a clear visor over the helmet. He taps his boss on the shoulder, and Sarver is off, each step bringing him closer to a personal encounter with a lethal machine. His world changes as he gets closer to the bomb. At 10 feet out, the point of no return, he encounters what he calls the Morbid Thrill. He feels a methlike surge of adrenaline. In the helmet's amplified speakers he hears his heart thump and his breath rasp, and then he sees it up close, the IED, an ancient artillery round wired to a blasting cap, half hidden in the white plastic bag.

He grabs the cap and heads back toward the safety zone, barely noticing a second white bag nearly out of his sight line in a roadside gully. There is a moment now when he doesn't breathe. He can run for his life and hope to beat this secondary bomb, which an insurgent placed specifically to kill him as he worked on the first one, or he can dive on it and take his chances. He pitches himself into the dirt and reaches for the blasting cap's wire with shaky hands, the menu of possible outcomes running through his mind. He decides he has to act now; there is no time for deliberation. He pulls it apart, pink wire by pink wire, since all of Baghdad's bombs seem to be wired with discolored old Soviet detonation cord. Then he breathes.

When he removes his helmet he stands sweating, pale, his body shaking from the rush. Williams and Millward run to help their boss out of the suit. Sarver is giddy, asking for a beer, cracking crude jokes about how close he came this time. "Can you smell the poop? Can you see the stain? I think I shit my pants."

Clear now, the area is reopened to traffic, and Team One turns toward the base, speeding down Route Irish while mosques broadcast the call to evening prayer. Soon it will be dark, curfew time, and the bomb makers will be at home. Sarver often wonders about these men. Would they shout "Allah akbar" ("God is great") if he were splattered on their streets? Are they political or just ex-soldiers in it for the $25,000 bounty the insurgency has reputedly placed on the heads of EOD techs—money to feed their kids, nothing personal? Back in Michigan his own son will turn eight in March. Another child is on the way, brother or sister to Jared. He'll see them both when his tour ends—just 30 more days of a six-month deployment that began that summer. That wasn't so bad. Thirty days not to get shot or blown into bits of DNA.

Then it comes to him again, the pep talk he gives himself in the downtime between missions. As the Humvee rocks and rattles down the road, Sarver stares out the window at the Iraqi dusk gorgeously transformed by all the pollution into a blazing sunset, and he plays it over again in his mind: *This is great. I love this place. If I keep going, I will have racked up more IEDs and disarmed more bombs than any man in the history of this war.*

Five months earlier, only weeks after he bagged his last buck in the forests north of Fort McCoy, Wisconsin, Sarver arrived in Iraq. He was excited to be there. During his nine years as an EOD tech he'd been to Egypt, Bosnia and Korea, but those were merely peacetime jobs, whereas this was, as he says, a "full-on combat operation" that had the entire United States military behind it. He had all the high-tech equipment he could use: electronics to jam the insurgents' cell phones, which they use to detonate IEDs, the suit, the bot. It was a long way from World War II, when bomb-disposal teams

were first created. Starting in 1942, when Germany blitzed London with time-delayed bombs, specially trained U.S. soldiers joined British officers who diagrammed the devices using pencil sketches before they attempted to defuse them with common tools. Many of these men died. During the Vietnam war the job grew even more dangerous. Bomb techs learned to unravel trip wires in the jungle, and they were called upon to work in hospital operating rooms, helping surgeons remove unexploded ordnance embedded in the bodies of wounded GIs. Not until the war in Iraq did IEDs become "the enemy's weapon of choice," in the words of Major General Martin Dempsey, commander of the 1st Armored Division. Bomb techs suddenly became indispensable.

For Sarver, Baghdad was a proving ground, a place where a bomb expert's specialized skills would be crucial to the success of Operation Iraqi Freedom II. "That's all the Army does all day, is go out on patrols looking for IEDs," says Sarver. "They got guys just sitting out there for hours in tanks and Humvees, just waiting to get hit by an IED. This whole war is about IEDs."

In July 2004 orders came down that Sarver should put together a team and head to An Najaf, a town 100 miles south of Baghdad. As his partner, Sarver picked Williams, 26, a promising young tech just months out of training. Williams had been among the 40 percent of enrollees to complete the EOD school at Eglin Air Force Base in Florida. He wears round steel-framed glasses, which give him a slightly bookish appearance, and he comports himself with an easygoing manner, quick to smile and laugh. "Hey, Williams, how would you like to go down with me to Najaf, where we can drink some beers and relax?" Sarver said one afternoon by the horseshoe pit. "It'll be cool."

When they arrived in August, the 11th Marine Expeditionary Unit was fighting some 2,000 insurgents under the command of Shiite cleric Muqtada al-Sadr in the Wadi Al Salam cemetery. It is one of the holiest places in Shiite Islam, for it adjoins the shrine of Imam Ali, son-in-law of the prophet Muhammad, and is one of the world's largest burial grounds, with an estimated 5 million bodies interred in a vast network of tombs and underground crypts three miles long and 1.8 miles wide. The insurgents fired on the advancing marines from positions behind the gravestones and tombs, many of which were adorned with life-size photographs of the deceased. Several times while working, Sarver and the other men fighting



The insurgents' weapon of choice, circa 2004: a classic Baghdad IED, constructed with a South African 155-millimeter artillery round wired to a cordless phone, a nine-volt battery and a timer from a washing machine.



**Anatomy of an explosion:** The forced detonation of a Russian rocket-propelled grenade by an EOD team at Camp Victory, Baghdad, December 2004. The rocket was packed with C-4 explosives to control the detonation, creating a typical military explosion. Unlike HMEs (what EOD guys call Hollywood movie explosions), with a fireball billowing gorgeous red flames into the sky, the conventional military explosion is ugly and dirty. The most dangerous part of these explosions is overpressure, supercompressed gases that rush out from the blast at 13,000 miles an hour.

squeezed off shots only to discover later that their bullets had hit pictures of dead men. Little by little, American airpower drove back al-Sadr's militia, but as it retreated it left behind a group of suicide fighters to defend the cemetery, which had been booby-trapped with mines and rockets and IEDs.

While the main fighting force hung back a few hundred yards, Sarver and Williams went in first with Marine EOD techs. In three weeks of some of the heaviest action ever experienced by bomb techs, they fought and worked amid the tombs in 120-degree heat, sweating off pounds of body weight every day. Each morning, Sarver and Williams returned to an area of the cemetery that was particularly dense with IEDs. They gained 10, 15 feet of ground at a time, as in some World War I trench warfare, except they were bent over disarming bombs as mortars crashed down around them. Sarver worked freestyle in An Najaf, off the book. There were no protocols to explain how to disarm a ground-to-air missile that had been lashed to the top of a palm tree while people were shooting at you. Often they would get pinned down. The marines encouraged them to press on, shouting, "Come on, man, run, run. They can't hit shit." That wasn't always the case. Sarver saw a private hit and killed instantly by an 80-millimeter mortar that severed his torso and blew it 20 feet away from his legs. "The poor guy died because he'd been ordered to run into a wrecked-out Humvee to retrieve a helmet," Sarver says.

At the peak of the fighting, two black-robed militiamen armed with AK-47s darted between the graves, taking potshots at Sarver's team as they were bent over trying to dig out an IED buried in the ground. Sarver crawled to a rise that looked down on the militiamen, and when they stood Sarver shot one of them. When he wasn't being shot at, Sarver worried about the frag from the mortars exploding around him, scraps of metal

traveling at 2,700 feet per second, which would cut through flesh and bone, searing the tissue in its flight path as it broke through and came popping out the other side of what used to be you. Even more than the frag, he feared overpressure, the wave of supercompressed gases that expands from the center of a blast. (All chemical explosions are solids turning into gases at a very fast rate.) This compressed air comes at an unlucky bomb tech at a force equal to 700 tons per square inch, traveling at a speed of 13,000 miles an hour, a destructive storm that rips through the suit, crushes the lungs and liquefies the brain; the fire that follows will roar upward through the ventilation cracks in his helmet and cook him inside. It's possible to survive a blast of overpressure if you're far enough away from the detonation, and this has given rise to a strange debate in the EOD community: Is it better to have your lungs full or empty if you're hit by overpressure from a distance? Each has its merits; a full lung is less likely to rattle against the rib cage and be punctured, but it is also more likely to burst on impact. At an even greater distance overpressure merely freezes your skin.

At night Bradleys fired their 25-millimeter cannons until first light, and the *boom-boom-boom* made the tents billow and flap. Next door in the medical tent, the moans of wounded marines joined the sound of coalition artillery. "You couldn't sleep when the tanks were firing," Sarver recalls, "and then you'd see the Maverick missiles coming in from Harrier jets miles away. They'd be rumbling overhead—*grrrrr*—and at night the afterburners would have flames spitting out, and you could see these bombs—they're 500 pounds each—bounce as they hit the ground before they went *boooooom!* Oh man, these bombs were huge." The bombs destroyed the old tombs and whoever might still be hiding in there with the dead. Mortuary Affairs hadn't been *(continued on page 148)*

P L A Y B O Y

# BOMB SUIT <span>(continued from page 74)</span>

*Baghdad is a city of bombs—mines, artillery shells, grenades, dynamite—detonated by suicide or cell phones.*

prepared for the bloodiness of the battle, and the dead marines were stored in ice coolers, he says. Sarver recalls that every time he went in there to grab a Coke, he saw the face of a young private nestled in the ice next to the sodas. "I knew him. He was a really nice kid," he says, shaking his head.

Toward the end of the month in An Najaf, Sarver and Williams were dismantling IEDs under heavy fire, and Williams began shaking, disoriented from the severe 120-degree heat. Sarver sent Williams back to the Humvee for water. When Sarver made it back to the truck uprange he found Williams prone in the back of the Humvee.

"Williams, where's the firing device?" Sarver asked.

"I left it back at the IEDs," Williams replied.

"Did you cut the wires?"

Williams stammered.

"Did you cut them? Did you cut them, Williams?"

"Yeah."

"Did you segregate them?"

"Yeah. But the mortars are getting really close."

"Did you put a charge on them?"

"No."

"Why didn't you put a fucking charge on them? Now we have to go back and blow them up!"

The two men were forced to go back to the IEDs in order to put a charge on the explosives and detonate them safely.

"How much time fuse are you using?"

"I put, uh...." Williams stammered some more.

"Three feet!"

"Why are we yelling?"

"Because we're getting shot at!"

Sarver never held the incident against him. In fact, as they were driving back to Baghdad, Sarver told the younger man that he trusted him and that there was no tech—not even another team leader—he'd rather have at his back. "You are going to be hot shit one day, Williams, and one hell of a leader," he said.

Then he shared his private view of the war. "Where else in the world do you think you're going to get to disarm five or six IEDs in a day?" Sarver asked him. Back in the States you would be lucky to see an IED once every five years, he said, so they may as well enjoy the opportunity to work while they had it. Plus, if the pace continued, they might just end up disarming more bombs than any team in the war. That would be a better souvenir than the memory of the private's face nestled in ice cubes.

The subject turned to their home lives, and Sarver told Williams about his son: "One cool dude. He's like me, a hardheaded bastard. But he's a stud." Then, ever the team leader, Sarver advised the younger man on how to handle being separated from his wife by the war. There were ways to behave during those phone calls home that would put a woman's mind to rest. "Ah-huh, okay," Williams said.

"Sarver's always trying to tell me how to live my life," Williams says later. "It's just funny. I mean, I'll listen to him when it comes to IEDs or being an EOD tech, because he's a great team leader. But he's telling me how I should talk to my wife. And I'm like, 'Jeff, you're not even married.'"

• 

All EOD techs start their training at a school in Eglin Air Force Base in Florida. The Army looks for volunteers who are confident, forthright, comfortable under extreme pressure and emotionally stable. To get into the training program, a prospective tech first needs a high score on the mechanical-aptitude portion of the armed forces exam. Once the school begins, candidates are gradually winnowed out over six months of training, and only 40 percent will graduate. "We have not yet cracked the code on what makes a great EOD tech. There is no textbook answer to the question of how to be a team leader," says Staff Sergeant Major Matthew Hughs, the commander of Eglin's bomb school. "The only way to find out if a man has the right qualities is to put him in the field, in the situation, and see how he does. You can simulate it, but the simulation will never be as tough as the real thing."

When Sarver was six years old his dad, a carpenter, took him hunting for the first time. They left the trailer park near Huntington, West Virginia and went into the forest. Dad showed him how to be alone, how to be self-sufficient. If you were willing to bear the isolation of waiting for hours in a thicket, you could catch an animal in its natural grace, a flash of fur, muscle and hoof. His mother never understood him. Sarver says. She always wanted to take him shopping, to visit relatives and socialize. "Sorry, Mom," he'd say, "I just don't have the gay gene."



*"Kyle is part of my new fitness plan. He has a third less fat than my regular boyfriend."*

As Sarver got older he was introduced to more intense encounters: how a coyote, its hind leg caught in a trap, would scream and howl, then finally whimper in a voice that sounded like an infant's; or how a 200-pound buck shot in the sweet spot above its shoulder would shiver, fall to its knees and lie panting, its last hot death breaths melting the snow. Sarver fell for all of it. He spent his free time hunting, and when he wasn't hunting he pored over hunting catalogs, and when his family moved to Ohio Sarver discovered new hunting grounds.

He finished high school and worked in construction for a few months before joining the Army at the age of 19. Later he signed up for the Rangers. That was cool at first. The legendarily tough entry requirements were a cakewalk after a childhood spent tracking coyotes. He did the whole gung-ho routine—he jumped out of airplanes, marched for 12 miles in full battle rattle, got in bar fights, punching until he hit bone, scarring his knuckles—and proved himself to be an excellent soldier, a natural. But in a year Sarver soured on the Rangers. He came to hate the long marches with 100 other guys on a trek to nowhere, just to train as a group. Despite the Ranger Creed, Sarver never got over the feeling that he was just another glorified grunt. This suspicion was solidified when he was sent to Central America on a hush-hush mission that escalated into a disastrous jungle firefight. Sarver took an AK-47 round in the hip. The medic cleaned the wound by twisting his finger in the bullet hole, shot him full of morphine, then sent him back to the fight. After that Sarver quit the Rangers, figuring anything would be better than mindless groupthink. He volunteered for EOD, where brains mattered more than biceps; plus these guys didn't march, they traveled in trucks. He proved to be suited to the job.

Sarver showed an intuitive grasp of engineering and with a quick glance could suss out the architecture of any bomb. This was evident even in training sessions, when the techs built their own bombs to practice with. Instead of the shoe boxes with basic triggers that the other techs built, Sarver's mock IED consisted of a monitor hookup, remote cameras, an array of motion detectors and multiple triggers linked by collapsible circuits so that if one were cut the others would deploy. "If I put that in a room, nobody could beat it," he says. "It's the ultimate IED." More important, Sarver proved that he could work on bombs without becoming bogged down by fear.

To Sarver EOD offered an infinite number of challenges—man-versus-materials moments when he would go down on a bomb and everything else would fall away, the Morbid Thrill. There were times, in fact—as when he was in Egypt disarming unexploded ordnance from the Arab-Israeli wars—when he understood that each bomb has its enduring and dangerous allure: It has strengths and weaknesses like any adversary, and there is beauty to be found in a well-constructed killing machine. There were times when he felt bomb work was better—far better—than hunting. The only problem with the job: There weren't that many bombs to disarm, and it could be hellishly slow going between deployments.

•

In September 2004 Sarver and Williams were back in Baghdad, where the situation had deteriorated even further. At this point in the war, the U.S. Army had pretty much hunkered down, hemmed in by an invisible insurgency that relied on small arms and improvised explosive devices. Every day a small part of this huge operation was sent into the streets of Baghdad to look for IEDs, which had also killed countless Iraqi civilians—we don't count them, and neither does the interim government—as well as more than 200 American soldiers, sailors and marines. While it was hell on the Iraqis, it was heaven for the EOD techs.

Baghdad, bombed twice from above, erupts beneath the feet of its conquerors several times a day. It is a city of bombs—mines, artillery shells, grenades, dynamite, cordite—exploding by suicidal transport or remotely held wireless phones, spreading blood and body parts, leaving a signature of black, greasy smoke curling above the carnage. This is a modern city of nearly 6 million, almost the same population as Hong Kong's but spread over a metropolitan area of 81 square miles. It is a major urban center by any standard, but more to the point it is Iraq's capital, with office towers and mosques, highways and traffic circles, middle-class neighborhoods like Mansur and slums whose markets draw pedestrians by the thousands at midday. With the rise of the insurgency, these features of a modern metropolis have been transformed into opportunities and platforms for killing Americans. From tall buildings and mosques, snipers watch and wait for passing patrols. The traffic on the roads gives cover to car bombers, who merely have to pull alongside your Humvee and wave hello. In the slums people bury bombs in the dirt roads among the garbage, in the concrete medians of the highways and in the bodies of roadkill, while the street dogs bark and never seem to stop.

These bombs are created from a vast supply of explosives left over from a dictatorship that poured its riches into military hardware. Saddam Hussein even stockpiled missiles that couldn't be launched, and they collected rust on the ground, waiting for this opportunity. After a war with Iran, Kurdish uprisings and two invasions by the United States, Iraqi soil has become a repository for every weapons system on the market. In the ground are an estimated 10 mil-

P L A Y B O Y

lion land mines—if Baghdad is a city of bombs, Iraq is a nation of mines—making it one of the most heavily mined areas on the planet. Even if the U.S. Army sealed the borders today, there would be enough explosives loose in Iraq to sustain the insurgency for several decades.

All this has taken the U.S. military by surprise. The protocol for suspected IEDs calls for securing a 300-meter perimeter around the bomb. No soldier goes near it and nothing can happen until the EOD arrives and takes control of the scene. The problem is there are only about 150 trained Army EOD techs in Iraq, a reflection of the fact that, until this war, bomb work was never considered a major duty of the nation's fighting forces. The Army is scrambling to add more techs. Plans are in the works to activate a total of 1,400 techs in the next four years by somehow convincing soldiers to join what may be the most dangerous unit in the armed forces for an extra $150 a month in "demolition pay." In the meantime U.S. generals have announced a Manhattan Project–like effort to combat IEDs and perhaps come up with a better day-to-day solution than having troops shoot at them, which is known as "recon by fire." This almost never works out and in most cases renders the unexploded bomb that much harder to defuse.

•

As summer turned to fall in Baghdad, Sarver and Williams worked 48-hour shifts, taking only a day off between runs

into the city. The days blurred. Either it was morning or night, either you were driving out from the base or coming home, either the bomb was in a pile of garbage or in the carcass of a dead dog or on the side of the road, and either you disarmed it or, if you were too late, there would be bodies or brains on the backseat of a truck. The incidents always started the same way, with Sarver jumping out of the truck and joshing with the soldiers on the ground—the lewd, crude ball of energy. Then he would go down on the bomb alone and feel the Morbid Thrill. Then he'd come back uprange, glowing from the rush, only to learn that command wanted him to get back in his truck and drive to a new intersection where another bomb was waiting.

By September, intelligence estimates put the number of bomb makers in Baghdad at somewhere between five and 50, but as one expert said, "the skill set was spreading." How else to explain the daily rise in the intensity of the campaign? Sarver followed these intelligence reports closely, and he tried to help by passing along the bomb circuitry he collected on his missions. After coming back to the base from a day in the field, he would sort the bits of wiring he'd picked up on Baghdad's streets and place them in neatly labeled plastic bags, which would eventually be sent to the FBI for analysis. In these devices Sarver could read the history of the insurgency as it grew in ferocity and sophistication. When he first landed in Iraq the bombs he encountered were rudimentary: a blasting

cap and shell connected by a command wire to an insurgent with a button. Now they were progressing to more lethal, wireless designs, incorporating modified car alarms, pagers and wireless phones for remote detonation. Still, the insurgents were far from fully exploiting the available technology. He predicts they will turn to remote motion sensors, pressure sensors, heat sensors and light sensors, all of which they will use to increase the body count.

After every shift, Sarver comes back to the base and paints a little bomb stencil on the door of his Humvee to keep track of his numbers. "How many you got now?" asks Staff Sergeant Kelsey Hendrickson, a tall, bald, strapping 26-year-old tech. Sarver tells him 120 IEDs and four vehicle-borne IEDs—car bombs.

"Man, I hate the car bombs," Hendrickson says. "They're the worst."

"I'll take 'em. Give 'em to me."

"You can have them." Hendrickson lights a cigarette. "Who cares, anyway? It's not like you get a special prize for disarming x number of IEDs, you know. They don't put a patch with a number on it on your uniform."

"But I'll know," Sarver says.

Sarver, a loner by nature, dips in and out of the roughhousing Southern-boy frat house of the 788th's social life. For the other guys it is the only way to blow off steam. "You need an escape," one tech tells me. "The last thing you want to do is come back and sit around thinking about what you just did, because then you'll go crazy. As long as you don't get contemplative, you're all right." Sarver takes his meals alone. When it's time to go to the gym and the guys are all guzzling protein shakes and getting ready to lift heavy, they don't even bother to ask him anymore.

"I'm saving my energy for IEDs," he'll say.

•

By October Sarver and Williams had disarmed 160 IEDs. The insurgency began targeting Iraqi civilians. One day Sarver's team was called out on two IEDs, but one went off before Team One reached it, and it killed an Iraqi family driving by in a pickup truck—father, mother, daughter and a sheep tethered in the flatbed. "If we had stopped, it could have been the starting point of an ambush because we didn't have the trucks to secure it. On the other hand, it really bothers me that a kid got killed inside that truck," Sarver says. "That was a catastrophic kill. There was brains all through the truck—that gray matter. Nobody survived."

That night Sarver went back to his trailer, which he shares with Williams. Sarver has divided the room with a wall of lockers, squeezing Williams into a corner. "You don't need the space," he declared, pulling seniority. All Williams has on his side are pictures of his family and his EOD certificate. Sarver



*"I'm used to being around celebrities. That's something you develop as a stalker."*

has decorated his considerably larger wall space like a command center, with photographs of classic IEDs, schematic drawings of fuses and maps of Baghdad showing the locations of major installations. His computer screen saver is an image of a bomb tech in Ireland taking the lonely walk downrange. Sarver keeps recovered bomb parts in a box by his bed. He keeps pictures of his son and his new girlfriend in his desk drawer, under bits and pieces of IEDs. Sarver would take out the photos if anybody asked to see them, but he wouldn't volunteer them.

In December, with only a month left in the tour, Sarver and the other techs feel the stress pile up. The last 30 days are the most dangerous time. Even under the best conditions EOD is one of the most dangerous jobs in the military, but the chances of dying grow especially high in the last month, when fatigue, distraction and homesickness can dull a soldier's instincts. "You zig when the bomber zags" is how Sarver describes the kind of mental mistake that can lead to death. Staff Sergeant Michael Sutter, an experienced tech and a close friend of Sarver's, zigged at the wrong time and died in the field the day after Christmas 2003, his last scheduled day on duty. Staff Sergeant Kimberly Voelz was laid open on the side of the road by a bomb that had been duct-taped to a telephone pole, and she survived long enough to make it home and die in her husband's arms.

In the second week of December, on a rare call when a colonel is in the field, Sarver's team travels to a location in downtown Baghdad. A hundred feet away is a rebar house with a high cement wall and a satellite dish, typical Baghdad styling—a dull, putty-colored job like everything else in Baghdad, a whole city in earth tones and faded yellows, with beat-up shitty cars, a once modern, shiny place now banged up and dirty.

Team One attempts to disarm the IED with a robot, but it doesn't work and Sarver has to take the long walk by himself. Millward seals him into the bomb suit, which makes him look like a cross between the Michelin Man and a hazmat specialist. The only visible part of him is his face; it is slightly distorted by the clear acrylic visor of the helmet, but if you look closely you can see he is smiling as he walks down on the bomb and prepares to face the ultimate fear. The rest of his face is tight with terror—the wide nose, small soft chin and large blue-green eyes, all drawn in and back—except for the lips, which are set in a cocky smile.

As he leaves the safety of the group, thoughts of his family flash at him. *What have I done bad?* he thinks. *Have I done everything I should have done? Have I done everything I can as an individual? Will my family be okay if this bomb goes off? How different from my parents, married for 40 years. My relationships have been big flops. So many mistakes. If I learned from each one, shouldn't I be a Ph.D. by now?*

As he approaches the bomb his mind goes blank. "Everything shuts down except for you and the device. I can hear myself breathing." His heart beats so loud he can hear it in his helmet, overlaid with the sound of the barking dogs; they all sound so close they could be biting off his ear. There is a radio receiver in the suit, but it's turned off to avoid sending stray radio waves that could set off the IED. So he is walking toward the bomb without any communication with his team—cut off, alone and in the open.

"When you get to 10 feet away from it, you get comfortable because you are at the point of no return," he explains. "And you look at it. Everything is shut off."

This bomb sits beneath a pile of garbage, the rusty metal cone poking out from under a banana peel, under a mountain of trash: rotting vegetables, plastic, tin cans. Sarver puts his hands on the device, an artillery shell containing 18 pounds of explosives with a blasting cap cemented in the nose. Rising from the cap is a pink wire leading to a battery connected to a cell phone. When the phone rings, it opens a circuit that sends 1.5 volts of electricity—less than the static charge on your dry-cleaning bag—to the blasting cap, which then detonates the entire contraption.

He must separate the blasting cap from the main charge, but it won't come out of the cement. Sarver reaches for his knife and starts digging. He digs around the wire, where there is no more than an inch of space to work with, and he tries desperately not to disturb the cap, which can blow from even a hard jolt.

Sarver is digging with the knife, trying to lift out the cap. From 300 meters away, he seems to be moving at hyperspeed, but inside the bomb helmet the moments seem to be stretched, and he feels as if he's moving in superslow motion. Finally the wire gives, the bomb separates, it's over, and he stands up. His face is flushed, and his body shakes in the aftermath of his adrenal hailstorm.

It's clear that he's tasted the incomparable rush of having disarmed a deadly weapon—of having seen how easy and real it would be to die—and lived. He rejoices in the sensations of his existence: the salty sweat falling in his eyes, the 80 pounds of weight on his back, the dogs barking madly in his ear.

When Sarver is finished, the colonel, whose personal convoy had almost been destroyed by the IED, comes up to congratulate him. Sarver recognizes him as one of the authors of the "recon by fire" tactic.

"Are you the crazy man in the bomb suit?" the colonel asks.

"Yes, sir, that was me."

"Look at that hero. America's finest. That is some good shit. Check that shit out—all right, good job," he says and shakes Sarver's hand. "I want a picture with this man."

Then Sarver begins to explain to the colonel exactly how a bullet would have failed to disarm the device. The



*"The new bed's arrived, Harry—it's great!"*

0150

► PLAYBOY

colonel nods, makes no reply. Sarver picks up the remains of the bomb to illustrate the point.

"Hey, hey, hey," says the colonel. "Don't be touching that thing around me."

As he walks away, the colonel says to his aide, "You wouldn't catch me going down on no fucking bomb."

That night Camp Victory is dark, nearly pitch-black. The Baghdad smog hides the stars, and the lights are turned off to avoid giving the enemy easy targets. It is quiet in the camp, too; the sounds that escape from individual trailers—music, laughter—quickly lose volume in the wide-open spaces, and Sarver, killing time in his room, confronts thoughts of home. "Not a day goes by that I don't think of my son," he says. "I know that I will not have the kind of relationship with him that my dad had with me," he adds wistfully. Sarver's dad wasn't in the military, and military life is different, especially EOD. Separations and relationship troubles are par for the course. "That's why they say EOD stands for 'every one divorced,'" Sarver says.

Taking a broom in hand, he sweeps the day's worth of sand out the front door of his trailer, then wipes the floor clean with a rag. "Believe it or not," he says, "I'm really going to miss this shithole."

•

On Christmas Eve, with six days left in his field duties and 190 bombs painted on his truck, Sarver is sent to assess the damage caused by an oil-tanker-truck bomb that has exploded in front of the Moroccan embassy. By the time he arrives, the only illumination is coming from a fire smoldering in the top of a palm tree. The air, thick with debris, smells wretched: sulfur, burned fuel and human blood.

A family of five has been caught under the rubble of one building, and the bodies are still inside as Sarver and his crew examine the scene. A taxi driver who was sitting in his car within the blast radius has been taken away, but the vehicle

remains, a charred hull still smoking, its insides melted and wrecked, and bits of the driver's hip on the seat.

Sarver examines the site with the guys from forensics, shining his flashlight in the crater, 30 feet wide and 10 feet deep, where there had been concrete and road. He steps through the crunching glass and bits of metal to the engine block and looks at that for traces of explosives to see whether the bomb was detonated remotely or was the work of a suicide bomber.

Now he walks from the center of the blast, his flashlight beam illuminating the progress of the destruction. At 40 paces he walks through a completely blackened expanse that gives way in another five paces to a few visible shapes—a bit of concrete, part of a wall. Then come recognizable things, charred but not consumed, and then finally just burned, the paint on a gate blistered from the heat. Beyond the gate, weird-looking chickens peck at the dirt, their feathers burned off. Sarver aims his light up into the branches of a tree and finds an orange, perfect and ripe. "This is where it ended," he says, then walks back to the center.

Sarver notices two well-dressed men standing in the doorway of their home. He approaches them. "I'm sorry this had to happen to you," he says.

"I'm sorry too," says one of the men, a Kuwaiti.

"Was anybody hurt?"

"My brother, next door. The glass fell on him. But he's okay."

"I'm sorry. If you see anything hazardous, give us a call and we will come and take it away for you."

"Yes, thank you." Then he shrugs and tilts his head. "What can we do? What can we do?"

Back at the base the men of Team One and Team Two sink into the couch. They tear into packages of Froot Loops and add the bitter reconstituted Iraqi milk. They talk about random cartoons and movies with funny-sounding characters. To emphasize a point, Millward imitates Elmer Fudd and then tries an impression of Daffy Duck that makes Williams laugh so hard the milk dribbles down his cheek.

Williams and Millward keep goofing off, laughing and laughing, while Sarver, ashen, leans against the wall, still lost in what he has seen. "Them chickens is what got me," he says finally. "It was horrible the way they had their feathers burnt."

A tech who is walking by overhears Sarver and asks, "Did the chickens smell like barbecue?"

"No, man, they…." Sarver shakes his head and shrugs, as if he is unwilling or unable to answer the question aimed to poke fun at his softness. He pushes himself away from the wall, stands straight for a moment, then leans back. He stands there with his hunched shoulders, looking down at the floor. After a while he gets up to leave, and on the way out he finally says, "By the way, it's Christmas Eve, so merry fucking Christmas."

Christmas comes and passes without celebration; then it is time to go. Before he leaves Iraq, Sarver tallies his bombs one last time. The number is 208. Every bomb he defused meant an Iraqi or an American didn't die that day. How many lives has he saved? The number could be anywhere from dozens to several hundred people. This does not go unnoticed by Army brass. In his After Action Report, the commander of the 788th Ordnance Company (EOD), Captain Christopher Wilson, notes that Sarver's team "was engaged by enemy militia on almost every mission" and in the end had "rendered safe the largest number of IEDs that were disarmed by any one team since operations began in Iraq."

On a C-130 en route to Wisconsin, flying for the last time over Camp Victory and the unending parking lots of machinery, Staff Sergeant Sarver is officially a hero. Nestled in the pocket of his shirt is a Bronze Star.

•

In late January the company lands in Wisconsin, nine days before Iraq holds its national elections. The men quickly find that the town next to their base in Fort McCoy—Sparta, Wisconsin, population 8,727—is just as dull as when they left it: shopping malls and bars and fast food.



At night Sparta shuts down, especially beyond the main road, where the farmland, much of it Amish, stretches out for miles of open countryside with only cows and silos and flat, straight roads all the way to St. Paul, Minnesota. In the woods the ground is covered with several feet of snow, but the men do not pile into a car and go camping in the powder.

Nor do they wish to linger at homecoming parties down at the local tavern, not after all that time rubbing up against one another in Iraq. They split up, each to his own. Williams rushes home to his wife and two boys, one of whom is already "a little terrorist." Sarver returns to his modest rented one-bedroom five minutes from the main road in Sparta.

He finds the place just as he left it, undisturbed by trespassers or visitors. None of his 100 rifles, shotguns and handguns have been moved from the three gun cabinets, the largest of which blocks the entrance to the front door, forcing him to use the side entrance. The living room also looks fine, still crowded with animal mounts—a pheasant, a fox, a beaver and a deer head, all hung on the wall and positioned with their eyes turned away from the couch so Sarver can sit there and admire the lush fur and brilliant feathers without being confronted by their staring eyes. Which is what he does. He sits on the couch, checks out his mounts, orders pizza and watches TV.

Then—as always, keeping his position fluid, not spending too much time in one place—he goes off on a hunting trip, a spree that leads to his killing dozens of animals and storing up enough meat to make him self-sufficient for a year. "I take pride in providing for myself," he says. The hunting trips may have had another purpose as well: They've used up his vacation time, and he will not be seeing his son right away.

One night he calls Williams and invites him to come out for a beer. "Come on, man, you have to," he says, but Williams begs off, citing obligations to his kids and wife. So Sarver calls another tech, a younger guy, and he agrees to knock back a few cold ones.

Sarver settles back on his bar stool and tells his friend how much he misses Iraq. More beers are ordered—it's now going on two cases—and Sarver is feeling silly again. "Baghdad was a blast," he says, the best time of his life. "Where else can you wake up in the morning and say, 'Okay, God, what are you going to give me?' Where else can I spend the morning taking apart an IED and in the afternoon drive down the road with 200 pounds of explosives in my truck, blowing up car bombs and trucks? I love all that stuff. Anything that goes boom. It's addictive. The thump, the boom—I love it. It's like the moth to the bright white light for me."

As the beers flow and Sarver gets a little sloppy, his posture slackens and the emotions come more readily to the surface of his face, softening it. He says he will be missing his second kid's birth because he used up so much time hunting. He doesn't want to ask another guy to sub for him. "I'll never hear the end of it from those guys," he says, and perhaps he is right, for already they are mocking ol' Sarver for sowing his seed and warning him that he will soon be besieged by crying infants. They say he'll have to move across the state line just to find a little peace and a fresh batch of women to love and leave. He is now not even sure if the thing with the new girlfriend, the one who's having his baby, will work out after all. "That's up in the air right now," he says.

"Have you told her yet that you're gonna miss the birth?"

"I'm going to have to sit with her tomorrow and tell her."

"Well, I guess it's good for you," says the buddy.

"Yes, it is," Sarver says as he gets up to go to the bathroom.

"Fuck it," he says when he comes back. Then, slamming another beer, he adds that he needs to transfer to another unit so he can get back into the theater quickly. "I need to get back to Iraq."

The next day he goes to work with a massive hangover and has to tackle a mountain of papers. This is his life now: filling out forms, answering to civilians, killing time. Only once in a month does he have to take the bomb suit out of the truck, when a family calls, having found an old pineapple grenade from World War II in their dead grandfather's trunk. The job is so easy it's ridiculous; it's a PUCA (pick up and carry away), and Sarver scoops up the old grenade and doesn't even bother to try to find the challenge in it because there is just none to be found.

A few weeks later, Sarver receives an e-mail. Back in Iraq, the new Team Three was hit with an IED. The team leader was killed instantly.

Finally a day off arrives. Hunting season is over, and there are no pineapple grenades to pick up. Sarver decides to visit his family; he drives to Ohio and spends an evening with his father. Then he goes to his ex-girlfriend's house in Michigan to see his son, Jared. After hugging them, he's hit with a wave of emotion, and he excuses himself to take a moment alone on the front porch.

Sarver sits down and takes a deep breath. He looks out into the calm Michigan evening, in the nation he has sworn to protect, where there are no IEDs to harm his son. Then Staff Sergeant Jeffrey S. Sarver, the best bomb tech in Baghdad, puts his head in his hands, and for two hours straight he cries.

1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
   DALE F. KINSELLA (SBN 063370)
2    dkinsella@kwikalaw.com
   JEREMIAH T. REYNOLDS (SBN 223554)
3    jreynolds@kwikalaw.com
   808 Wilshire Boulevard, 3rd Floor
4  Santa Monica, California  90401
   Telephone: 310.566.9800
5  Facsimile: 310.566.9850

6  Attorneys for Defendants Mark Boal and
   Kathryn Bigelow

7

8                UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                    WESTERN DIVISION

11

12  SGT. JEFFREY S. SARVER,                CASE NO. 2:10-cv-09034-JHN (JCx)

13          Plaintiff,                     **DECLARATION OF MARK BOAL
                                           IN SUPPORT OF MOTION TO
14      v.                                 STRIKE PLAINTIFF'S
                                           COMPLAINT PURSUANT TO CAL.
15  THE HURT LOCKER, LLC; MARK            CIV. PROC. CODE § 425.16**
    BOAL; KATHRYN BIGELOW;
16  GREG SHAPIRO; NICOLAS                  Date:   April 4, 2011
    CHARTIER; TONY MARK;                   Time:   2:00 p.m.
17  DONALL MCCLUSKER; SUMMIT              Room:   790
    ENTERTAINMENT, LLC;
18  VOLTAGE PICTURES, LLC;
    GROSVENOR PARK MEDIA, LP;
19  FIRST LIGHT PRODUCTIONS, INC.;
    KINGSGATE FILMS, INC. and
20  PLAYBOY ENTERPRISES, INC.,
    Jointly and Severally,
21
            Defendants.
22

23

24

25

26

27

28

10571.00002/57915.3                                    2:10-cv-09034-JHN (JCx)
DECLARATION OF MARK BOAL IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S COMPLAINT

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

# DECLARATION OF MARK BOAL

I, Mark Boal, declare as follows:

1.    I am a named defendant in this action. The facts set forth in this declaration are personally known to me and I have first-hand knowledge thereof. If called as a witness, I could and would testify competently to the facts set forth herein under oath.

2.    On August 12, 2005, Playboy magazine published an article, written by me, entitled "The Man in the Bomb Suit," ("the Playboy Article"). (A true and correct copy of this article, appearing in the September 2005 edition of Playboy magazine, is attached hereto as Exhibit "A.") The Playboy Article was published and distributed beginning on or about August 12, 2005. The Playboy Article is the same one referenced by Plaintiff in his Complaint in this action, ¶52.

3.    In 2004, I was embedded, as a journalist, with various troops and bomb squads in 2004 in Iraq during the Iraq War, which included Plaintiff's unit for the purposes of researching the Playboy Article. I spent approximately 14 days with Plaintiff's unit in Iraq during which Plaintiff voluntarily participated in taped interviews with me in Iraq, and Plaintiff voluntarily appeared in numerous photographs, some of which were used in the Playboy Article.

4.    Prior to completion of the Playboy Article, I visited with Plaintiff at his house in Wisconsin and interviewed him for the express purposes of the article I was preparing. Plaintiff voluntarily participated in hours of interviews with me. I never informed Plaintiff that I would not utilize any details of his life in the Playboy Article, nor did he make any such request to me. Plaintiff was aware that I was writing an article about him. Prior to the publication of the Playboy Article, Plaintiff requested via email that I send an advance copy to him and his then girlfriend. (A true and correct copy of the email string between Plaintiff and me,

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

10571.00002/57915.3                                    1                              2:10-cv-09034-JHN (JCx)
DECLARATION OF MARK BOAL IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S COMPLAINT

0154

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   sent on August 2, 2005, is attached hereto as Exhibit "B.").

2       5.      On August 2, 2005, prior to publication, I provided an advance copy of

3   the Playboy Article to the senior enlisted commander, Command Sergeant Major

4   James Clifford, in Plaintiff's unit. Sergeant Clifford responded to the Playboy

5   Article by stating: "Good job, Mark. I remember asking you to focus on the soldiers

6   and that you did. Thanks. I'm sure this article will reflect positively on us. I will

7   keep it close-hold until it hits the news stands. Good luck on your future projects."

8   (A true and correct copy of Sergeant Clifford's email to me, sent on August 2, 2005,

9   is attached hereto as Exhibit "C.")

10      6.      In 2006, Reader's Digest published an abridged version of the Playboy

11  Article (see Complaint, ¶57.) Editors at Reader's Digest informed me that Plaintiff

12  participated with Reader's Digest with respect to the publication of this Reader's

13  Digest version of the article.

14      7.      I wrote the screenplay for the motion picture, "The Hurt Locker." The

15  character of "William James" in the Film is not Plaintiff, as Plaintiff alleges in his

16  Complaint. William James is a fictional character that is a product of my

17  imagination. Certain elements of the character were inspired by different people

18  that I have met throughout my life, including but not limited to members of the

19  United States military and foreign militaries. Indeed, prior to writing the screenplay

20  for the Film, I interviewed in excess of 50 to 60 military personnel who were

21  involved with explosive ordnance disposal.

22      8.      With respect to most, if not all, of the material events in the Film,

23  concerning William James, they were never described to me by Plaintiff, do not

24  reflect events that I, or anyone I know of, observed of Plaintiff, and do not reflect

25  events which, from my knowledge, actually occurred to Plaintiff. The following is a

26  list of material events in the Film that were not described to me by Plaintiff as

27  occurring to him:

28

10571.00002/57915.3
2
2:10-cv-09034-JHN (JCx)
DECLARATION OF MARK BOAL IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S COMPLAINT

0155

a. Plaintiff was not a reinforcement soldier called up to replace a killed EOD team leader. He deployed under normal circumstances. Plaintiff's predecessor was not named Sergeant Thompson.

b. Plaintiff did not serve in Afghanistan prior to serving in Iraq.

c. Plaintiff did not have an African-American teammate on his EOD team in Iraq.

d. Plaintiff did not have a teammate who was "in intelligence for seven years."

e. Plaintiff did not meet his other team members in Iraq. He deployed with them from the United States.

f. Plaintiff did not tell his team members he would try to "fill the shoes" of a former team leader.

g. Plaintiff did not remove protective plywood from his CHU (combat housing unit) in order to let the sunshine come into his living quarters.

h. Plaintiff did not deploy a smoke grenade during his first mission in Baghdad by tossing the grenade onto a city street.

i. Plaintiff did not sever communications with his teammates during his first mission in Baghdad.

j. Plaintiff never fired at the windshield and tires of a taxi cab.

k. Plaintiff did not press a pistol to the forehead of a taxi driver.

l. Plaintiff did not dismiss a suggestion by his teammates that he abort his first mission.

m. Plaintiff never befriended a child Iraqi DVD street vendor.

n. Plaintiff never responded to a car bomb threat at a United Nations building.

o. Plaintiff never used a fire extinguisher to put out a fire in a car bomb that had been placed in front of a UN building.

p. Plaintiff was never punched in the jaw by a subordinate soldier after he

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

10571.00002/57915.3                3                2:10-cv-09034-JHN (JCx)
DECLARATION OF MARK BOAL IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S COMPLAINT

0156

had finished disarming a car bomb.

q. Plaintiff never shot and killed insurgents in a desert firefight.

r. Plaintiff never fought with mercenaries in a desert firefight.

s. Plaintiff never wiped blood from bullets in order to reload them into a sniper rifle.

t. Plaintiff never assaulted his subordinates.

u. Plaintiff never spent a night drinking heavily with his subordinates.

v. Plaintiff never found a weapons cache with a body bomb in the cache.

w. Plaintiff never witnessed the death by IED of a combat stress counselor.

x. Plaintiff never hunted insurgents by leaving his base at night and traveling alone through the streets of Baghdad

y. Plaintiff never hunted insurgents by taking two soldiers, without any backup, through the back alleys of Baghdad.

z. Plaintiff never accidentally shot an American soldier while attempting to rescue him from a rescue situation.

aa. Plaintiff never encountered an (innocent) Iraqi civilian who had a bomb strapped to his person and unsuccessfully attempted to diffuse the bomb.

bb. Plaintiff never saw a suicide bomber with a bomb strapped to his chest detonate his bomb.

cc. Plaintiff did not return home only to immediately redeploy back to Baghdad. He went to work for the Army at a facility in New Jersey.

9. Plaintiff falsely asserts that he originated the term, "the hurt locker." The phrase, "the hurt locker," dates back to the Vietnam War and has been used throughout the military for decades. I did not first learn the phrase from Plaintiff, and Plaintiff certainly did not originate it.

10. Plaintiff falsely contends that I learned the phrase, "war is a drug," from him. The Film opens with a quotation from "War is a Force That Gives Us Meaning," a best-selling 2002 book by Chris Hedges, a New York Times war

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1   correspondent and journalist. The exact quote from Hedges' book is, "The rush of
2   battle is a potent and often lethal addiction, for war is a drug." That is the source of
3   such statement.

4        11.   Plaintiff falsely claims that actor Jeremy Renner based his character on
5   Plaintiff. Contrary to Plaintiff's false allegation, Renner did not dye his hair for the
6   role, did not impersonate Plaintiff's persona, and did not use Plaintiff's "West
7   Virginia accent, dialect, expressions, mannerisms, personality and even dress habits
8   . . . ." Renner wore a distinctively different uniform from Plaintiff during the Film
9   and carried a gun in his uniform, unlike Plaintiff.

10        12.   Plaintiff informed me that he was promoted during the time period of
11   the Film's construction and release. We corresponded about the Film prior to its
12   release and he, and many other members of the United States military, were invited
13   to advance screenings of the Film. Plaintiff, as well as his military friends, indicated
14   to me, following the premiere of the Film, that they thoroughly enjoyed the Film and
15   appreciated how the military was portrayed in the Film.

16        13.   Plaintiff alleges that I signed an agreement with the United States
17   Department of Defense that prohibited me from writing the Playboy Article or the
18   screenplay for the Film. I do not recall ever signing such an agreement and it would
19   have made no sense for me to do so. Prior to my embedment, I informed the U.S.
20   Department of Defense that I was a journalist embedded in Iraq for the express
21   purpose of writing an article about EOD teams.

22        I declare under penalty of perjury under the laws of the United States of
23   America and the State of California that the foregoing is true and correct.

24        Executed at Los Angeles, California, on March 2, 2011.

25

26

27                            Mark Boal

28

KINSELLA WEITZMAN ISER KUMP &
ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA  90401
TEL 310.566.9800  •  FAX 310.566.9850

10571.00002/57915.3                          5                          2:10-cv-09034-JHN (JCx)
DECLARATION OF MARK BOAL IN SUPPORT OF MOTION TO STRIKE PLAINTIFF'S COMPLAINT

100 �☒                                                                      FAX   0158

For Staff Sergeant Jeffrey Sarver of the U.S. Army's 788th Ordnance Company, the war in Iraq couldn't get any more personal. What it's like to be THE MAN IN THE...

Exhibit A

by mark boal

0159

# BO
# MB
# SUIT

t's 4:30 p.m. early December 2004, and a caravan of Humvees rumbles out of Camp Victory carrying Staff Sergeant Jeffrey S. Sarver and his team of bomb-squad technicians from the U.S. Army's 788th Ordnance Company. As Sarver's team bounces down Victory's rutted roads, the convoy passes a helipad where Chinooks, Black Hawks and Apaches thump in and out, some of them armed with laser-guided missiles and 30-millimeter cannons that fire fist-size shells. Sarver sees the Bradley and Abrams tanks sitting in neat rows, like cars at a dealership, their depleted-uranium bumpers aligned with precision. All that lethal hardware is parked, more or less useless

0160

Case 2:09-cv-04607-MMB Document 98-1 Filed 03/05/11 Page 9 of 21 Page ID #:943



Sarver (above) takes the long, lonely walk downrange to defuse an improvised explosive device, known in this war as an IED, while an Army Ranger watches his back. Right, from top: Sarver, Williams and Millward, part of the Badass Baghdad Bomb Squad (their words). During their six-month tour, which ended in January 2005, these three soldiers are believed to have "rendered safe" more IEDs than any other explosive-ordnance-disposal team since combat operations in Iraq began. They may have saved hundreds of lives.

against the Iraqi insurgency's main weapon in this phase of the war: improvised explosive devices made from artillery shells, nine-volt batteries and electrical tape—what the troops call IEDs.

As they leave the front gate, Sarver is in high spirits. He grabs the radio and sings out in his West Virginia twang, "Hey, ah, do you want to be the dirty old man or the cute young boy?"

"I'll be the boy," comes the response with a laugh. It's Sarver's junior team member, Specialist Jonathan Williams.

"Okay, cute boy. This is dirty old man, over."

"Roger, ol' man. We're en route to the *ah-ee-dee*."

Turning onto a main road, the busiest bomb squad in Iraq enters Baghdad—a massive city, filthy and foul-smelling, teeming with life despite two decades of war—and the caravan blasts down its highways, jumping curbs on the side streets, pushing through traffic like VIPs. The lead Humvee driver leans on the horn, and his gunner in the .50-caliber machine gun turret shouts, "*Imshee, imshee, imshee!* Go away, go away, go away!" his finger ready on the trigger if any car violates the cushion of space between them and anything Iraqi.

At last they arrive at an intersection where everything is still. Here the city has stopped dead, pressing itself against road-blocks set up by a Ranger team, and traffic is backing up on both sides of the busy crossroads. This is what the war in Iraq looks like on most days: a traffic jam and a roadside bomb. The war has stopped to wait for Sarver and his fellow techs,

> It is a job so dangerous that bomb techs are five times more likely to die in Iraq than all other soldiers in the theater.

the 100- to 150-man counterforce in this theater, who are specifically trained to handle the homemade bombs that now account for more than half of American hostile deaths.

Sarver is out of his seat and moving fast, darting up to a cluster of Ranger officers. A little guy, just five-foot-eight in combat boots, Sarver is a head shorter than the Rangers: His helmet bobs at the level of their shoulders as he steps up and slaps one of them on the back, saying, "What's goin' on boys? What have we got here? Where's the *ah-ee-dee* at?"

The Rangers point to a white plastic bag fluttering in the breeze on the side of a dusty median, 300 meters downrange.

Sarver, 33, in wraparound shooting shades that make his baby face look even younger, takes a second to consider the possibilities: Is it real or a decoy to lure him into the kill zone of a second bomb? Is it a hoax designed only to pull him into the shooting range of a sniper? Is it wired to a mine or daisy-chained to a series of IEDs? Is it wired at all or remote-controlled? Is it on a mechanical timer ticking down? Wired in a collapsible circuit that will trigger the explosion when he cuts it? He runs back to his truck, a few inches of belly fat moving under his uniform. He keeps his time on the ground to a minimum because it is impossible to tell whether that Iraqi in the dark suit with the cell phone is calling his wife or transmitting Sarver's position to a sniper team. This is a job so dangerous that bomb techs in Iraq are five times more likely to die than all other soldiers in the theater.

He tells Specialist Williams and Sergeant Chris Millward to break out the $150,000 Talon robot, which has articulating plier grips and tanklike treads. The bot moves out under the remote control of a military-grade laptop that Sergeant Millward operates on the hood of the Humvee. It zips down to the bag

ALL PHOTOGRAPHY BY MARK BOAL

and pulls it apart. Then it separates the shell from the electronics, or at least it appears to. Army protocol insists the area is not safe until a human explosive-ordnance-disposal tech goes downrange and sees the device with his own eyes. Sarver's team kneels in the dirt, working on his armor like squires attending a knight. Soon he is strapped into an 80-pound bomb-protection envelope that will save his life if the blast is caused by five pounds or less of explosives. As the men secure the straps, Sarver looks down, impatient.

"Come on, man, let's go," Sarver says. "Let's go."

Williams seals Sarver in by inserting a clear visor over the helmet. He taps his boss on the shoulder, and Sarver is off, each step bringing him closer to a personal encounter with a lethal machine. His world changes as he gets closer to the bomb. At 10 feet out, the point of no return, he encounters what he calls the Morbid Thrill. He feels a methlike surge of adrenaline. In the helmet's amplified speakers he hears his heart thump and his breath rasp, and then he sees it up close, the IED, an ancient artillery round wired to a blasting cap, half hidden in the white plastic bag.

He grabs the cap and heads back toward the safety zone, barely noticing a second white bag nearly out of his sight line in a roadside gully. There is a moment now when he doesn't breathe. He can run for his life and hope to beat this secondary bomb, which an insurgent placed specifically to kill him as he worked on the first one, or he can dive on it and take his chances. He pitches himself into the dirt and reaches for the blasting cap's wire with shaky hands, the menu of possible outcomes running through his mind. He decides he has to act now; there is no time for deliberation. He pulls it apart, pink wire by pink wire, since all of Baghdad's bombs seem to be wired with discolored old Soviet detonation cord. Then he breathes.

When he removes his helmet he stands sweating, pale, his body shaking from the rush. Williams and Millward run to help their boss out of the suit. Sarver is giddy, asking for a beer, cracking crude jokes about how close he came this time. "Can you smell the poop? Can you see the stain? I think I shit my pants."

Clear now, the area is reopened to traffic, and Team One turns toward the base, speeding down Route Irish while mosques broadcast the call to evening prayer. Soon it will be dark, curfew time, and the bomb makers will be at work. Sarver often wonders about these men. Would they shout *"Allah akbar"* ("God is great") if he were splattered on their streets? Are they political or just ex-soldiers in it for the $25,000 bounty the insurgency has reputedly placed on the heads of EOD techs—money to feed their kids, nothing personal? Back in Michigan his own son will turn eight in March. Another child is on the way, brother or sister to Jared. He'll see them both when his tour ends—just 30 more days of a six-month deployment that began that summer. That wasn't so bad. Thirty days not to get shot or blown into bits of DNA.

Then it comes to him again, the pep talk he gives himself in the downtime between missions. As the Humvee rocks and rattles down the road, Sarver stares out the window at the Iraqi dusk gorgeously transformed by all the pollution into a blazing sunset, and he plays it over again in his mind: *This is great. I love this place. If I keep going, I will have racked up more IEDs and disarmed more bombs than any man in the history of this war.*

ive months earlier, only weeks after he bagged his last buck in the forests north of Fort McCoy, Wisconsin, Sarver arrived in Iraq. He was excited to be there. During his nine years as an EOD tech he'd been to Egypt, Bosnia and Korea, but those were merely peacetime jobs, whereas this was, as he says, a "full-on combat operation" that had the entire United States military behind it. He had all the high-tech equipment he could use: electronics to jam the insurgents' cell phones, which they use to detonate IEDs, the suit, the bot. It was a long way from World War II, when bomb-disposal teams

were first created. Starting in 1942, when Germany blitzed London with time-delayed bombs, specially trained U.S. soldiers joined British officers who diagrammed the devices using pencil sketches before they attempted to defuse them with common tools. Many of these men died. During the Vietnam war the job grew even more dangerous. Bomb techs learned to unravel trip wires in the jungle, and they were called upon to work in hospital operating rooms, helping surgeons remove unexploded ordnance embedded in the bodies of wounded GIs. Not until the war in Iraq did IEDs become "the enemy's weapon of choice," in the words of Major General Martin Dempsey, commander of the 1st Armored Division. Bomb techs suddenly became indispensable.

or Sarver, Baghdad was a proving ground, a place where a bomb expert's specialized skills would be crucial to the success of Operation Iraqi Freedom II. "That's all the Army does all day, is go out on patrols looking for IEDs," says Sarver. "They got guys just sitting out there for hours in tanks and Humvees, just waiting to get hit by an IED. This whole war is about IEDs."

In July 2004 orders came down that Sarver should put together a team and head to An Najaf, a town 100 miles south of Baghdad. As his partner, Sarver picked Williams, 26, a promising young tech just months out of training. Williams had been among the 40 percent of enrollees to complete the EOD school at Eglin Air Force Base in Florida. He wears round steel-framed glasses, which give him a slightly bookish appearance, and he comports himself with an easygoing manner, quick to smile and laugh. "Hey, Williams, how would you like to go down with me to Najaf, where we can drink some beers and relax?" Sarver said one afternoon by the horseshoe pit. "It'll be cool."

When they arrived in August, the 11th Marine Expeditionary Unit was fighting some 2,000 insurgents under the command of Shiite cleric Muqtada al-Sadr in the Wadi Al Salam cemetery. It is one of the holiest places in Shiite Islam, for it adjoins the shrine of Imam Ali, son-in-law of the prophet Muhammad, and is one of the world's largest burial grounds, with an estimated 5 million bodies interred in a vast network of tombs and underground crypts three miles long and 1.8 miles wide. The insurgents fired on the advancing marines from positions behind the gravestones and tombs, many of which were adorned with life-size photographs of the deceased. Several times while working, Sarver and the other men fighting



The insurgents' weapon of choice, circa 2004: a classic Baghdad IED, constructed with a South African 155-millimeter artillery round wired to a cordless phone, a nine-volt battery and a timer from a washing machine.



Anatomy of an explosion: The forced detonation of a Russian rocket-propelled grenade by an EOD team at Camp Victory, Baghdad, December 2004. The rocket was packed with C-4 explosives to control the detonation, creating a typical military explosion. Unlike HMEs (what EOD guys call Hollywood movie explosions), with a fireball billowing gorgeous red flames into the sky, the conventional military explosion is ugly and dirty. The most dangerous part of these explosions is overpressure, supercompressed gases that rush out from the blast at 13,000 miles an hour.

squeezed off shots only to discover later that their bullets had hit pictures of dead men. Little by little, American airpower drove back al-Sadr's militia, but as it retreated it left behind a group of suicide fighters to defend the cemetery, which had been booby-trapped with mines and rockets and IEDs.

While the main fighting force hung back a few hundred yards, Sarver and Williams went in first with Marine EOD techs. In three weeks of some of the heaviest action ever experienced by bomb techs, they fought and worked amid the tombs in 120-degree heat, sweating off pounds of body weight every day. Each morning, Sarver and Williams returned to an area of the cemetery that was particularly dense with IEDs. They gained 10, 15 feet of ground at a time, as in some World War I trench warfare, except they were disarming bombs as mortars crashed down around them. Sarver worked freestyle in An Najaf, off the book. There were no protocols to explain how to disarm a ground-to-air missile that had been lashed to the top of a palm tree while people were shooting at you. Often they would get pinned down. The marines encouraged them to press on, shouting, "Come on, man, run, run. They can't hit shit." That wasn't always the case. Sarver saw a private hit and killed instantly by an 80-millimeter mortar that severed his torso and blew it 20 feet away from his legs. "The poor guy died because he'd been ordered to run into a wrecked-out Humvee to retrieve a helmet," Sarver says.

At the peak of the fighting, two black-robed militiamen armed with AK-47s darted between the graves, taking potshots at Sarver's team as they were bent over trying to dig out an IED buried in the ground. Sarver crawled to a rise that looked down on the militiamen, and when they stood Sarver shot one of them. When he wasn't being shot at, Sarver worried about the frag from the mortars exploding around him, scraps of metal

traveling at 2,700 feet per second, which would cut through flesh and bone, searing the tissue in its flight path as it broke through and came popping out the other side of what used to be you. Even more than the frag, he feared overpressure, the wave of supercompressed gases that expands from the center of a blast. (All chemical explosions are solids turning into gases at a very fast rate.) This compressed air comes at an unlucky bomb tech at a force equal to 700 tons per square inch, traveling at a speed of 13,000 miles an hour, a destructive storm that rips through the suit, crushes the lungs and liquefies the brain; the fire that follows will roar upward through the ventilation cracks in his helmet and cook him inside. It's possible to survive a blast of overpressure if you're far enough away from the detonation, and this has given rise to a strange debate in the EOD community: Is it better to have your lungs full or empty if you're hit by overpressure from a distance? Each has its merits; a full lung is less likely to rattle against the rib cage and be punctured, but it is also more likely to burst on impact. At an even greater distance overpressure merely freezes your skin.

At night Bradleys fired their 25-millimeter cannons until first light, and the *boom-boom-boom* made the tents billow and flap. Next door in the medical tent, the moans of wounded marines joined the sound of coalition artillery. "You couldn't sleep when the tanks were firing," Sarver recalls, "and then you'd see the Maverick missiles coming in from Harrier jets miles away. They'd be rumbling overhead—*grrrrr*—and at night the afterburners would have flames spitting out, and you could see these bombs—they're 500 pounds each—bounce as they hit the ground before they went *boooooom!* Oh man, these bombs were huge." The bombs destroyed the old tombs and whoever might still be hiding in there with the dead. Mortuary Affairs hadn't been *(continued on page 148)*

74

P L A Y B O Y

# BOMB SUIT *(continued from page 74)*

*Baghdad is a city of bombs—mines, artillery shells, gre-
nades, dynamite—detonated by suicide or cell phones.*

prepared for the bloodiness of the bat-
tle, and the dead marines were stored in
ice coolers, he says. Sarver recalls that
every time he went in there to grab a
Coke, he saw the face of a young private
nestled in the ice next to the sodas. "I
knew him. He was a really nice kid," he
says, shaking his head.

Toward the end of the month in An
Najaf, Sarver and Williams were disman-
tling IEDs under heavy fire, and Wil-
liams began shaking, disoriented from
the severe 120-degree heat. Sarver sent
Williams back to the Humvee for water.
When Sarver made it back to the truck
uprange he found Williams prone in the
back of the Humvee.

"Williams, where's the firing device?"
Sarver asked.

"I left it back at the IEDs," Williams
replied.

"Did you cut the wires?"

Williams stammered.

"Did you cut them? Did you cut them,
Williams?"

"Yeah."

"Did you segregate them?"

"Yeah. But the mortars are getting
really close."

"Did you put a **charge** on them?"

"No."

"Why didn't you put a fucking charge
on them? Now we have to go back and
blow them up!"

The two men were forced to go back to
the IEDs in order to put a charge on the
explosives and detonate them safely.

"How much time fuse are you using?"

"I put, uh...." Williams stammered
some more.

"Three feet!"

"Why are we yelling?"

"Because we're getting shot at!"

Sarver never held the incident
against him. In fact, as they were
driving back to Baghdad, Sarver told
the younger man that he trusted him
and that there was no tech—not even
another team leader—he'd rather have
at his back. "You are going to be hot

shit one day, Williams, and one hell of
a leader," he said.

Then he shared his private view of the
war. "Where else in the world do you
think you're going to get to disarm five
or six IEDs in a day?" Sarver asked him.
Back in the States you would be lucky to
see an IED once every five years, he said,
so they may as well enjoy the opportu-
nity to work while they had it. Plus, if the
pace continued, they might just end up
disarming more bombs than any team in
the war. That would be a better souvenir
than the memory of the private's face
nestled in ice cubes.

The subject turned to their home lives,
and Sarver told Williams about his son:
"One cool dude. He's like me, a hard-
headed bastard. But he's a stud." Then,
ever the team leader, Sarver advised the
younger man on how to handle being
separated from his wife by the war. There
were ways to behave during those phone
calls home that would put a woman's mind
to rest. "Ah-huh, okay," Williams said.

"Sarver's always trying to tell me how
to live my life," Williams says later. "It's
just funny. I mean, I'll listen to him
when it comes to IEDs or being an EOD
tech, because he's a great team leader.
But he's telling me how I should talk to
my wife. And I'm like, 'Jeff, you're not
even married.'"

•

All EOD techs start their training at a
school in Eglin Air Force Base in Florida.
The Army looks for volunteers who are
confident, forthright, comfortable under
extreme pressure and emotionally stable.
To get into the training program, a pro-
spective tech first needs a high score on
the mechanical-aptitude portion of the
armed forces exam. Once the school
begins, candidates are gradually win-
nowed out over six months of training,
and only 40 percent will graduate. "We
have not yet cracked the code on what
makes a great EOD tech. There is no
textbook answer to the question of how
to be a team leader," says Staff Sergeant
Major Matthew Hughs, the commander
of Eglin's bomb school. "The only way to
find out if a man has the right qualities
is to put him in the field, in the situation,
and see how he does. You can simulate it,
but the simulation will never be as tough
as the real thing."

When Sarver was six years old his dad,
a carpenter, took him hunting for the
first time. They left the trailer park near
Huntington, West Virginia and went into
the forest. Dad showed him how to be
alone, how to be self-sufficient. If you
were willing to bear the isolation of wait-
ing for hours in a thicket, you could catch
an animal in its natural grace, a flash of
fur, muscle and hoof. His mother never
understood him, Sarver says. She always
wanted to take him shopping, to visit rel-
atives and socialize. "Sorry, Mom," he'd
say, "I just don't have the gay gene."



*"Kyle is part of my new fitness plan. He has a third less
fat than my regular boyfriend."*

0164

As Sarver got older he was introduced to more intense encounters: how a coyote, its hind leg caught in a trap, would scream and howl, then finally whimper in a voice that sounded like an infant's; or how a 200-pound buck shot in the sweet spot above its shoulder would shiver, fall to its knees and lie panting, its last hot death breaths melting the snow. Sarver fell for all of it. He spent his free time hunting, and when he wasn't hunting he pored over hunting catalogs, and when his family moved to Ohio Sarver discovered new hunting grounds.

He finished high school and worked in construction for a few months before joining the Army at the age of 19. Later he signed up for the Rangers. That was cool at first. The legendarily tough entry requirements were a cakewalk after a childhood spent tracking coyotes. He did the whole gung-ho routine—he jumped out of airplanes, marched for 12 miles in full battle rattle, got in bar fights, punching until he hit bone, scarring his knuckles—and proved himself to be an excellent soldier, a natural. But in a year Sarver soured on the Rangers. He came to hate the long marches with 100 other guys on a trek to nowhere, just to train as a group. Despite the Ranger Creed, Sarver never got over the feeling that he was just another glorified grunt. This suspicion was solidified when he was sent to Central America on a hush-hush mission that escalated into a disastrous jungle firefight. Sarver took an AK-47 round in the hip. The medic cleaned the wound by twisting his finger in the bullet hole, shot him full of morphine, then sent him back to the fight. After that Sarver quit the Rangers, figuring anything would be better than mindless groupthink. He volunteered for EOD, where brains mattered more than biceps; plus these guys didn't march, they traveled in trucks. He proved to be suited to the job.

Sarver showed an intuitive grasp of engineering and with a quick glance could suss out the architecture of any bomb. This was evident even in training sessions, when the techs built their own bombs to practice with. Instead of the shoe boxes with basic triggers that the other techs built, Sarver's mock IED consisted of a monitor hookup, remote cameras, an array of motion detectors and multiple triggers linked by collapsible circuits so that if one were cut the others would deploy. "If I put that in a room, nobody could beat it," he says. "It's the ultimate IED." More important, Sarver proved that he could work on bombs without becoming bogged down by fear.

To Sarver EOD offered an infinite number of challenges—man-versus-materials moments when he would go down on a bomb and everything else would fall away, the Morbid Thrill. There were times, in fact—as when he was in Egypt disarming unexploded ordnance from the Arab-Israeli wars—when he understood that each bomb has a fascinating and dangerous allure: It has strengths and weaknesses like any adversary, and there is beauty to be found in a well-constructed killing machine. There were times when he felt bomb work was better—far better—than hunting. The only problem with the job: There weren't that many bombs to disarm, and it could be hellishly slow going between deployments.

•

In September 2004 Sarver and Williams were back in Baghdad, where the situation had deteriorated even further. At this point in the war, the U.S. Army had pretty much hunkered down, hemmed in by an invisible insurgency that relied on small arms and improvised explosive devices. Every day a small part of this huge operation was sent into the streets of Baghdad to look for IEDs, which had also killed countless Iraqi civilians—we don't count them, and neither does the interim government—as well as more than 200 American soldiers, sailors and marines. While it was hell on the Iraqis, it was heaven for the EOD techs.

Baghdad, bombed twice from above, erupts beneath the feet of its conquerors several times a day. It is a city of bombs—mines, artillery shells, grenades, dynamite, cordite—exploding by suicidal transport or remotely held wireless phones, spreading blood and body parts, leaving a signature of black, greasy smoke curling above the carnage. This is a modern city of nearly 6 million, almost the same population as Hong Kong's but spread over a metropolitan area of 81 square miles. It is a major urban center by any standard, but more to the point it is Iraq's capital, with office towers and mosques, highways and traffic circles, middle-class neighborhoods like Mansur and slums whose markets draw pedestrians by the thousands at midday. With the rise of the insurgency, these features of a modern metropolis have been transformed into opportunities and platforms for killing Americans. From tall buildings and mosques, snipers watch and wait for passing patrols. The traffic on the roads gives cover to car bombers, who merely have to pull alongside your Humvee and wave hello. In the slums people bury bombs in the dirt roads among the garbage, in the concrete medians of the highways and in the bodies of roadkill, while the street dogs bark and never seem to stop.

These bombs are created from a vast supply of explosives left over from a dictatorship that poured its riches into military hardware. Saddam Hussein even stockpiled missiles that couldn't be launched, and they collected rust on the ground, waiting for this opportunity. After a war with Iran, Kurdish uprisings and two invasions by the United States, Iraqi soil has become a repository for every weapons system on the market. In the ground are an estimated 10 mil-

149

P L A Y B O Y

lion land mines—if Baghdad is a city of bombs, Iraq is a nation of mines—making it one of the most heavily mined areas on the planet. Even if the U.S. Army sealed the borders today, there would be enough explosives loose in Iraq to sustain the insurgency for several decades.

All this has taken the U.S. military by surprise. The protocol for suspected IEDs calls for securing a 300-meter perimeter around the bomb. No soldier goes near it and nothing can happen until the EOD arrives and takes control of the scene. The problem is there are only about 150 trained Army EOD techs in Iraq, a reflection of the fact that, until this war, bomb work was never considered a major duty of the nation's fighting forces. The Army is scrambling to add more techs. Plans are in the works to activate a total of 1,400 techs in the next four years by somehow convincing soldiers to join what may be the most dangerous unit in the armed forces for an extra $150 a month in "demolition pay." In the meantime U.S. generals have announced a Manhattan Project–like effort to combat IEDs and perhaps come up with a better day-to-day solution than having troops shoot at them, which is known as "recon by fire." This almost never works out and in most cases renders the unexploded bomb that much harder to defuse.

As summer turned to fall in Baghdad, Sarver and Williams worked 48-hour shifts, taking only a day off between runs

into the city. The days blurred. Either it was morning or night, either you were driving out from the base or coming home, either the bomb was in a pile of garbage or in the carcass of a dead dog or on the side of the road, and either you disarmed it or, if you were too late, there would be bodies or brains on the backseat of a truck. The incidents always started the same way, with Sarver jumping out of the truck and joshing with the soldiers on the ground—the lewd, crude ball of energy. Then he would go down on the bomb alone and feel the Morbid Thrill. Then he'd come back upstange, glowing from the rush, only to learn that command wanted him to get back in his truck and drive to a new intersection where another bomb was waiting.

By September, intelligence estimates put the number of bomb makers in Baghdad at somewhere between five and 50, but as one expert said, "the skill set was spreading." How else to explain the daily rise in the intensity of the campaign? Sarver followed these intelligence reports closely, and he tried to help by passing along the bomb circuitry he collected on his missions. After coming back to the base from a day in the field, he would sort the bits of wiring he'd picked up on Baghdad's streets and place them in neatly labeled plastic bags, which would eventually be sent to the FBI for analysis. In these devices Sarver could read the history of the insurgency as it grew in ferocity and sophistication. When he first landed in Iraq the bombs he encountered were rudimentary: a blasting

cap and shell connected by a command wire to an insurgent with a button. Now they were progressing to more lethal, wireless designs, incorporating modified car alarms, pagers and wireless phones for remote detonation. Still, the insurgents were far from fully exploiting the available technology. He predicts they will turn to remote motion sensors, pressure sensors, heat sensors and light sensors, all of which they will use to increase the body count.

After every shift, Sarver comes back to the base and paints a little bomb stencil on the door of his Humvee to keep track of his numbers. "How many you got now?" asks Staff Sergeant Kelsey Hendrickson, a tall, bald, strapping 26-year-old tech. Sarver tells him 120 IEDs and four vehicle-borne IEDs—car bombs.

"Man, I hate the car bombs," Hendrickson says. "They're the worst."

"I'll take 'em. Give 'em to me."

"You can have them." Hendrickson lights a cigarette. "Who cares, anyway? It's not like you get a special prize for disarming x number of IEDs, you know. They don't put a patch with a number on it on your uniform."

"But I'll know," Sarver says.

Sarver, a loner by nature, dips in and out of the roughhousing Southern-boy frat house of the 788th's social life. For the other guys it is the only way to blow off steam. "You need an escape," one tech tells me. "The last thing you want to do is come back and sit around thinking about what you just did, because then you'll go crazy. As long as you don't get contemplative, you're all right." Sarver takes his meals alone. When it's time to go to the gym and the guys are all guzzling protein shakes and getting ready to lift heavy, they don't even bother to ask him anymore.

"I'm saving my energy for IEDs," he'll say.

By October Sarver and Williams had disarmed 160 IEDs. The insurgency began targeting Iraqi civilians. One day Sarver's team was called out on two IEDs, but one went off before Team One reached it, and it killed an Iraqi family driving by in a pickup truck—father, mother, daughter and a sheep tethered in the flatbed. "If we had stopped, it could have been the starting point of an ambush because we didn't have the trucks to secure it. On the other hand, it really bothers me that a kid got killed inside that truck," Sarver says. "That was a catastrophic kill. There was brains all through the truck—that gray matter. Nobody survived."

That night Sarver went back to his trailer, which he shares with Williams. Sarver has divided the room with a wall of lockers, squeezing Williams into a corner. "You don't need the space," he declared, pulling seniority. All Williams has on his side are pictures of his family and his EOD certificate. Sarver



*"I'm used to being around celebrities. That's something you develop as a stalker."*

Case 1:56286-02/13/2013  ID:851244  DktEntry:34-5  Page 27 of 54

has decorated his considerably larger wall space like a command center, with photographs of classic IEDs, schematic drawings of fuses and maps of Baghdad showing the locations of major installations. His computer screen saver is an image of a bomb tech in Ireland taking the lonely walk downrange. Sarver keeps recovered bomb parts in a box by his bed. He keeps pictures of his son and his new girlfriend in his desk drawer, under bits and pieces of IEDs. Sarver would take out the photos if anybody asked to see them, but he wouldn't volunteer them.

In December, with only a month left in the tour, Sarver and the other techs feel the stress pile up. The last 30 days are the most dangerous time. Even under the best conditions EOD is one of the most dangerous jobs in the military, but the chances of dying grow especially high in the last month, when fatigue, distraction and homesickness can dull a soldier's instincts. "You zig when the bomber zags" is how Sarver describes the kind of mental mistake that can lead to death. Staff Sergeant Michael Sutter, an experienced tech and a close friend of Sarver's, zigged at the wrong time and died in the field the day after Christmas 2003, his last scheduled day on duty. Staff Sergeant Kimberly Voelz was laid open on the side of the road by a bomb that had been duct-taped to a telephone pole, and she survived long enough to make it home and die in her husband's arms.

In the second week of December, on a rare call when a colonel is in the field, Sarver's team travels to a location in downtown Baghdad. A hundred feet away is a rebar house with a high cement wall and a satellite dish, typical Baghdad styling—a dull, putty-colored job like everything else in Baghdad, a whole city in earth tones and faded yellows, with beat-up shitty cars, a once modern, shiny place now banged up and dirty.

Team One attempts to disarm the IED with a robot, but it doesn't work and Sarver has to take the long walk by himself. Millward seals him into the bomb suit, which makes him look like a cross between the Michelin Man and a hazmat specialist. The only visible part of him is his face; it is slightly distorted by the clear acrylic visor of the helmet, but if you look closely you can see he is smiling as he walks down on the bomb and prepares to face the ultimate fear. The rest of his face is tight with terror—the wide nose, small soft chin and large blue-green eyes, all drawn in and back—except for the lips, which are set in a cocky smile.

As he leaves the safety of the group, thoughts of his family flash at him. *What have I done bad?* he thinks. *Have I done everything I should have done? Have I done everything I can as an individual? Will my family be okay if this bomb goes off? How different from my parents, married for 40 years. My relationships have been big flops. So many*

mistakes. *If I learned from each one, shouldn't I be a Ph.D. by now?*

As he approaches the bomb his mind goes blank. "Everything shuts down except for you and the device. I can hear myself breathing." His heart beats so loud he can hear it in his helmet, overlaid with the sound of the barking dogs; they all sound so close they could be biting off his ear. There is a radio receiver in the suit, but it's turned off to avoid sending stray radio waves that could set off the IED. So he is walking toward the bomb without any communication with his team—cut off, alone and in the open.

"When you get to 10 feet away from it, you get comfortable because you are at the point of no return," he explains. "And you look at it. Everything is shut off."

This bomb sits beneath a pile of garbage, the rusty metal cone poking out from under a banana peel, under a mountain of trash: rotting vegetables, plastic, tin cans. Sarver puts his hands on the device, an artillery shell containing 18 pounds of explosives with a blasting cap cemented in the nose. Rising from the cap is a pink wire leading to a battery connected to a cell phone. When the phone rings, it opens a circuit that sends 1.5 volts of electricity—less than the static charge on your dry-cleaning bag—to the blasting cap, which then detonates the entire contraption.

He must separate the blasting cap from the main charge, but it won't come out of the cement. Sarver reaches for his knife and starts digging. He digs around the wire, where there is no more than an

inch of space to work with, and he tries desperately with the knife, trying to lift out the cap. From 300 meters away, he seems to be moving at hyperspeed, but inside the bomb helmet the moments seem to be stretched, and he feels as if he's moving in superslow motion. Finally the wire gives, the bomb separates, it's over, and he stands up. His face is flushed, and his body shakes in the aftermath of his adrenal hailstorm.

It's clear that he's tasted the incomparable rush of having disarmed a deadly weapon—of having seen how easy and real it would be to die—and lived. He rejoices in the sensations of his existence: the salty sweat falling in his eyes, the 80 pounds of weight on his back, the dogs barking madly in his ear.

When Sarver is fatigued, the colonel, whose personal convoy had almost been destroyed by the IED, comes up to congratulate him. Sarver recognizes him as one of the authors of the "recon by fire" tactic.

"Are you the crazy man in the bomb suit?" the colonel asks.

"Yes, sir, that was me."

"Look at that hero. America's finest. That is some good shit. Check that shit out—all right, good job," he says and shakes Sarver's hand. "I want a picture with this man."

Then Sarver begins to explain to the colonel exactly how a bullet would have failed to disarm the device. The



"The new bed's arrived, Harry—it's great!"

151

P L A Y B O Y

colonel nods, makes no reply. Sarver picks up the remains of the bomb to illustrate the point.

"Hey, hey, hey," says the colonel. "Don't be touching that thing around me."

As he walks away, the colonel says to his aide, "You wouldn't catch me going down on no fucking bomb."

•

That night Camp Victory is dark, nearly pitch-black. The Baghdad smog hides the stars, and the lights are turned off to avoid giving the enemy easy targets. It is quiet in the camp, too; the sounds that escape from individual trailers—music, laughter—quickly lose volume in the wide-open spaces, and Sarver, killing time in his room, confronts thoughts of home. "Not a day goes by that I don't think of my son," he says. "I know that I will not have the kind of relationship with him that my dad had with me," he adds wistfully. Sarver's dad wasn't in the military, and military life is different, especially EOD. Separations and relationship troubles are par for the course. "That's why they say EOD stands for 'every one divorced,'" Sarver says.

Taking a broom in hand, he sweeps the day's worth of sand out the front door of his trailer, then wipes the floor clean with a rag. "Believe it or not," he says, "I'm really going to miss this shithole."

•

On Christmas Eve, with six days left in his field duties and 190 bombs painted on his truck, Sarver is sent to assess the damage caused by an oil-tanker-truck bomb that has exploded in front of the Moroccan embassy. By the time he arrives, the only illumination is coming from a fire smoldering in the top of a palm tree. The air, thick with debris, smells wretched: sulfur, burned fuel and human blood.

A family of five has been caught under the rubble of one building, and the bodies are still inside as Sarver and his crew examine the scene. A taxi driver who was sitting in his car within the blast radius has been taken away, but the vehicle remains, a charred hull still smoking, its insides melted and wrecked, and bits of the driver's hip on the seat.

Sarver examines the site with the guys from forensics, shining his flashlight in the crater, 30 feet wide and 10 feet deep, where there had been concrete and road. He steps through the crunching glass and bits of metal to the engine block and looks at that for traces of explosives to see whether the bomb was detonated remotely or was the work of a suicide bomber.

Now he walks from the center of the blast, his flashlight beam illuminating the progress of the destruction. At 40 paces he walks through a completely blackened expanse that gives way in another five paces to a few visible shapes—a bit of concrete, part of a wall. Then some recognizable things, charred but not consumed, and then finally just burned, the paint on a gate blistered from the heat. Beyond the gate, weird-looking chickens peck at the dirt, their feathers burned off. Sarver aims his light up into the branches of a tree and finds an orange, perfect and ripe. "This is where it ended," he says, then walks back to the center.

Sarver notices two well-dressed men standing in the doorway of their home. He approaches them. "I'm sorry this had to happen to you," he says.

"I'm sorry too," says one of the men, a Kuwaiti.

"Was anybody hurt?"

"My brother, next door. The glass fell on him. But he's okay."

"I'm sorry. If you see anything hazardous, give us a call and we will come and take it away for you."

"Yes, thank you." Then he shrugs and tilts his head. "What can we do? What can we do?"

Back at the base the men of Team One and Team Two sink into the couch. They tear into packages of Froot Loops and add the bitter reconstituted Iraqi milk. They talk about random cartoons and movies with funny-sounding characters. To emphasize a point, Millward imitates Elmer Fudd and then tries an impression of Daffy Duck that makes Williams laugh so hard the milk dribbles down his cheek.

Williams and Millward keep goofing off, laughing and laughing, while Sarver, ashen, leans against the wall, still lost in what he has seen. "Them chickens is what got me," he says finally. "It was horrible the way they had their feathers burnt."

A tech who is walking by overhears Sarver and asks, "Did the chickens smell like barbecue?"

"No, man, they...." Sarver shakes his head and shrugs, as if he is unwilling or unable to answer the question aimed to poke fun at his softness. He pushes himself away from the wall, stands straight for a moment, then leans back. He stands there with his hunched shoulders, looking down at the floor. After a while he gets up to leave, and on the way out he finally says, "By the way, it's Christmas Eve, so merry fucking Christmas."

Christmas comes and passes without celebration; then it is time to go. Before he leaves Iraq, Sarver tallies his bombs one last time. The number is 208. Every bomb he defused meant an Iraqi or an American didn't die that day. How many lives has he saved? The number could be anywhere from dozens to several hundred people. This does not go unnoticed by Army brass. In his After Action Report, the commander of the 788th Ordnance Company (EOD), Captain Christopher Wilson, notes that Sarver's team "was engaged by enemy militia on almost every mission" and in the end had "rendered safe the largest number of IEDs that were disarmed by any one team since operations began in Iraq."

On a C-130 en route to Wisconsin, flying for the last time over Camp Victory and the unending parking lots of machinery, Staff Sergeant Sarver is officially a hero. Nestled in the pocket of his shirt is a Bronze Star.

•

In late January the company lands in Wisconsin, nine days before Iraq holds its national elections. The men quickly find that the town next to their base in Fort McCoy—Sparta, Wisconsin, population 8,727—is just as dull as when they left it: shopping malls and bars and fast food.



0168

At night Sparta shuts down, especially beyond the main road, where the farmland, much of it Amish, stretches out for miles of open countryside with only cows and silos and flat, straight roads all the way to St. Paul, Minnesota. In the woods the ground is covered with several feet of snow, but the men do not pile into a car and go camping in the powder.

Nor do they wish to linger at homecoming parties down at the local tavern, not after all that time rubbing up against one another in Iraq. They split up, each to his own. Williams rushes home to his wife and two boys, one of whom is already "a little terrorist." Sarver returns to his modest rented one-bedroom five minutes from the main road in Sparta.

He finds the place just as he left it, undisturbed by trespassers or visitors. None of his 100 rifles, shotguns and handguns have been moved from the three gun cabinets, the largest of which blocks the entrance to the front door, forcing him to use the side entrance. The living room also looks fine, still crowded with animal mounts—a pheasant, a fox, a beaver and a deer head, all hung on the wall and positioned with their eyes turned away from the couch so Sarver can sit there and admire the lush fur and brilliant feathers without being confronted by their staring eyes. Which is what he does. He sits on the couch, checks out his mounts, orders pizza and watches TV.

Then—as always, keeping his position fluid, not spending too much time in one place—he goes off on a hunting trip, a spree that leads to his killing dozens of animals and storing up enough meat to make him self-sufficient for a year. "I take pride in providing for myself," he says. The hunting trips may have had another purpose as well: They've used up his vacation time, and he will not be seeing his son right away.

One night he calls Williams and invites him to come out for a beer. "Come on, man, you have to," he says, but Williams begs off, citing obligations to his kids and wife. So Sarver calls another tech, a younger guy, and he agrees to knock back a few cold ones.

Sarver settles back on his bar stool and tells his friend how much he misses Iraq. More beers are ordered—it's now going on two cases—and Sarver is feeling lively again. "Baghdad was a blast," he says, the best time of his life. "Where else can you wake up in the morning and say, 'Okay, God, what are you going to give me?' Where else can I spend the morning taking apart an IED and in the afternoon drive down the road with 200 pounds of explosives in my truck, blowing up car bombs and trucks? I love all that stuff. Anything that goes boom. It's addictive. The thump, the boom—I love it. It's like the moth to the bright white light for me."

As the beers flow and Sarver gets a little sloppy, his posture slackens and the emotions come more readily to the surface of his face, softening it. He says he will be missing his second kid's birth because he used up so much time hunting. He doesn't want to ask another guy to sub for him. "I'll never hear the end of it from those guys," he says, and perhaps he is right, for already they are mocking ol' Sarver for sowing his seed and warning him that he will soon be besieged by crying infants. They say he'll have to move across the state line just to find a little peace and a fresh batch of women to love and leave. He is now not even sure if the thing with the new girlfriend, the one who's having his baby, will work out after all. "That's up in the air right now," he says.

"Have you told her yet that you're gonna miss the birth?"

"I'm going to have to sit with her tomorrow and tell her."

"Well, I guess it's good for you," says the buddy.

"Yes, it is," Sarver says as he gets up to go to the bathroom.

"Fuck it," he says when he comes back. Then, slamming another beer, he adds that he needs to transfer to another unit so he can get back into the theater quickly. "I need to get back to Iraq."

The next day he goes to work with a massive hangover and has to tackle a mountain of papers. This is his life now: filling out forms, answering to civilians, killing time. Only once in a month does he have to take the bomb suit out of the truck, when a family calls, having found an old pineapple grenade from World War II in their dead grandfather's trunk. The job is so easy it's ridiculous; it's a PUCA (pick up and carry away), and Sarver scoops up the old grenade and doesn't even bother to try to find the challenge in it because there is just none to be found.

A few weeks later, Sarver receives an e-mail. Back in Iraq, the new Team Three was hit with an IED. The team leader was killed instantly.

Finally a day off arrives. Hunting season is over, and there are no pineapple grenades to pick up. Sarver decides to visit his family; he drives to Ohio and spends an evening with his father. Then he goes to his ex-girlfriend's house in Michigan to see his son, Jared. After hugging them, he's hit with a wave of emotion, and he excuses himself to take a moment alone on the front porch.

Sarver sits down and takes a deep breath. He looks out into the calm Michigan evening, in the nation he has sworn to protect, where there are no IEDs to harm his son. Then Staff Sergeant Jeffrey S. Sarver, the best bomb tech in Baghdad, puts his head in his hands, and for two hours straight he cries.

```
------ Forwarded Message
> From: <jeff.sarver@us.army.mil>
> Date: Tue, 02 Aug 2005 14:47:54 -0500
> To: Mark Boal <mark@markboal.com>
> Subject: Re: Playboy article
>
> Hey Mark my address is
>
> Jeff Sarver
> 301 Walrath Street
> Sparta, WI 54656
>
> Hey by the way, I think you got some stuff mixed up with me and
another team
> leader. I didn't work on 15 foot missiles in Egypt. Hendrickson did
in Iraq
> during the initial assault into the country. I do look forward to
seeing the
> article even though I am a little nervous. Hey could you send my
girlfriend a
> copy in Colorado? Kinda maybe deck it out in Playboy
stuff.............. Could
> you do that? Later, Jeff
>
> ----- Original Message -----
> From: mark <mark@markboal.com>
> Date: Tuesday, August 2, 2005 12:09 pm
> Subject: Playboy article
>
>> Jeff,
>> Hope this finds you well. I have an early copy of the article I
```

Exhibit B

**0170**

>> want to send
>> you. What is the current address?
>> Mark
>>
>>
>

------ Forwarded Message
> From: <jeff.sarver@us.army.mil>
> Date: Wed, 09 Feb 2005 01:08:00 +0300
> To: Mark Boal <mboal@nyc.rr.com>
> Subject: Re: south african 155s
>
> Hey man how's it going? I would have written you sooner but I just came off of
> leave. So how is the article coming? How would you have offended me anyway?
> Later, Jeff
>
> ----- Original Message -----
> From: Mark Boal <mboal@nyc.rr.com>
> Date: Monday, January 24, 2005 7:26 am
> Subject: south african 155s
>
>> Hi Jeff,
>>
>> Is everything okay with us? I haven't heard back from you, and that's
>> unlike you, so I hope that I didn't inadvertently cause offense.
>>
>> Mark
>>
>>
>>
>>
>>
>> Mark Boal
>> Writer At Large
>> Playboy Magazine
>>

------ End of Forwarded Message

0171

------ Forwarded Message
> From: "Clifford, James CSM - 52D EOD"
<James.Clifford@forscom.army.mil>
> Date: Tue, 02 Aug 2005 14:00:43 -0400
> To: Mark Boal <mboal@nyc.rr.com>
> Subject: RE: EOD Article
>
> Good job, Mark.  I remember asking you to focus on the soldiers and
that you
> did.  Thanks.  I'm sure this article will reflect positively on us.
I will
> keep it close-hold until it hits the news stands.  Good luck on your
future
> projects.
>
> Jim
>
> -----Original Message-----
> From: Mark Boal [mailto:mboal@nyc.rr.com]
> Sent: Tuesday, August 02, 2005 1:06 PM
> To: Clifford, James CSM - 52D EOD
> Subject: Re: EOD Article
>
>
> Jim,
> Here's the article as PDF for Your Eyes Only. Please don't email the
PDF to
> anyone as Playboy doesn't want the article in electronic form to be
> circulated.
> Best,
> Mark
>
>
> On 7/29/05 4:10 AM, "Clifford, James CSM - 52D EOD"

Exhibit C

```
> <James.Clifford@forscom.army.mil> wrote:
>
>> That's great.  Thanks.
>> --------------------------
>> Sent from my BlackBerry Wireless Handheld
>>
>>
>> -----Original Message-----
>> From: Mark Boal <mboal@nyc.rr.com>
>> To: Clifford, James CSM - 52D EOD <James.Clifford@forscom.army.mil>
>> Sent: Thu Jul 28 21:09:18 2005
>> Subject: Re: EOD Article
>>
>> Hi Jim I am planning to email you a PDF version of it on Aug 3, the
> earliest
>> I can release it... Street publication date is Aug 12...
>>
>> Best,
>> mark
>>
>>
>> On 7/26/05 12:48 PM, "Clifford, James CSM - 52D EOD"
>> <James.Clifford@forscom.army.mil> wrote:
>>
>>> Mark,
>>>
>>> We're about 2 weeks out from the publication of the EOD article.
Can you
>>> let me take a sneak peek yet?
>>>
>>> Playboy's sales might have spiked a little this month as a few EOD
types
>>> told me they went out and picked up a copy.  They thought our
article
>> would
>>> be in the August issue.
>>>
>>> Jim Clifford
>>
>
```

LINDA GEORGE
577 Summit Avenue
Hackensack, NJ 07601
Telephone: (201) 487-5225
Fax: (201) 487-8807
lgdefense@yahoo.com
Attorney for Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

SGT. JEFFREY S. SARVER,                           )
                                                  )   Case No.:
            Plaintiff,                            )
                                                  )
v                                                 )   **PLAINTIFF'S COMPLAINT AND**
                                                  )   **DEMAND FOR JURY TRIAL**
THE HURT LOCKER, LLC, MARK BOAL,                  )
KATHRYN BIGELOW, GREG SHAPIRO,                    )
NICOLAS CHARTIER, TONY MARK,                      )
DONALL McCUSKER, SUMMIT                           )
ENTERTAINMENT, LLC, VOLTAGE                       )
PICTURES, LLC, GROSVENOR PARK                     )
MEDIA, LP, FIRST LIGHT PRODUCTIONS,               )
INC., KINGSGATE FILMS, INC., and                  )
PLAYBOY ENTERPRISES, INC., Jointly and            )
Severally,                                        )
                                                  )
            Defendants.                           )
                                                  )

NOW COMES Plaintiff, SGT. JEFFREY SARVER, by and through his attorney, LINDA

GEORGE, and for his Complaint against the above-named Defendants, states as follows:

0174

## JURISDICTION AND VENUE

1.     Plaintiff SGT. JEFFREY SARVER (hereinafter "Plaintiff") is a resident of the city of Clarksville, state of Tennessee, and has been since August of 2009.

2.     At all times relevant, Plaintiff was a resident of the city of Dover, State of New Jersey.

3.     At all times relevant, Defendant THE HURT LOCKER, LLC (hereinafter "HURT LOCKER"), was and is a California Limited Liability Corporation, having its principal office and headquarters in the city of Los Angeles, state of California, and conducting business in the state of California.

4.     At all times relevant, Defendant MARK D. BOAL (hereinafter "BOAL") was and is a citizen and resident of the city of New York, county of New York, state of New York, and conducting business in the state of California.

5.     At all times relevant, Defendant KATHRYN BIGELOW (hereinafter "BIGELOW"), was and is a citizen and resident of the state of California, conducting business in the state of California.

6.     At all times relevant, Defendant GREG SHAPIRO (hereinafter "SHAPIRO") was and is a citizen and resident of the state of California, conducting business in the state of California.

7.     At all times relevant, Defendant NICOLAS CHARTIER (hereinafter "CHARTIER") was and is a resident of the state of California, conducting business in the state of California, serving as the registered agent for Defendants HURT LOCKER and VOLTAGE PICTURES, and the current CEO of Defendant VOLTAGE PICTURES.

8.     At all times relevant, Defendant TONY MARK (hereinafter "MARK"), was and is a resident of the state of California, conducting business in the state of California.

2

**0175**

9.      At all time relevant, Defendant DONALL McCUSKER (hereinafter "McCUSKER"), was and is a resident of the state of California, conducting business in the state of California.

10.     At all times relevant, Defendant SUMMIT ENTERTAINMENT, LLC (hereinafter "SUMMIT ENTERTAINMENT"), was and is a California Limited Liability Corporation, having its principal office and headquarters in the city of Universal City, state of California, and conducting business in the state of California.

11.     At all times relevant, Defendant VOLTAGE PICTURES, LLC (hereinafter "VOLTAGE PICTURES"), was and is a California Limited Liability Corporation, having its principal office and headquarters in the city of Los Angeles, California, and conducting business in the state of California.

12.     At all time relevant, Defendant GROSVENOR PARK MEDIA, LP (hereinafter "GROSVENOR PARK MEDIA"), was and is a California Limited Partnership, having its principal office and headquarters in the city of Santa Monica, California, and conducting business in the state of California.

13.     At all times relevant, Defendant FIRST LIGHT PRODUCTIONS, INC. (hereinafter "FIRST LIGHT PRODUCTIONS"), was and is a California Corporation, having its principal office and headquarters in the city of Los Angeles, state of California, conducting business in the state of California.

14.     At all times relevant, Defendant KINGSGATE FILMS, INC. (hereinafter "KINGSGATE FILMS"), was and is a California Corporation, having its principal office and headquarters in the city of Los Angeles, state of California, conducting business in the state of California.

**0176**

15. At all times relevant, Defendant PLAYBOY ENTERPRISES, INC. (hereinafter "PLAYBOY"), was and is an Illinois corporation, having its principal office and headquarters in the city of Chicago, state of Illinois, and conducting business in the state of California.

16. There is complete diversity of citizenship between the Plaintiff and the Defendants, and the matter in controversy well exceeds, exclusive of interest and costs, the jurisdictional sum of $75,000.00. Therefore, this court has subject matter jurisdiction over this action pursuant to 28 USC § 1332(a).

17. This court may exercise personal jurisdiction over the Defendants because Defendants have written, released, and distributed, the major motion film and DVD, "The Hurt Locker", to various movie theatres and retail stores located throughout the country, including such movie theaters and retail stores located in the state of New Jersey, and including those counties comprising the New Jersey District of this Federal United States District Court.

## GENERAL ALLEGATIONS

18. Plaintiff hereby restates and re-alleges paragraphs one (1) through seventeen (17) of this Complaint as if fully stated herein.

19. At all times relevant, the individual Defendants, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, and McCUSKER, were employees and/or actual, implied, and / or express agents of Defendants HURT LOCKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or KINGSGATE FILMS, and at all times were acting within the course and scope of said employment / agency relationship, thereby rendering Defendants HURT LOCKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or

4

0177

1  KINGSGATE FILMS, vicariously liable for said individual Defendants' actions and omissions, as
2  set forth below, under the doctrine of *respondent superior.*

3      20.    At all times relevant, the individual Defendant BOAL was an employee and/or
4  actual, implied, and / or express agent of Defendant PLAYBOY, and at all times was acting within
5  the course and scope of said employment / agency relationship, thereby rendering Defendant
6  PLAYBOY vicariously liable for said individual Defendant's actions and omissions, as set forth
7  below, under the doctrine of *respondent superior.*
8

9      21.    At all times relevant, Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO,
10 CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES,
11 GROSVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, KINGSGATE FILMS, and/or
12 PLAYBOY, individually and/or through their / its employees / agents, wrote, produced, and/or
13 distributed the motion picture film "The Hurt Locker", which was released and distributed to select
14 theaters in New York and Los Angeles on June 26, 2009,, and then underwent a more widespread
15 release on July 24, 2009.
16

17     22.    At all times relevant, Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO,
18 CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES,
19 GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY,
20 individually and/or through their / its employees / agents, wrote, produced, and/or distributed the
21 motion picture DVD "The Hurt Locker", which was released and distributed to general public
22 throughout the United States on January 12, 2010.
23

24     23.    For the reasons more fully explained below, the production, release, distribution, and
25 publication of the motion picture film "The Hurt Locker", and the motion picture DVD "The Hurt
26 Locker", are hardly the "literary" or "artistic" works of Defendants as the Defendants themselves
27 have proclaimed. Instead, "The Hurt Locker" motion picture film and DVD are nothing more than
28

0178

the exploitation of a real life honorable, courageous, and long serving member of our country's armed forces, by greedy multi-billion dollar "entertainment" corporations, which engaged in the very simple - though unconscionable and unlawful – act of plagiarizing the name, likeness, mannerisms, habits, and intimate and personal life story of Plaintiff Staff Sgt. Jeffrey S. Sarver, for the sole commercial purpose of unjustly enriching the Defendants in the amount of multiple millions of dollars.

24.     After unlawfully using Plaintiff's name and likeness – without his consent – to make, produce, and distribute a movie about the Plaintiff personally, Defendants further violated the law by unlawfully invading Plaintiff's privacy and defaming the Plaintiff in several scenes of the movie.

## **FACTUAL ALLEGATIONS**

25.     Plaintiff hereby restates and re-alleges paragraphs one (1) through twenty-four (24) of this Complaint as if fully stated herein.

26.     Plaintiff has been a member of the United States Army since October 7, 1991, who continues to proudly serve his country as a Master Sergeant.

27.     In 2003, for the purpose of facilitating complete, accurate, and up to date (i.e. virtually instantaneous) coverage and reporting of military combat operations, the United States Department of Defense adopted the "embedded media" policies and procedures.

28.     The embedded media policy was designed to facilitate the timely telling of the factual story of our country's combat related operations, "before others seed the media with disinformation and distortions".

29.     To facilitate the immediate release of factually correct military operations related information, the Department of Defense promulgated the embedded media policy, whereby designated media representatives would be selected for long term, minimally restrictive access to

6

0179

US forces through "embedding", whereby the media will actually live, work, and travel as part of a military unit for several weeks at a time.

30.     In exchange for the Department of Defense agreeing to provide this unprecedented, up-front access to combat operations, the media agreed to be bound by the "Ground Rules" applicable to embedded media, which were agreed to and signed by the media prior to the embedding.

31.     One of the Ground Rules agreed to by the media restricts the type of information to be released / published by the media.  For example, release / publication of a service member's personal information is specifically limited to the member's name and hometown only, and only on condition the service member has provided consent.

32.     In July of 2004, Plaintiff was a Staff Sergeant of the US Army's 788th Ordnance Company, who was a trained and highly experienced EOD (explosive ordnance disposal) technician.

33.     In July of 2004, orders were received for the 788th Ordnance Company, including Plaintiff, to deploy overseas for a six months of service in Operation Iraqi Freedom II.

34.     The orders further commanded Plaintiff to assemble and lead one of three EOD teams (a/k/a "Bomb Squad" teams) for the 788th while deployed in Iraq.

35.     While deployed in Iraq, the central mission of the 788th EOD teams was to identify, render safe, and dispose of hazardous unexploded conventional munitions, chemical munitions, and improvised explosive devices (hereinafter "IEDs").

36.     During this time, there were only about 150 trained Army EOD techs in Iraq.

37.     Because the war zones were inundated with IEDs, Plaintiff's job as an Army EOD tech in Iraq was very dangerous, such that bomb techs were five times more likely to die in Iraq than all other soldiers in theater.

0180

38.     During his deployment, Plaintiff and his EOD team were sent on a significant number of missions, during which Plaintiff and his team successfully disarmed multiple number of IEDs.

39.     In December of 2004, Defendant BOAL, a writer for Playboy Magazine, a publication owned, operated, and circulated by Defendant PLAYBOY, was embedded with Plaintiff's 78[8th] Ordnance Company, which was set up at Camp Victory (formerly Camp Liberty) in Baghdad, Iraq.

40.     Defendant BIGELOW first learned of Defendant BOAL's upcoming embedment, as described above, sometime in 2003.  Prior to Defendant BOAL's embedment in December of 2004, Defendant BIGELOW shared with Defendant BOAL how he could use his media embedment as a vehicle to come up with a "screenplay" for a commercial movie.

41.     Shortly before Defendant BOAL's embedment, Plaintiff and the rest of the 788th's members were advised by their Command of Defendant BOAL's upcoming 30 day embedment, and that service members were to accommodate Defendant BOAL as he was to report on / write about EOD operations in Iraq, *in general.*

42.     Shortly after Defendant BOAL's embedment with the 788th Company, Defendant BOAL stated, represented to, and assured the Company's service members, including Plaintiff, he was working on a report / story about EOD operations in Iraq, *in general.*

43.     During his embedment with the 788th Company in Iraq, Defendant BOAL essentially exclusively followed and accompanied the Plaintiff and his EOD team during the 30 day embedment period, including accompanying Plaintiff while on various different EOD missions and assignments, as well as accompanying Plaintiff after operations when Plaintiff retired for his shift back at the camp.

8

44. Throughout his embedment, Defendant BOAL took multiple photographs, videos, and audios of the Plaintiff and other service members, and again emphasized and assured the service members these were necessary for Defendant's report / article on EOD *in general*.

45. Throughout Defendant BOAL's embedment, Plaintiff and his team fed, sheltered, personally protected, and ensured the personal safety of, Defendant BOAL.

46. During his embedment, Defendant BOAL became acquainted with not only the *general* military operations of the 788th's EOD, but also with Plaintiff's personal information and personal life story by virtue of the questions Defendant BOAL directed to Plaintiff and by virtue of Defendant's ubiquitous presence around the Plaintiff, including the need to even document Plaintiff's personal environment and effects, including Plaintiff's closed off personal bedroom / sleeping area.

47. Defendant BOAL, after hearing Plaintiff use the phrase "the hurt locker" on multiple occasions while leading his team in Iraq, asked Plaintiff what he meant by that phrase. Plaintiff answered the question for Defendant BOAL.

48. That Defendant BOAL *never* advised the 788th Company's service members, including Plaintiff, that he intended to use his government issued embedment for the purpose of exploiting Plaintiff by gathering Plaintiff's personal information, photographing his likeness, videotaping his likeness, mannerisms, and habits, and recording his discussions, which would later be published in the form of a sensational, personal, private, and embarrassing story or movie about the Plaintiff (in which selected parts are even untrue and defamatory).

49. That had Defendant BOAL advised Plaintiff that he was gathering information for the purpose of publishing a story and / or even a movie, based upon the Plaintiff personally, Plaintiff, as well as other service members of the 788th, would have refused to answer or respond to Defendant's questions and other requests for information.

0182

Case: 11-56986   02/13/2013   ID: 8513444   DktEntry: 34-5   Page: 43 of 54

50.     Plaintiff's deployment ended in January of 2005.  By this time, Plaintiff honorably and courageously served his country, fellow service members, and Iraqi civilians, by having disarmed more IEDs than any single team since the operations began in Iraq.  Sgt. Sarver was awarded the bronze star for his commitment and service to his country.

51.     Shortly after Plaintiff's return home to Wisconsin, Defendant BOAL started hounding the Command of the 788th Company, asking for a "visit" with the service members in Wisconsin, so he could finish reporting on his "article" by documenting they were now "safely home".

52.     That after Defendant BOAL visited Plaintiff and other service members in Wisconsin in early 2005, Defendants PLAYBOY and BOAL released, in August /September of 2005, an eleven (11) page article which was focused not on EOD *in general*, but the Plaintiff and his personal life[1].

53.     Immediately after receiving a copy of Defendant BOAL's and Defendant PLAYBOY's August / September 2005 article (hereinafter "the Playboy Article") [**Exhibit A** attached hereto], Plaintiff advised Defendants he did not approve of the article because it was about him personally, contained several untruths, and portrayed him in a false light in various different sections.

54.     Plaintiff requested Defendants to refrain from publishing the Playboy Article.

55.     Defendants told Plaintiff the Playboy Article was already published and distributed to retail stores, and therefore there was nothing which they could do.

---

[1] The title alone illustrates the plain and simple fact that the Playboy Article is really a personal article about Plaintiff Jeffrey Sarver – "For Staff Sergeant Jeffrey Sarver … the war in Iraq couldn't get any more personal.  What's it like to be THE MAN IN THE BOMB SUIT".

10

0183

56.     The Playboy Article was released for sale to the general public in September of 2005, in which was documented the following information concerning the Plaintiff[2]:

   a.   Plaintiff's name and *personal* life are the actual title of Defendants' article;

   b.   The title identifies Plaintiff as "the man in the bomb suit";

   c.   The two photos depicting a man in a bomb suit are identified as plaintiff;

   d.   Plaintiff's age & height;

   e.   Plaintiff having grown up in a trailer park in West Virginia;
   f.   Plaintiff's specific pronunciation of words via his "accent" ("West Virginia twang"; "ah-ee-dee" [IED]);

   g.   The identification of Plaintiff's minor's son by name - Jared, who lives with his ex-wife;

   h.   Quoting Plaintiff about his son: "… a hard headed bastard";

   i.   Plaintiff turning off the headset in his bombsuit during a mission;

   j.   Plaintiff's history of bar fights;

   k.   Plaintiff's personal relationship problems with his ex-wife, his son, and proclivity for fathering children out of wedlock;

   l.   Plaintiff's bedroom / sleeping area being decorated with a map of Iraq;

   m.   Plaintiff's collection of bomb remnants which was kept in a box under his bed;

   n.   Plaintiff stowing away photos of his son, unwilling to show them without being asked;

   o.   Plaintiff's military history including having been a former US Army Ranger;

   p.   Plaintiff's fascination with bombs and deadly explosives;

   q.   Plaintiff being a very successful bomb tech because of an his reckless and flawed character (addicted to war and violence; willing to risk his or anyone else's life simply for "the morbid thrill" or adrenaline rush; being a reckless "wild-man" or "cowboy"; having a twisted fascination and obsession for death and deadly explosive devices; loving war and violence more than his family);

---

[2] Some of which is true, some not.

11

0184

r.  Drinking alcohol after missions;

s.  Plaintiff's custom / habit of tracking the number of IEDs he disarmed by painting bomb stencils on his humvee;

t.  Being approached by a Colonel after Plaintiff successfully disarmed a very dangerous IED in the Colonel's presence, during which the Colonel asked Plaintiff if he was the crazy man in the bomb suit, then called Plaintiff a hero and asked for a picture;

u.  Plaintiff having abandoned his family (including his son) by choosing to go back to Iraq to continue serving his country;

v.  After giving away Plaintiff's identity, age, height, and speech dialect; after publishing photos of photo both in and out of his bomb suit; after identifying Plaintiff as *the* man in the bomb suit, and knowing Plaintiff was going back to Iraq in the very near future, the article then gratuitously provides there is a $25,000 bounty for the head of any EOD tech;

57.  The Playboy Article (an abridged version) surfaced again when it was republished in the Reader's Digest in 2006.

58.  On June 26, 2009, Defendants initiated the limited released of the motion picture film "The Hurt Locker" in the cities of New York and Los Angeles.

59.  The motion picture film "The Hurt Locker" underwent a more widespread release in the United States on July 24, 2009.

60.  The DVD film "The Hurt Locker", with additional features and materials, underwent a complete nationwide release on January 12, 2010.

61.  At no point in time did *any* Defendant ever so much as even ask Plaintiff for his consent to use his personal story, name, and likeness in a major motion picture.

62.  At no time did Plaintiff ever agree to, consent to, request, or acquiesce in, the making and publication of a movie about himself, his family, or his military activities while in Iraq.

12

0185

63.     Notwithstanding Defendants' disclaimer at the end of the film which states "this is a work of fiction"[3], the movie and the movie's main character "Will James", played by actor Jeremy Renner, is really the Plaintiff, the Plaintiff's name and likeness, and Plaintiff's personal story which were misappropriated by Defendants without Plaintiff's consent.

64.     Plaintiff's colleagues, family members, and friends, easily recognize that the movie's main character Will James and the movie itself are about the Plaintiff Sgt. Jeffrey Sarver personally, both with respect to his actions while in Iraq, as well as his actions at home and with his family.

65.     Notwithstanding Defendants having changed the name of Jeremy Renner's character from "Sgt Sarver" to "Will James", because of Defendant BOAL's and PLAYBOY's previously published articles, every reader of those articles likewise knows and is led to believe that the movie's main character Will James and the movie itself are about the Plaintiff Sgt. Jeffrey Sarver personally, both with respect to his actions while in Iraq, as well as his actions at home and with his family.

66.     Any casual reader of the Playboy Article will easily identify the movie's main character Will James and the movie itself are about the Plaintiff Sgt. Jeffrey Sarver personally, both with respect to his actions while in Iraq, as well as his actions at home and with his family.

67.     An *example*[4] of the movie's portrayal of Plaintiff's likeness and personal information, *some* of which were was documented in the Playboy Article, includes the following:

    a.  The title "The Hurt Locker" – Plaintiff originated this term and said it often around colleagues while in Iraq. Defendant BOAL took interest in this phrase and asked Plaintiff what the phrase meant. Because Plaintiff was told Defendant BOAL was collecting information for the sake of documenting a factual report about Army EOD *in general*, Plaintiff acquiesced with BOAL's request, which he said often while during his deployment in Iraq;

---

[3] The boilerplate disclaimer further states "The characters and incidents portrayed and the names herein are fictitious, and any similarity to or identification with the name, character, or history of any actual persons living or dead … is entirely coincidental and unintentional."

[4] There are many, many more likenesses of Plaintiff depicted throughout the movie.

13

b. "War is a Drug" – Another phrase Plaintiff used when talking to Defendant BOAL;

c. "Will James", played by Jeremy Renner" – Mr. Renner is essentially the same age and height; to personate Sgt. Sarver, Renner's hair was dyed blonde, and Renner impersonated Sgt. Sarver's persona down to the smallest detail, including the replication of Sgt. Sarver's West Virginia accent, dialect, expressions, mannerisms, personality, and even dress habits (i.e. rolling his sleeves in the exact same manner as Sarver); succinctly stated, Renner acts and behaves just like Plaintiff[5] throughout the movie;

d. Same Military & Family Background – Just like Plaintiff, character "Will James" is a former Army Ranger who has a young son who lives with his ex-wife back home; Renner is also referenced as a "red neck" and "trailer trash";

e. Same EOD Missions – Most of the EOD missions depicted in the movie are identical to Plaintiff's, including the same camps where the EOD team was based (ie Camp Victory), and the same manner in which they were handled - as documented in the Playboy Article;

f. Jeremy Renner sleeping in his bed at night wearing his bomb helmet and underwear;

g. Jeremy Renner taking a shower while in full army uniform, including the helmet;

h. Photos of Renner's son discovered in his Renner's bedroom / sleeping area;

i. Plaintiff's bedroom / sleeping area decorated with a map of Iraq and having a box of collected miscellaneous bomb parts underneath his bed;

j. Renner referencing his son as a "bastard";

k. Renner struggles with personal, family relationships just like, and in the same manner as, Plaintiff;

l. Renner drinking alcohol after successful missions;

m. Renner setting the record for the most IEDs disarmed by any single soldier;

n. Like the Playboy Article, Plaintiff is depicted as one who is abnormally fascinated with death, deadly explosives, to the extent that the adrenaline rush he gets from death, killing, and war, is more important to him than his personal relationships, including his children and wife / former wife;

---

[5] During interviews, actor Jeremy Renner admitted the character "Will James" was based upon "one guy [Defendants] knew who was like 'James'". Defendants apparently showed / replicated for, Renner, the habits / mannerisms of Plaintiff in specific situations, and then had Renner replicate those very same actions, and exhibit the same "mentality" as Plaintiff (i.e "that's why I started kicking that trunk [in which was an IED in the movie]". Renner was mimicking Plaintiff, who "literally" kicked IED's, whose actions were taped or recorded by Defendant BOAL during the embedment].

14

o. Renner is shown leaving his son / family again by enlisting in another deployment to Iraq.

68. Though the movie clings to the plaintiff's likeness and personal circumstances throughout the movie, Plaintiff is also defamed in placed in a false light in several scenes, such as (1) the scene where Plaintiff explains to his young son that he essentially does not love him, and that the only thing plaintiff loves now is "war". The movie ends by showing Plaintiff back in Iraq, starting another deployment mission; and (2) the portrayal of Plaintiff as a reckless, gung-ho war addict who has a morbid fascination with death which causes him to carelessly risk both his and his colleagues' lives in the theater of war, simply to feel the thrill of cheating death.

69. As a direct and proximate result of Defendants' unlawful actions as described above and below, Plaintiff has suffered, and will continue to suffer, significant injuries and damages, both economic and non-economic alike, including, but not limited to, the following:

a. Defendants' unjust enrichment of the value of Plaintiff's name and likeness;

b. Increase risk of harm and/or death to Plaintiff's person caused by Defendants' misappropriating Plaintiff's likeness, and highly publicizing both Plaintiff's likeness and his "perceived" likeness (ie the defamatory / untrue portrayal of him as a mad, foolish, crazy, wild, mentally ill man, who will recklessly risk his and others' lives because of an addiction / fascination with death) – Defendants have essentially placed a bulls-eye on the back of plaintiff's army uniform / bomb suit for any future deployments;

c. Emotional distress and harm (i.e. young soldiers – privates - now cavalierly laugh at Plaintiff as they unabashedly walk up to the highly ranked, Master Sergeant, to ask for his autograph because of his likeness, and involuntary lead role in the film; the fear of whether his peers will now respect / protect him in the theater of war);

d. Injury and damage to Plaintiff's reputation and standing amongst friends, family, and military peers;

e. Loss of earning capacity based upon the injury and harm inflicted against Plaintiff's reputation and standing amongst his friends, family, and military peers;

f. Punitive damages allowed under state and federal law;

g. Any and all other damages otherwise recoverable under state and federal law;

15

0188

## COUNT I

### RIGHT OF PUBLICITY / MISAPPROPRIATION OF NAME & LIKENESS
### ALL DEFENDANTS

70.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through sixty-eight (69) as if fully set forth herein.

71.     That the writing, filming, production, and distribution of the motion picture film "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives, amounted to an appropriation of plaintiff's name and/or likeness for the Defendants' own use and benefit.

72.     That Defendants' various different uses of Plaintiff's name and/or likeness, was mainly for commercial or trade purposes, without redeeming public interest, news, or historical value[6].

73.     That as a result of Defendants' misappropriation of Plaintiff's likeness, Plaintiff is entitled to the commercial value to Defendants of Plaintiff's likeness, which obviously equates to the revenues thus far earned, and to be earned, in the future by virtue of further movie theater revenues, DVD sales, royalties, and other associated revenues.

74.     That as a direct and proximate result of Defendants' actions and inactions as described above, Plaintiff suffered the injuries and damages as more fully described above.

_____

[6] As admitted by Defendant Bigelow during interviews surrounding the Release of the film, the real, primary reason for making *this* movie with *this* story was to simply "sell it".

16

0189

1    WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of

2    Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00)

3    Dollars, plus costs, interest, and attorney fees.

4

5                                   **COUNT II**

6                      **FALSE LIGHT INVASION OF PRIVACY**

7                                **ALL DEFENDANTS**

8         75.    Plaintiff hereby restates and re-alleges each and every allegation contained in

9    paragraphs one through seventy-three (74) as if fully set forth herein.

10        76.    That the writing, filming, production, and distribution of the motion picture film

11   "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT

12   LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT

13   ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT

14   PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives,

15   throughout various different scenes, depicted Plaintiff in a "false light" in that:

17        a.  The depiction of Plaintiff was and is a major misrepresentation of his character,
              history, activities, and/or beliefs;

18

19        b.  The depiction of Plaintiff was and is highly offensive to a reasonable person; and

20        c.  Defendants acted in a reckless disregard as to the falsity of the publicized matter.

21        77.    That as a direct and proximate result of Defendants' actions and inactions as

22

23   described above, Plaintiff suffered the injuries and damages as more fully described above.

24        WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of

25   Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00)

26   Dollars, plus costs, interest, and attorney fees.

27

28

0190

**COUNT III**

**DEFAMATION / DEFAMATION PER SE**
**ALL DEFENDANTS**

78.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through seventy-six (77) as if fully set forth herein.

79.     That the writing, filming, production, and distribution of the motion picture film "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives, throughout various different scenes, contained several false and defamatory statements concerning the Plaintiff, including, but not limited to, the following portrayals / scenes:

    a.  Being portrayed / described as a bad father who did not love his son, who would rather be in the middle of a war confronting the face of death than being with his son;

    b.  Portraying that Plaintiff was embarrassed or ashamed of his son in the scene where photos of Plaintiff's son were found stashed in a hidden in a box, concealed under miscellaneous bomb pieces;

    c.  Being portrayed / described as a "messed up"[7] / "reckless"[8] soldier whose success was attained because Plaintiff had no respect or compassion for human life, who engaged in reckless, uncalculated risks which threatened the lives of Plaintiff and his colleagues;

    d.  Being portrayed as an unstable person who is fascinated with / addicted to the thrill of war and death, who enjoys playing cruel practical jokes on people (ie telling a young child he will chop off his head with a dull knife because he sold him a poor quality DVD, after which he tells the child he is "just kidding"; callously ordering an Iraqi civilian to get inside of a car bomb, after which Plaintiff tells the frightened man "I'm kidding");

---

[7] The words Jimmy Fallon used when describing his thoughts of the character "Will James" during his discussion with Jeremy Renner.

[8] The words Jeremy Renner used when describing "Will James".

18

0191

e. Being portrayed / described as a soldier who violates military rules and regulations (i.e. getting drunk after missions; taking off his communication headset during missions);

f. All foreign and irrelevant communications throughout the movie and DVD.

80. That these false portrayals rise to the level of defamation, libel, and libel per se, of which Defendants were aware and/or should have been aware.

81. That as a direct and proximate result of Defendants' actions, Plaintiff suffered the injuries and damages as more fully described above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest, and attorney fees.

## COUNT IV

### BREACH OF CONTRACT – ALL DEFENDANTS

82. Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through eighty (81) as if fully set forth herein.

83. That Defendants BOAL and PLAYBOY entered into a contract with the United States Department of Defense, whereby Defendants BOAL / PLAYBOY were provided up front access (via embedment with the unit) to the 788th Company's EOD military operations, including access to the service members, including Plaintiff.

84. In exchange for this up front access via embedment, Defendants BOAL / PLAYBOY agreed to be bound by various Department of Defense rules and restrictions, including the "Ground Rules" applicable to embedded media members.

85. The ground rules were implemented for the purpose of protecting the health and safety of the military service members, the media representative, and to protect the national security interests of the United States.

0192

86.    Plaintiff is thus a 3rd party intended beneficiary under this contract, which entitles him to enforce the contract and to enforce any legal remedies for the breach of said contract.

87.    There was also an express and/or implied contract / agreement between Defendant BOAL / PLAYBOY and Plaintiff, the terms of which included the following:

    a.  Plaintiff agreeing to provide Defendant BOAL / PLAYBOY with:

        i.  food, shelter, personal protection, and safety;
        ii. an up front seat on all missions participated in and led by Plaintiff;
        iii. Plaintiff's cooperation with Defendant's reporting requests / activities.

    b.  In return, Defendant BOAL / PLAYBOY agreed to:

        i.  comply with the Department of Defense's Ground Rules for embedded media;

        ii. limit the release of information gathered during the embedment and related reporting activities to an article about EOD military operations *in general*

        iii. Refrain from releasing or publishing specific and/or personal information about the Plaintiff;

        iv. Refrain from releasing, publishing, or using Plaintiff's name and/or likeness;

88.    The remaining Defendants, by virtue of their agency and / or contractual relationship with Defendants BOAL and PLAYBOY in connection with the production and publication of the Hurt Locker film and DVD, are therefore privies to these contracts and likewise bound by the same terms and provisions.

89.    That one of the provisions of the embedment contract restricts / limits the media to releasing / publishing only the name and hometown of a service member.

90.    That the publication of the Playboy Article and the Hurt Locker film and DVD obviously release / publish much more information about the Plaintiff than just his name and hometown, (to which Plaintiff consented only because he was advised this information would only be used in conjunction with an article about EOD *in general*), and therefore the Defendants have breached its contract entered into the United States Department of Defense.

0193

91.     That as a direct and proximate result of Defendants' breach of contract, Plaintiff suffered the injuries and damages as more fully described above.

WHEREFORE, Plaintiff requests that this Honorable Court enter a Judgment in favor of Plaintiff and against Defendants in an amount in excess of Seventy-Five Thousand ($75,000.00) Dollars, plus costs, interest, and attorney fees.

## COUNT V

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### ALL DEFENDANTS

92.     Plaintiff hereby restates and re-alleges each and every allegation contained in paragraphs one through ninety (91) as if fully set forth herein.

93.     That the writing, filming, production, and distribution of the motion picture film "The Hurt Locker" and the motion picture DVD "The Hurt Locker" by Defendants HURT LOCKER, BOAL, BIGELOW, SHAPIRO, CHARTIER, MARK, McCUSKER, SUMMIT ENTERTAINMENT, VOLTAGE PICTURES, GROSEVENOR PARK MEDIA, FIRST LIGHT PRODUCTIONS, and/or PLAYBOY, individually and/or through their authorized representatives, amounted to an Intentional Infliction of Emotional Distress, in that Defendants knew both the film and DVD:

    a.  Appropriated Plaintiff's likeness without Plaintiff's consent;

    b.  Contained scenes and material about Plaintiff which would place him at an increased risk of harm or even death during future deployments in a war zone (further inciting enemies to hunt down this high profile bomb squad hero who holds the record for most disarmed enemy IEDs);

    c.  Contained scenes and information about Plaintiff's personal life which would greatly embarrass him and / or his family members;

    d.  Contained scenes and material about the Plaintiff which were utterly false, including:

0194