# ADDENDUM A

FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| SGT. JEFFREY S. SARVER,<br>*Plaintiff-Appellant*,<br><br>v.<br><br>NICOLAS CHARTIER; SUMMIT<br>ENTERTAINMENT, LLC; KATHRYN<br>BIGELOW; THE HURT LOCKER LLC;<br>MARK BOAL; GREG SHAPIRO;<br>VOLTAGE PICTURES, LLC;<br>GROSVENOR PARK MEDIA, LP;<br>KINGSGATE FILMS INC.; TONY<br>MARK; DONALL MCKUSKER; FIRST<br>LIGHT PRODUCTIONS INC.,<br>*Defendants-Appellees*,<br><br>PLAYBOY ENTERPRISES, INC.,<br>*Defendant*. | No. 11-56986<br><br>D.C. No.<br>2:10-cv-09034-<br>JHN-JC |

(2 of 35)

Case: 11-56986, 03/01/2016, ID: 9883712, DktEntry: 55-2, Page 2 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 2 of 30

2                    SARVER V. CHARTIER

| | |
|---|---|
| SGT. JEFFREY S. SARVER, <br> *Plaintiff-Appellant*, <br><br> v. <br><br> NICOLAS CHARTIER; SUMMIT ENTERTAINMENT, LLC; KATHRYN BIGELOW; THE HURT LOCKER LLC; MARK BOAL; GREG SHAPIRO; VOLTAGE PICTURES, LLC; GROSVENOR PARK MEDIA, LP; KINGSGATE FILMS INC.; DONALL MCKUSKER; TONY MARK; FIRST LIGHT PRODUCTIONS INC., <br> *Defendants-Appellees*, <br><br> and <br><br> PLAYBOY ENTERPRISES, INC., <br> *Defendant*. | No. 12-55429 <br><br> D.C. No. 2:10-cv-09034-JHN-JC <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Jacqueline H. Nguyen, District Judge, Presiding

Argued and Submitted May 9, 2013
Submission Vacated May 9, 2013
Resubmitted December 24, 2015
Pasadena, California

Filed February 17, 2016

Before: Diarmuid F. O'Scannlain, Richard A. Paez,
and Sandra S. Ikuta, Circuit Judges.

Opinion by Judge O'Scannlain

## SUMMARY[*]

### California Anti-SLAPP / Choice of Law

The panel affirmed the district court's dismissal, pursuant to filmmakers/defendants' motions to strike the complaint under Cal. Civ. Proc. Code § 425.16, California's Anti-Strategic Lawsuit Against Public Participation (anti-SLAPP) statute, of plaintiff Army Sergeant Jeffrey Sarver's lawsuit relating to the Oscar-winning film *The Hurt Locker*.

Sarver contended that Will James, *The Hurt Locker*'s main character, was based on his life and experiences when he served as an United States Army explosive ordnance disposal technician in Iraq; that he did not consent to such use; and that some scenes in the film falsely portrayed him in a way that harmed his reputation.

The panel applied the choice-of-law rules of New Jersey, and concluded that the California contacts predominated, and the Restatement (Second) of Conflicts § 145 factors weighed in favor of the application of California law. The panel considered the section 6 Second Restatement principles, and concluded that California had the most significant

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

(4 of 35)

Case: 11-56986, 03/01/2016, ID: 9887128, DktEntry: 55-2, Page 5 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 4 of 30

4                    SARVER V. CHARTIER

relationship to this litigation, which was sufficient to overcome any presumption of Sarver's domicile, wherever that may be.  The panel applied California's anti-SLAPP law.

The panel held that Cal. Civ. Proc. Code § 425.16(f), which generally provides that an anti-SLAPP motion be filed within 60 days of the service of the complaint, did not apply in federal court.  The panel held that under Federal Rule of Civil Procedure 56, the defendants' anti-SLAPP motions were timely filed.

Turning to the merits of the defendants' anti-SLAPP motions, the panel applied the statute's two-step analysis. First, the panel held that *The Hurt Locker* film and the narrative of its central character Will James spoke directly to issues of a public nature.  Second, the panel held that *The Hurt Locker* was speech that was fully protected by the First Amendment, which safeguards the storytellers and artists who take the raw materials of life and transform them into art, such as movies.  The panel held that because Sarver could not show a compelling state interest in preventing the defendants' speech, applying California's right of publicity law – which prohibits a person from using a celebrity's name or likeness without consent – in this case would violate the First Amendment.  The panel concluded that because Sarver could not state a right of publicity claim, the district court did not err in granting the defendants' anti-SLAPP motion regarding the claim.

The panel concluded that Sarver's false light invasion of privacy, defamation, breach of contract, intentional infliction of emotional distress, fraud, and constructive fraud/negligent misrepresentation claims were properly dismissed.

SARVER V. CHARTIER                    5

**COUNSEL**

Michael R. Dezsi, Law Office of Michael R. Dezsi, PLLC, Detroit, Michigan, argued the cause and filed the briefs for the Plaintiff-Appellant.

Jon-Jamison Hill, Eisner, Kahan & Gorry, Beverly Hills, California; David Halberstadter, Katten Muchin Rosenman LLP, Los Angeles, California; and Jeremiah T. Reynolds, Kinsella Weitzman Iser Kump & Aldisert LLP, Santa Monica, California, each argued the cause and filed the brief for the Defendants-Appellees. With them on the brief were Timothy J. Gorry and Jackie M. Joseph, Eisner, Kahan & Gorry, Beverly Hills, California; Rebecca F. Ganz, Katten Muchin Rosenman LLP, Los Angeles, California; and Dale F. Kinsella, Kinsella Weitzman Iser Kump & Aldisert LLP, Santa Monica, California.

Kelli L. Sager, Davis Wright Tremaine LLP, Los Angeles, California, filed a brief on behalf of amici curiae Motion Picture Association of America, Inc. And Entertainment Merchants Association in support of the Defendants-Appellees. With her on the brief was Karen A. Henry, Davis Wright Tremaine LLP, Los Angeles, California.

6                    SARVER V. CHARTIER

## OPINION

O'SCANNLAIN, Circuit Judge:

We must decide whether the district court properly applied California's Anti-Strategic Lawsuit Against Public Participation (anti-SLAPP) statute when it dismissed Army Sergeant Jeffrey Sarver's lawsuit relating to the Oscar-winning film *The Hurt Locker*.

I

A

Sergeant Jeffrey Sarver joined the United States Army in 1991. During parts of 2004 and 2005, he served as one of approximately 150 Explosive Ordnance Disposal (EOD) technicians in Iraq. Sarver led one of three teams in the 788th Ordnance Company whose principal duty was to identify, make safe, and dispose of improvised explosive devices.

In December 2004, Mark Boal, a journalist working for *Playboy* magazine, was embedded with the 788th out of Camp Victory in Baghdad, Iraq. Boal followed Sarver for a significant amount of time and took photographs and video of him while he was on and off duty. After Sarver returned to the United States, Boal conducted additional interviews with him in Wisconsin.

Boal wrote an article focused on Sarver's life and experiences in Iraq, which was published in the August/September 2005 issue of *Playboy*. A condensed version of that article was later published in *Reader's Digest*. The *Playboy* article contained two photographs of Sarver in

SARVER V. CHARTIER                    7

addition to other personal information about him. Sarver alleges that he never consented to the use of his name and likeness in the *Playboy* article, that he objected to it after reviewing an advance copy, and that he attempted to have portions of the article removed before its publication in *Reader's Digest*.

Boal later wrote the screenplay for the film that became *The Hurt Locker*, which was released in June 2009 while Sarver was stationed at the Picatinny Arsenal in New Jersey. Sarver contends that Will James, the movie's main character, is based on his life and experiences, pointing to characteristics of James and events in the movie that allegedly mirror his life story. Sarver asserts that he did not consent to such use and that several scenes in the film falsely portray him in a way that has harmed his reputation.

B

In March 2010, Sarver filed suit in the District of New Jersey against Boal, Kathryn Bigelow, the film's director, Nicholas Chartier, its producer, and numerous corporate defendants (collectively the "defendants"), alleging causes of action for misappropriation of his likeness and right of publicity, false light invasion of privacy, defamation, breach of contract, intentional infliction of emotional distress, fraud, and negligent misrepresentation. The defendants moved to dismiss Sarver's complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(3), or, alternately, to transfer venue to the Central District of California pursuant to 28 U.S.C. § 1404(a). In response, the District of New Jersey transferred the case to the Central District of California.

8                    SARVER V. CHARTIER

On February 1, 2011, Chartier and some of the corporate defendants filed a motion to strike Sarver's complaint under Cal. Civ. Proc. Code § 425.16, California's "anti-SLAPP" statute, which was "enacted to allow early dismissal of meritless first amendment cases aimed at chilling expression through costly, time-consuming litigation." *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 839 (9th Cir. 2001). Shortly thereafter, Boal and Bigelow filed a separate motion to strike on the same grounds.

Four days before hearing oral argument, the district court released a tentative order that would have allowed Sarver to proceed on his right of publicity claim but would have dismissed all other claims pursuant to the anti-SLAPP statute. However, in its final order, the district court reversed course, striking Sarver's complaint in its entirety. The district court concluded that California's anti-SLAPP statute applied because the defendants were engaged in the exercise of free speech in connection with a public issue, and also that "[e]ven assuming that [Sarver] and Will James share similar physical characteristics and idiosyncracies, a significant amount of original expressive content was inserted in the work through the writing of the screenplay, and the production and direction of the movie." The district court concluded that the film's use of Sarver's identity was transformative and dismissed all of Sarver's claims.

Sarver timely appealed.[1]

---

[1] We have jurisdiction to review the district court's final order pursuant to 28 U.S.C. § 1291. We review the district court's choice of law analysis de novo. *Schoenberg v. Exportadora de Sal, S.A. de C.V.*, 930 F.2d 777, 782 (9th Cir. 1991). We also review the district court's grant of the

## II

Before reaching the merits of Sarver's claims, we must determine whether the district court properly applied California law instead of New Jersey law and whether the defendants' anti-SLAPP motion was timely filed. Sarver contends that the district court erred on both counts, arguing that the district court should have applied New Jersey law and that the anti-SLAPP motion was not timely filed.

## A

Our "choice of law inquiry has two levels." *Schoenberg*, 930 F.2d at 782. "First, we must determine whose choice of law rules govern. Second, applying those rules, we determine whose law applies."[2] *Id.* Typically, "a federal court sitting in diversity applies the conflict-of-law rules of the state in which it sits." *Id.* (internal quotation marks omitted). However, after a transfer under 28 U.S.C. § 1404, the choice-of-law rules of the transferor court apply. *See Newton v. Thomason*, 22 F.3d 1455, 1459 (9th Cir. 1994). We therefore apply the choice-of-law rules of New Jersey.

The New Jersey Supreme Court has adopted the choice-of-law approach set forth in the Restatement (Second) of Conflict of Laws ("Second Restatement"). *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008). Under that

---

defendants' motions to strike under the anti-SLAPP statute de novo. *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1102 (9th Cir. 2003).

[2] There is no dispute that there is a conflict of law between California and New Jersey with regard to California's anti-SLAPP statute, which has no New Jersey analogue.

(10 of 35)

Case: 11-56986, 03/01/2016, ID: 9887718, DktEntry: 55-2, Page 11 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 11 of 30

10                 SARVER V. CHARTIER

approach, we must first consider the specific provisions of the
Second Restatement which set forth the presumptive rule for
the claims at issue. *See id.* at 461. Once this presumptive
rule is established, we must then consult the general tort
principles outlined in section 145 of the Second Restatement,
*see id.* at 461–63, before finally considering the two states'
competing interests under the general principles outlined in
section 6, *id.* at 455. We address each in turn.

1

Both sections 150 and 153 of the Second Restatement are
relevant when determining the presumptive rule for Sarver's
claims.[3] Fortunately, "essentially the same choice-of-law
rules are applicable to the two torts." Restatement (Second)
of Conflicts § 152 cmt. d. Section 150 addresses multistate
defamation that arises from, among other things, "exhibition
of a motion picture" or "similar aggregate communication."
*Id.* § 150(1). This section provides that rights and liabilities
regarding defamation claims are "determined by the local law
of the state which . . . has the most significant relationship to
the occurrence and the parties." *Id.* Section 153, which
addresses multistate invasion of privacy, provides the same
rule. Section 153 explains that the state with the most
significant relationship "will usually be the state where the
plaintiff was domiciled at the time if the matter complained
of was published in that state." *See also Hanley v. Trib.
Publ'g Co.*, 527 F.2d 68, 70 (9th Cir. 1975) ("In cases of

---

[3] Sarver erroneously contends that section 146, which governs actions
for personal injury, applies. However, the Second Restatement expressly
excludes "injuries to a person's reputation" and "the violation of a
person's right of privacy" from those injuries classified as "personal
injuries." Restatement (Second) of Conflicts § 146 cmt. b (1971).

defamation, [the Second Restatement factors] normally would call for application of the law of the plaintiff's domicil.").

Determining where Sarver was domiciled is not straightforward. Sarver contends that his domicile is New Jersey, and calls on us to enforce the laws of that state. However, Sarver has provided little support for his contention. Without citation to the record, Sarver asserts that he lived in New Jersey for approximately two years while stationed there, including at the time *The Hurt Locker* was released in theaters. Even if we credit Sarver's assertion, this statement alone is insufficient to establish the state as his legal domicile. *See* 13E Charles A. Wright et al., *Federal Practice & Procedure* § 3617 (3d ed. 2015) ("Service personnel are presumed not to acquire a new domicile when they are stationed in a place pursuant to orders; they retain the domicile they had at the time of entry into the service."). Sarver does not appear to have marshaled other indicia of domicile in New Jersey, for example that he obtained a New Jersey driver's license, registered to vote in the state, or acquired property there. In sum, other than Sarver's own assertion, we have little basis to conclude that New Jersey was indeed his legal domicile at the time *The Hurt Locker* was released.

### 2

Even assuming *arguendo* that New Jersey was Sarver's domicile would not end our inquiry. As the New Jersey Supreme Court would, we must next consider the factors enumerated in section 145 of the Second Restatement, which presents the "general rule" that informs all torts. *Camp Jaycee*, 962 A.2d at 458, 461–63. Those factors include: "'[1] the place where the injury occurred, [2] the place where the

12                  SARVER V. CHARTIER

conduct causing the injury occurred, [3] the domicile,
residence, nationality, place of incorporation and place of
business of the parties, and [4] the place where the
relationship, if any, between the parties is centered.'" *Id.* at
458 (quoting Restatement (Second) of Conflicts
§ 145(2)(a)–(d)).

Here, the second and third factors weigh strongly in favor
of application of California law. The conduct causing the
alleged injury—the production of *The Hurt Locker*—took
place in California. Moreover, all of the corporate defendants
other than Playboy Enterprises are incorporated and alleged
to be conducting business in California. And, although Boal
is a citizen of New York and Playboy Enterprises is a citizen
of Illinois and Delaware, Sarver alleges that both conduct
business in California. For his part, although Sarver contends
that he was domiciled in New Jersey, as explained above, he
has failed to support that contention.

The first and fourth factors do not weigh strongly in favor
of either state. First, it is difficult to identify, let alone place
great weight upon, the location of Sarver's alleged injury.
Sarver insists that New Jersey was the primary location of his
injuries, because that is where he was best known to his Army
cohorts. But even that contention is somewhat belied by
Sarver's admission that he and fellow service members
traveled to view the film at its premiere in New York—not in
New Jersey. Further, Sarver's claims of reputational harm by
those who knew him would have presumably been felt not
only in the location he lived in 2009, but also where his
various friends and family live and in the states in which he
has lived since the film's release. The multistate nature of
Sarver's alleged harms is central to the choice-of-law
analysis. Because the film was distributed nationwide and

(13 of 35)

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 14 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 13 of 30

SARVER V. CHARTIER                    13

Sarver's alleged injuries would most likely have occurred in multiple states, "the place of injury will *not* play an important role in the selection of the state of applicable law." Restatement (Second) of Conflicts § 145 cmt. e (emphasis added); *see also BP Chems. Ltd. v. Formosa Chem. & Fibre Corp.*, 229 F.3d 254, 267 (3d Cir. 2009) (applying this rule to a claim of misappropriation of trade values involving multistate harms). Finally, the fourth factor is neutral here because the only relationship between Sarver and the defendants centered around interviews for the *Playboy* article that occurred in Iraq and Wisconsin.

Altogether, we conclude that the California contacts predominate, and the section 145 factors weigh in favor of the application of California law.

3

Finally, we consider the section 6 principles, which the New Jersey Supreme Court has identified as: "(1) the interests of interstate comity; (2) the interests of the parties; (3) the interests underlying the field of tort law; (4) the interests of judicial administration; and (5) the competing interests of the states." *Camp Jaycee*, 962 A.2d at 463 (internal quotation marks omitted). In effect, this analysis "focus[es] primarily on the interests of the two states." Peter Hay, Patrick J. Borchers & Symeon C. Symeonides, *Conflict of Laws* 888 (5th ed. 2010). We apply these principles to "determine whether more or less weight should be ascribed to those contacts" we have just discussed. *Camp Jaycee*, 962 A.2d at 468.

In the text of the statute itself, California has expressed a strong interest in enforcing its anti-SLAPP law to "encourage

Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 14 of 30

14          Sᴀʀᴠᴇʀ ᴠ. Cʜᴀʀᴛɪᴇʀ

continued participation in matters of public significance" and to protect against "a disturbing increase in lawsuits brought primarily to chill the valid exercise" of constitutionally protected speech. *See* Cal. Civ. Proc. Code § 425.16(a). To this end, courts are instructed to construe California's statute "broadly." *Id.*

Although New Jersey has declined to establish a similar law, its courts have allowed defendants to bring a claim for malicious use of process to protect against suspected SLAPP actions. *See LoBiondo v. Schwartz*, 970 A.2d 1007, 1022 (N.J. 2009). In this regard, New Jersey seems to have staked something of a middle ground to guard against SLAPP lawsuits. Indeed, in an opinion declining to create a specific anti-SLAPP cause of action, New Jersey's Appellate Division nevertheless acknowledged that SLAPP suits require some level of "counteraction." *Lobiondo v. Schwartz*, 733 A.2d 516, 533 (N.J. Super. Ct. App. Div. 1999).

On balance, the interests of interstate comity and the competing interests of the states tilt in favor of applying California law. Whereas California would appear to object strongly to the absence of a robust anti-SLAPP regime, New Jersey's interests would be less harmed by the use of California law. Moreover, because the vast majority of the parties in this action are citizens of or do business in California, the parties' expectations likewise tilt in favor of California law.

Thus, like our analysis under section 145, our section 6 inquiry weighs in favor of applying California law. Taken together, we conclude that California has the most significant relationship to this litigation, which is sufficient to overcome any presumption of Sarver's domicile, wherever that may be.

(15 of 35)

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 16 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 15 of 30

*See Camp Jaycee*, 962 A.2d at 461 (recognizing that analysis under sections 145 and 6 can overcome presumptive rule). Thus, as did the district court, we apply California's anti-SLAPP law.

B

Having determined that California's anti-SLAPP law applies, we must consider whether the defendants' anti-SLAPP motions—which were filed almost one year after Sarver filed his complaint—were timely. Sarver contends that they were not, relying on Cal. Civ. Proc. Code § 425.16(f), which provides that an anti-SLAPP motion "may be filed within 60 days of the service of the complaint or, in the court's discretion, at any later time upon terms it deems proper."

Sarver asserts that the defendants showed no good cause for their filing delay and that the district court therefore abused its discretion in accepting the anti-SLAPP motions so far beyond California's 60-day time frame. The defendants counter that California's timing provision does not apply in federal court, because it is a procedural device that conflicts directly with Federal Rule of Civil Procedure 56. *See, e.g.*, *Metabolife*, 264 F.3d at 845 ("Procedural state laws are not used in federal court if to do so would result in a direct collision with a Federal Rule of Civil Procedure." (internal quotation marks omitted)).

We have previously recognized that the requirements set forth in subsections 425.16(f) and (g) fundamentally collide with federal courts' rules of procedure. In *Metabolife*, we considered whether federal courts are obliged to adhere to the expedited discovery process established under subsections

(16 of 35)

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 17 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 16 of 30

16                    SARVER V. CHARTIER

425.16(f) and (g).  264 F.3d at 846.  We concluded that we
are not, agreeing with the district court that "[b]ecause the
discovery-limiting aspects of § 425.16(f) and (g) collide with
the discovery-allowing aspects of Rule 56, these aspects of
subsections (f) and (g) cannot apply in federal court."  *Id.*
(internal quotation marks omitted)).

So, too, do the timing controls imposed by section
425.16(f) directly collide with the more permissive timeline
Rule 56 provides for the filing of a motion for summary
judgment.  *See* Fed. R. Civ. P. 56(b) (permitting parties to file
a motion for summary judgment "at any time until 30 days
after the close of all discovery").  Although section 425.16(f)
does not prohibit the filing of an anti-SLAPP motion after 60
days, it certainly restricts a party's ability to do so in a way
Rule 56 would not.  We therefore decline to apply the
statute's 60-day time frame in federal court, and we refer
instead to our own rules of procedure.  Under those rules, the
defendants' anti-SLAPP motions were timely filed.[4]

                          III

Turning to the merits of the defendants' anti-SLAPP
motions, we have previously observed that "California's anti-
SLAPP statute is designed to discourage suits that
'masquerade as ordinary lawsuits but are brought to deter
common citizens from exercising their political or legal rights
or to punish them for doing so.'"  *In re NCAA Student-Athlete
Name & Likeness Licensing Litig.*, 724 F.3d 1268, 1272 (9th

---

[4] Because we conclude that section 425.16(f) does not apply here, we do
not reach the parties' arguments regarding whether it was within the
District Court's discretion to accept defendants' anti-SLAPP motions
under California's procedural requirements.

SARVER V. CHARTIER                17

Cir. 2013) [hereinafter *Keller*] (quoting *Batzel v. Smith*, 333 F.3d 1018, 1024 (9th Cir. 2003)).  In relevant part, the statute states:

> A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim.

Cal. Civ. Proc. Code § 425.16(b)(1).

Tracking the language of the statute, we evaluate anti-SLAPP motions in two steps.  The defendant must first "make a prima facie showing that the plaintiff's suit arises from an act by the defendant made in connection with a public issue in furtherance of the defendant's right to free speech under the United States or California Constitution." *Keller*, 724 F.3d at 1272–73 (internal quotation marks omitted).  Second, if the defendant has made such showing, we evaluate whether the plaintiff has "establish[ed] a reasonable probability that the plaintiff will prevail on his or her . . . claim." *Id.* (internal quotation marks omitted) (alterations in original).  "'Put another way, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited.'" *Hilton v. Hallmark Cards*, 599 F.3d

894, 903 (9th Cir. 2009) (quoting *Wilson v. Parker, Covert & Chidester*, 50 P.3d 733, 739 (Cal. 2002)).

## A

For the defendants' anti-SLAPP motions to succeed, they must first show that "'the act or acts of which the plaintiff complains were taken in furtherance of [the defendants'] right of petition or free speech under the United States or California Constitution in connection with a public issue.'" *Hilton*, 599 F.3d at 903 (citing *Equilon Enters., LLC v. Consumer Cause, Inc.*, 52 P.3d 685, 694 (Cal. 2002)). Thus, if the defendants fail to show that Sarver's lawsuit involves a matter of public concern, California's anti-SLAPP provisions are inapplicable on their face.

Interpreting the California Supreme Court's pronouncements, we have "construe[d] 'public issue or public interest' . . . broadly in light of the statute's stated purpose to encourage participation in matters of public importance or consequence." *Hilton*, 599 F.3d at 906 (quoting Cal. Civ. Proc. Code § 425.16(e)(4)). California's intermediate appellate courts have offered insight into how we should conduct this analysis. The California Court of Appeal for the First District has identified "three categories of public issues: (1) statements 'concern[ing] a person or entity in the public eye'; (2) 'conduct that could directly affect a large number of people beyond the direct participants'; (3) 'or a topic of widespread, public interest.'" *Id.* (alteration in original) (quoting *Rivero v. Am. Fed'n of State, Cnty., & Mun. Emps.*, 130 Cal. Rptr. 2d 81, 89–90 (Cal. Ct. App. 2003)). California's Court of Appeal for the Third District has explained that "'public interest' does not equate with mere curiosity," but instead "a matter of public interest should be

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 20 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 19 of 30

(19 of 35)

something of concern to a substantial number of people."
*Weinberg v. Feisel*, 2 Cal. Rptr. 3d 385, 392 (Cal. Ct. App.
2003). Further, "there should be some degree of closeness
between the challenged statements and the asserted public
interest," and the "focus of the speaker's conduct should be
the public interest." *Id.* Finally, a "person cannot turn
otherwise private information into a matter of public interest
simply by communicating it to a large number of people." *Id.*
at 393.

The defendants rightly contend that the Iraq War was a
matter of significant and sustained public attention, as was
the use of improvised explosive devices (IEDs) by insurgents
during the war. Accordingly, the defendants conclude that
*The Hurt Locker*'s portrayal of those issues necessarily
presents a matter of public concern. Sarver counters that our
analysis should not be so encompassing. Rather than ask
whether the film's portrayal of the Iraq War raises a question
of public concern, Sarver calls on us to ask specifically
whether the defendants' alleged misappropriation of his
*private persona* is of public interest. Under this standard,
Sarver concludes that—because he was not personally in the
public's eye before this film—the defendants cannot satisfy
the first step of the anti-SLAPP analysis.

Sarver's argument relies principally on *Dyer v. Childress*,
55 Cal. Rptr. 3d 544 (Cal. Ct. App. 2007). In that case, Troy
Dyer sued the makers of the film *Reality Bites*, for what he
claimed to be an unflattering representation of his younger
self. *See id.* at 545–46. Affirming the denial of the
defendants' anti-SLAPP motion, the California Court of
Appeal for the Second District held that, although the film
broadly addressed public matters such as the issues facing
Generation X, the film's depiction of Dyer as "a rebellious

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 21 of 31
Case: 11-56986, 02/17/2016, ID: 9867123, DktEntry: 48-1, Page 20 of 30

slacker" failed to address any such issue, as there was "no discernable public interest in Dyer's persona." *Id.* at 547–48.

The nature of Sarver's occupation and the context in which his alleged portrayal appears in *The Hurt Locker* set him apart from Dyer. Unlike Dyer's youth, Sarver's work while deployed in Iraq was an issue of public concern significant attention devoted to the war and to the role of IEDs in it. Importantly, the film's alleged portrayal of Sarver's persona specifically centers around that work. Although the film allegedly incorporates personal characteristics of Sarver—for example his appearance, his temperament, and parts of his biography—such characteristics are displayed only in the context of the character's experiences fighting in Iraq. In other words, the private aspects that Sarver alleges the film misappropriated are inherently entwined with the film's alleged portrayal of his participation in the Iraq War.

We conclude that this focus on the conduct of the Iraq War satisfies California's standards for determining whether an issue is one of public concern. That war, its dangers, and soldiers' experiences were subjects of longstanding public attention. Indeed, *The Hurt Locker*, with its unique focus on IED disposal teams, contributed to that attention. That the film won several Oscars and reached widespread audiences only buttresses our conclusion. The film and the narrative of its central character Will James speak directly to issues of a public nature.

B

Having satisfied the public interest inquiry, we turn to the second step in the analysis, where the burden shifts to Sarver

(21 of 35)

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 22 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 21 of 30

to "state and substantiate a legally sufficient claim." *Hilton*, 599 F.3d at 908 (internal quotation marks omitted).

California's right of publicity law "prohibit[s] any other person from using a celebrity's name, voice, signature, photograph, or likeness for commercial purposes without the [celebrity's] consent." *Comedy III Prods., Inc. v. Gary Saderup, Inc.*, 25 Cal. 4th 387, 391 (2001). The elements of a claim of misappropriation of the right of publicity are "(1) the defendant's use of the plaintiff's identity; (2) the appropriation of plaintiff's name or likeness to defendant's advantage, commercially or otherwise; (3) lack of consent; and (4) resulting injury." *Downing v. Abercrombie & Fitch*, 265 F.3d 994, 1001 (9th Cir. 2001) (internal quotation marks omitted). The parties disagree primarily over the second element—whether the filmmakers appropriated Sarver's name or likeness in their production of *The Hurt Locker*.

But, even assuming for the sake of argument that Sarver can establish all elements of his claim, the defendants contend that their production of the film is nevertheless protected under the First Amendment. That is, they argue that allowing Sarver to pursue his right of publicity action against them would infringe their constitutional right to free speech. Because it is dispositive, we consider that argument first.

1

The First Amendment, applicable to the states through the Fourteenth Amendment, forbids laws "abridging the freedom of speech." U.S. Const. amend. I; *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). State laws, including state common law, may not "restrict expression because of its

22                    SARVER V. CHARTIER

message, its ideas, its subject matter, or its content." *Police Dep't of City of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."[5] *Reed*, 135 S. Ct. at 2226.

By its terms, California's right of publicity law clearly restricts speech based upon its content. The Supreme Court has reviewed the constitutionality of a state's right of publicity law only once, concluding that application of such a law to prevent the broadcast of a performer's entire performance did not violate the First Amendment. In *Zacchini v. Scripps-Howard Broadcasting Co.*, a journalist videotaped and broadcasted Zacchini's entire 15-second "human cannonball" act. 433 U.S. 562, 563–64 (1977). Zacchini brought an action against the television station for violation of his right of publicity under Ohio law. *Id.* at 564. In rejecting the station's First Amendment defense, the Court first considered the nature of Ohio's interest in enforcing the law. According to the Court, the state's right of publicity law was aimed at protecting "the proprietary interest of the individual in his act" and "prevent[ing] unjust enrichment by the theft of good will," in order to provide "an economic incentive for [the individual] to make the investment required to produce a performance of interest to the public." *Id.* at 573, 576 (internal quotation marks omitted). The Court

---

[5] This case does not concern a law that governs commercial speech or speech that falls within one of a few traditional categories which receive lesser First Amendment protection. *See United States v. Stevens*, 559 U.S. 460, 468 (2010); *Cent. Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557, 562–63 (1980).

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 24 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 54-1, Page 23 of 30

analogized this interest to those which "underlie[] the patent and copyright laws long enforced by this Court," as opposed to reputational and privacy-based interests which underlie torts like defamation. *Id.* at 573–76.

The Court balanced this state interest against the station's countervailing First Amendment interests in broadcasting Zacchini's performance. It determined that the First Amendment interest in broadcasting the *entire* performance (as opposed to just using Zacchini's name or picture) was minimal because "[n]o social purpose [was] served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay." *Id.* (internal quotation marks omitted). The Court explained that such a broadcast is tantamount to "preventing [Zacchini] from charging an admission fee" to view what was "the product of [his] own talents and energy, the end result of much time, effort, and expense." *Id.* at 575–76. Thus, because the "broadcast of a film of [Zacchini]'s entire act pose[d] a substantial threat to the economic value of that performance," and protection provided an "economic incentive" for him to develop such a performance of public interest, the Court held that the First Amendment did not prevent Ohio from protecting Zacchini's right of publicity. *Id.* at 575–79. The Court has not revisited the question of when a state's right of publicity law is consistent with the First Amendment since *Zacchini*.

## 2

We, however, have interpreted *Zacchini* to uphold the right of publicity in a variety of contexts where the defendant appropriates the economic value that the plaintiff has built in an identity or performance. For example, in *Hilton v.*

(24 of 35)

Case: 11-56986, 03/01/2016, ID: 9887718, DktEntry: 55-2, Page 25 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 25 of 30

*Hallmark Cards*, we held that Paris Hilton could pursue a right of publicity claim for Hallmark's use of her image and catch phrase ("that's hot") from her television show in one of its greeting cards. 599 F.3d at 899. In doing so, we suggested that "merely merchandising a celebrity's image without that person's consent, the prevention of which is the core of the right of publicity," is not protected by the First Amendment.[6] *Id.* at 910. Similarly, in *Keller v. Electronic Arts, Inc.*, we upheld an action by a college football player who sought to prevent the use of his likeness in EA's video game. 724 F.3d at 1268; *see also Davis v. Elec. Arts, Inc.*, 775 F.3d 1172 (9th Cir. 2015) (upholding right of publicity action challenging EA's use of professional football player likenesses in a video game). We noted that the video game "literally recreates [the football player] in the very setting in which he has achieved renown," *Keller*, 724 F.3d at 1271, and interferes with his ability "to capitalize on his athletic success," which took "talent and years of hard work on the football field" to build. *Id.* at 1277 n.9, 1281.[7]

---

[6] That case addressed the First Amendment only through the lens of California's "transformative use" doctrine, an affirmative defense formulated by the California Supreme Court which aims to strike a balance between First Amendment interests and a plaintiff's asserted right of publicity. We need not and do not reach the question of whether such defense applies in this case.

[7] These cases follow California decisions, which have likewise held that the state's right of publicity law protects celebrities from appropriation of their performance or persona. *See Comedy III*, 25 Cal. 4th at 391 (registered owner of The Three Stooges act was permitted to sue an artist who sold lithographs and t-shirts created from his charcoal drawing of The Three Stooges); *No Doubt v. Activision Publ'g, Inc.*, 192 Cal. App. 4th 1018, 1023 (2011) (rock band No Doubt was permitted to sue video game company that used computer generated images of the band in its video game).

Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 25 of 30

SARVER V. CHARTIER                    25

Likewise, we have upheld actions involving celebrities challenging the use of their images in commercial advertising. *See, e.g.*, *Newcombe v. Adolf Coors Co.*, 157 F.3d 686, 691–94 (9th Cir. 1998) (California's right of publicity law applied to use of Dodgers pitcher Don Newcombe's image in printed beer advertisement); *White v. Samsung Elecs. Am., Inc.*, 971 F.2d 1395, 1397–99, 1401 n.3 (9th Cir. 1992) (same for use of Vanna White's likeness as a robot in an advertisement for VCRs). Although we have not explicitly applied *Zacchini* in these cases, our opinions indicate that the state's interest is in preventing "the exploitation of celebrity to sell products, and an attempt to take a free ride on a celebrity's celebrity value." *White*, 971 F.2d at 1401 n.3.[8]

In sum, our precedents have held that speech which either appropriates the economic value of a performance or persona or seeks to capitalize off a celebrity's image in commercial advertisements is unprotected by the First Amendment against a California right-of-publicity claim.

3

Such lines of cases are not applicable here.

First, *The Hurt Locker* is not speech proposing a commercial transaction. Accordingly, our precedents relying on the lesser protection afforded to commercial speech are

---

[8] In one case, we also upheld a right of publicity action brought by private individuals challenging the use of their photo in retail advertising under the less protective standards applicable to commercial speech. *See Downing*, 265 F.3d at 1001–02 & n.2. Because this case does not involve purely commercial speech, we do not opine on the scope of that holding.

inapposite. Second, and critically, unlike the plaintiffs in
*Zacchini*, *Hilton*, and *Keller*, Sarver did not "make the
investment required to produce a performance of interest to
the public," *Zacchini*, 433 U.S. at 576, or invest time and
money to build up economic value in a marketable
performance or identity. *Cf. Keller*, 724 F.3d at 1280–81.
Rather, Sarver is a private person who lived his life and
worked his job. Indeed, while Sarver's life and story may
have proven to be of public interest, Sarver has expressly
disavowed the notion that he sought to attract public attention
to himself. Neither the journalist who initially told Sarver's
story nor the movie that brought the story to life stole
Sarver's "entire act" or otherwise exploited the economic
value of any performance or persona he had worked to
develop. The state has no interest in giving Sarver an
economic incentive to live his life as he otherwise would.

In sum, *The Hurt Locker* is speech that is fully protected
by the First Amendment, which safeguards the storytellers
and artists who take the raw materials of life—including the
stories of real individuals, ordinary or extraordinary—and
transform them into art, be it articles, books, movies, or plays.
If California's right of publicity law applies in this case,[9] it is

---

[9] And it is not clear that California would extend its right of publicity to
Sarver's situation. In a case decided shortly after *Zacchini*, the California
Supreme Court barred a right of publicity action filed by the nephew of
actor Rudolph Valentino based upon the unauthorized exhibition of a
"fictionalized version" of Valentino's life on television, upon the
conclusion that such right "expires upon the death of the person so
protected." *Guglielmi v. Spelling-Goldberg Prods.*, 603 P.2d 454, 455
(Cal. 1979). But a concurring opinion joined by three of California's
seven Supreme Court justices (and implicitly approved by a fourth)
expressed broader doubt that the plaintiff could prevail even on the merits
of such a claim. The concurrence explained that, unlike in *Zacchini*, there

Case: 11-56986, 03/01/2016, ID: 9885718, DktEntry: 55-2, Page 28 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 54-1, Page 27 of 30

simply a content-based speech restriction. As such, it is presumptively unconstitutional, and cannot stand unless Sarver can show a compelling state interest in preventing the defendants' speech. Because Sarver cannot do so, applying California's right of publicity in this case would violate the First Amendment.

Accordingly, Sarver cannot "state and substantiate a legally sufficient" right of publicity claim, *Hilton*, 599 F.3d at 908, and the district court did not err in granting the defendants' anti-SLAPP motions regarding such claim.

## IV

Sarver also contends that his claims for defamation, false light, and intentional infliction of emotional distress were improperly dismissed.[10] We address each in turn.

*First*, to prevail on his defamation claim, Sarver must show that *The Hurt Locker* depicted him in a way that is "provably false" and which exposed him "to hatred, contempt, ridicule, or obloquy, or which cause[d] him to be

---

was no claim that the defendants secretly filmed Valentino's "performance" or otherwise stole his "entire act," so as to "undercut[] his ability to earn a living." *Id.* at 464 (Bird, C.J., concurring). The justices cautioned that the defendants' fictionalized portrayal of Valentino's life was entitled to greater First Amendment protection than the conduct in *Zacchini*, and explained that they wrote in an effort "to define one boundary of this state's common law right of publicity." *Id.*

[10] Because Sarver failed in his opening brief to argue any error concerning the dismissal of his breach of contract, fraud, and negligent misrepresentation claims, he has waived such arguments on appeal. *See United States v. Marcia-Acosta*, 780 F.3d 1244, 1250 (9th Cir. 2015).

shunned or avoided, or which ha[d] a tendency to injure him in his occupation." *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1047–48 (2008) (internal quotation marks omitted). Sarver contends that the film has interfered with his employment prospects because it portrayed him as a bad father, bereft of compassion, fascinated with war and death, and disobedient.

Sarver's allegations do not stand up in light of the film as a whole. We agree with the district court that a reasonable viewer of the film would be left with the conclusion that the character Will James was a heroic figure, albeit one struggling with certain internal conflicts. Directly contrary to Sarver's allegations, James exhibits compassion for various Iraqi citizens, including a young boy and a man trapped in a suicide vest; appears to care for and miss his son; and occasionally departs from military protocol in an effort to save human lives.[11] Even if Sarver is correct that certain aspects of Will James's character are unflattering, it does not support the conclusion that the film's overall depiction of James could reasonably be seen to defame Sarver.[12]

---

[11] Further, many of Sarver's allegations are not "provably false." For example, even if the film did show James to be fascinated with war or death, many of the scenes supposedly supporting such a conclusion resemble statements Sarver made to Boal, such as that Sarver "love[s]" working with explosives and that "[a]nything that goes boom" is "addictive."

[12] We do not agree with Sarver that the district court engaged in impermissible factfinding in reaching this conclusion. Under California law, it is a question of law for the court whether a challenged statement is reasonably susceptible to a defamatory interpretation. *See In re Sicroff*, 401 F.3d 1101, 1105 (9th Cir. 2005).

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 30 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 29 of 30

*Second*, to prevail on his false light invasion of privacy claim, Sarver must show that *The Hurt Locker* publicly portrayed him "in a false light that would be highly offensive to a reasonable person." *Price v. Operating Eng'rs Local Union No. 3*, 195 Cal. App. 4th 962, 970 (2011). This claim fails for the same reasons that Sarver's defamation claim does; we agree with the district court that, even if the film's portrayal of Sarver were somehow false, such depiction certainly would not "highly offend" a reasonable person.

*Finally*, to prevail on his claim for intentional infliction of emotional distress, Sarver must show that the defendants intentionally or recklessly caused him to suffer "severe or extreme emotional distress" through their "extreme and outrageous conduct." *Hughes v. Pair*, 209 P.3d 963, 976 (Cal. 2009). We agree with the district court that Sarver has not alleged facts sufficient to show that any portrayal of him in *The Hurt Locker* was the result of "extreme" or "outrageous" conduct that induced severe or extreme emotional distress.

Boal was embedded with Sarver's unit, interviewed Sarver, and ultimately published a factual account of those experiences. It is not outrageous that Boal's factual account then led to a fictionalized screenplay and film. This is especially true given Sarver's numerous allegations that the film did not transform his personality, but instead adhered closely to Boal's nonfiction account and Sarver's actual experiences. Although Sarver suggests the defendants made substantial use of his identity and persona, he has not alleged facts to support the notion that any such use was somehow "outrageous."

Case: 11-56986, 03/01/2016, ID: 9883718, DktEntry: 55-2, Page 31 of 31
Case: 11-56986, 02/17/2016, ID: 9867125, DktEntry: 48-1, Page 30 of 30

30                          SARVER V. CHARTIER

   In sum, we conclude that Sarver's false light invasion of
privacy, defamation, breach of contract, intentional infliction
of emotional distress, fraud, and constructive fraud/negligent
misrepresentation claims were properly dismissed.[13]

                                V

   The judgment of the district court is **AFFIRMED**.[14]

---

   [13] In addition, we reject as moot Sarver's challenge to the district court's
denial of his motion to stay execution and waive bond pending appeal.

   [14] The motion of Motion Picture Association of America, Inc. and
Entertainment Merchants Association for leave to file a brief as amici
curiae is granted.